UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

---------------------------------------------------------
JACK BOOTHE, Individually and on Behalf of      :
All Others Similarly Situated,                  :
320 West 76th Street                       :   Civil Action No. _____
New York, NY 10023                              :
                                                :
       Plaintiff,       :   **CLASS ACTION COMPLAINT FOR**
                                                :   **VIOLATIONS OF SECTIONS 14(a)**
v.                                              :   **AND 20(a) OF THE SECURITIES**
                                                :   **EXCHANGE ACT OF 1934**
NORTHSTAR REALTY FINANCE CORP.                  :
SERVE ON:                                       :   **JURY TRIAL DEMAND**
CSC-LAWYERS INCORPORATING                       :
SERVICE COMPANY                                 :
7 St. Paul Street                               :
Suite 820                                       :
Baltimore, MD 21202                             :
(Baltimore City)                                :
                                                :
DAVID T. HAMAMOTO                               :
c/o Northstar Realty Finance Corp.              :
399 Park Avenue                                 :
18th Floor                                 :
New York, NY 10022                              :
                                                :
JUDITH A. HANNAWAY                              :
c/o Northstar Realty Finance Corp.              :
399 Park Avenue                                 :
18th Floor                                 :
New York, NY 10022                              :
                                                :
WESLEY D. MINAMI                                :
c/o Northstar Realty Finance Corp.              :
399 Park Avenue                                 :
18th Floor                                 :
New York, NY 10022                              :
                                                :
LOUIS J. PAGLIA                                 :
c/o Northstar Realty Finance Corp.              :
399 Park Avenue                                 :
18th Floor                                 :
New York, NY 10022                              :
                                                :

|  |  |
|---|---|
| GREGORY RUSH | : |
| c/o Northstar Realty Finance Corp. | : |
| 399 Park Avenue | : |
| 18th Floor | : |
| New York, NY 10022 | : |
|  | : |
| AND | : |
|  | : |
| CHARLES W. SCHOENHERR | : |
| c/o Northstar Realty Finance Corp. | : |
| 399 Park Avenue | : |
| 18th Floor | : |
| New York, NY 10022 | : |
|  | : |
|  | : |
| Defendants. | : |

-----------------------------------------------------------

# CLASS ACTION COMPLAINT

Jack Boothe ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1. This is a class action brought by Plaintiff on behalf of himself and the other public stockholders of Northstar Realty Finance Corp. ("NRF" or the "Company"), other than Defendants and their affiliates, against NRF and the members of its board of directors (the "Board" or the "Individual Defendants," and together with NRF, the "Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between NRF, Colony Capital Inc. ("Colony"), and NorthStar Asset Management Group Inc.("NSAM") (the "Proposed Transaction").

1

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading joint proxy statement/prospectus (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC")[1]. The Proxy recommends that NRF stockholders vote in favor of the Proposed Transaction.  Under the Merger Agreement, NSAM will redomesticate to Maryland and elect to be treated as a REIT beginning in 2017, and NRF and Colony, through a series of transactions, will merge with and into the redomesticated NSAM, which will be renamed Colony Northstar, Inc.  NRF common stockholders will receive 1.0996 shares of Colony Northstar's common stock for each share of NRF common stock they own (the "Merger Consideration").  NSAM stockholders will continue to own one (1) share of Colony Northstar common stock for each share of NSAM common stock they previously owned.  Colony common stockholders will receive 1.4663 shares of Colony Northstar's common stock for each share of Colony common stock they own.  Upon completion of the Proposed Transaction, NRF stockholders will own 33.90% of the combined company.

3.     As discussed below, the Merger Consideration and the Proposed Transaction are fundamentally unfair to Plaintiff and the other common stockholders of NRF.  Simply put, the Board has agreed to a deal where NRF stockholders receive no premium for their shares and end up with a diluted ownership stake in a combined company that will be dragged down by the recent financial and corporate governance problems that have plagued Colony and NSAM.

4.     Defendants have now asked NRF's stockholders to support the Proposed Transaction in exchange for the inadequate Merger Consideration based upon the materially

---

[1] An initial joint proxy statement/prospectus was filed with the SEC on July 29, 2016. Defendants subsequently caused an amended joint proxy statement/prospectus to be filed with the SEC on September 15, 2016 and another amendment on November 14, 2016, which serves as the basis for the allegations contained herein.

incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for NRF, Colony and NSAM, which were relied upon by the Board in assessing the fairness of the Merger Consideration and by the Company's financial advisor, UBS Securities LLC ("UBS") in connection with preparing its fairness opinion; and (ii) certain information regarding the valuation analyses UBS performed in support of its fairness opinion.

5.  For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to NRF's stockholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.  Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.  Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an

3

effect in this District; (ii) NRF is incorporated in Maryland; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

9. Plaintiff is, and has been at all relevant times, the owner of NRF common stock and has held such shares since prior to the wrongs complained of herein.

10. Defendant NRF is a Maryland corporation. NRF is a diversified commercial real estate company that is organized as a REIT and is managed by an affiliate of NSAM. NRF's core business activities include acquiring commercial real estate properties, such as healthcare, hotels, manufactured housing communities, office and retail net lease and multifamily real estate.

11. Individual Defendant David T. Hamamoto ("Hamamoto") is, and has been at all relevant times, Chairman of the Board of NRF. Mr. Hamamoto previously served as Chief Executive Officer of NRF from October 2004 until August 2015 and as President from October 2004 until April 2011. Mr. Hamamoto has been Chairman of the board of directors of Northstar Realty Europe Corp. since October 2015 and has served as one of its directors since June 2015. Mr. Hamamoto also serves as Executive Chairman of NSAM since August 2015, a position he maintains as co-employee, having previously served as Chairman and Chief Executive Officer from January 2014 until August 2015. From 1983 to 1997, Mr. Hamamoto worked for Goldman, Sachs & Co. where he was co-head of the Real Estate Principal Investment Area and general partner of the firm between 1994 and 1997.

12. Individual Defendant Judith A. Hannaway ("Hannaway") has been a director of NRF since September 2004. Ms. Hannaway also serves as an independent director of NSAM since 2014, and Northstar Realty Europe Corp. since October 2015.

13. Individual Defendant Wesley D. Minami ("Minami") has been a director of NRF since September 2004. Mr. Minami also serves as an independent director of NSAM since June 2014 and a director of Northstar Realty Europe Corp. since October 2015. Mr. Minami serves as Principal of Billy Casper Golf LLC, a position he has held since March 2012, having previously served as its President since 2003.

14. Individual Defendant Louis J. Paglia ("Paglia") has been a director of NRF since February 2006. Mr. Paglia also serves as an independent director of NSAM, since 2014.

15. Individual Gregory Rush ("Rush") has been a director of NRF since March 2016. Mr. Rush serves as Managing Member of Rush Capital Partners LLC, an investment firm he founded in September 2015.

16. Individual Defendant Charles W. Schoenherr ("Schoenherr") has been a director of NRF since June 2014. Mr. Schoenherr also serves as a director of Northstar Realty Europe Corp., a position he has held since October 2015.

## SUBSTANTIVE ALLEGATIONS

**The Proposed Transaction Is Not In The Best Interests Of NRF Stockholders**

17. NRF is a diversified commercial real estate company that is organized as a REIT and is managed by an affiliate of NSAM. NRF's core business activities include acquiring commercial real estate properties, such as healthcare, hotels, manufactured housing communities, office and retail net lease and multifamily real estate. The Merger Consideration fails to adequately compensate NRF's stockholders in light of the Company's recent and historical

5

financial performance and strong growth prospects as shown in NRF's stock chart for the year to date.



18.     Despite NRF's strong stand-alone prospects, the Board has agreed to a three-way merger of purported "equals" with Colony and NSAM. If the Proposed Transaction is consummated, NRF's current stockholders will own only approximately 33.90% of the combined entity. Furthermore, if the Proposed Transaction is consummated, NRF's executives will receive significant amounts in executive compensation, money which otherwise would have remained in the coffers of the combined company.

19.     In sum, NRF is well-positioned to generate significant earnings in the foreseeable future. Despite NRF's bright financial prospects, the Board has now agreed to combine the Company with potential two weaker entities and without obtaining an adequate premium for the Company's stockholders. It is therefore imperative that NRF stockholders receive all material information concerning the Proposed Transaction, so that they may properly evaluate whether or not it is in their best interests.

6

**The Materially Incomplete and Misleading Proxy**

20.  Defendants caused the Proxy to be filed with the SEC, and the Proxy has been published on the SEC's online Edgar database. The information contained in the Proxy has thus been disseminated to NRF stockholders to solicit their vote in favor of the Proposed Transaction. The Proxy omits certain material information concerning the fairness of the Proposed Transaction and Merger Consideration. Without such information, NRF stockholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

21.  The sections of the Proxy summarizing NRF's financial projections are misleading because they fail to disclose the line item projections for the adjustments that were made to the various non-GAAP financial projections that are disclosed.

22.  With respect to the "Certain Unaudited Prospective Financial Information of NRF" section of the Proxy at page 207, the Proxy includes NRF's non-GAAP projections for NOI & Other Revenue, EBITDA before Equity-Comp, and CAD. The Proxy then describes the various adjustments that were made to these non-GAAP measures, but fails to disclose the line item projections for the adjustments.

23.  With respect to NRF's projections for NOI, the Proxy states that "NRF defines Net Operating Income, or NOI, as total property and related revenues, adjusted for: (i) amortization of above/below market rent; (ii) straight line rent; (iii) other metrics such as adjustments related to joint ventures, cash flow related to community fees and non-recurring bad debt expense; and (iv) less property operating expenses. **However, the usefulness of NOI is limited because it excludes general and administrative costs, interest expense, transaction costs, depreciation and amortization expense, realized gains (losses) from the sale of properties and other metrics under GAAP and capital expenditures and leasing costs**

7

**necessary to maintain the operating performance of properties, all of which may be significant economic costs. NOI may fail to capture significant trends in these components of GAAP net income (loss) which further limits its usefulness**." In other words, the Proxy tells stockholders trying to assess the fairness of the Proposed Transaction and make sense of NRF's financial projections that the disclosed projections are actually useless to them, and further fails to provide them with the projections that would allow them to make sense of the useless and misleading projections that are included in the Proxy.

24. With respect to NRF's projections for "Other Revenue" the Proxy notes that "NRF defines Other Revenue as net interest income derived from: (i) real estate debt investments; (ii) real estate securities; and (iii) equity in earnings from investments in unconsolidated ventures. NRF recognizes interest income from real estate securities using the effective interest method with any premium or discount amortized or accreted through earnings based on expected cash flow through the expected maturity date of the security. Unconsolidated ownership interest in an entity may be accounted for using the equity method, at fair value or the cost method. NRF elected the fair value option for its investments (directly or indirectly in joint ventures) that own limited partnership interests in real estate private equity funds and certain investments in unconsolidated ventures." None of the projections for the metrics used to calculate the non-GAAP metric "Other Revenue" are disclosed.

25. With respect to NRF's projections for "EBITDA before Equity-Comp", another non-GAAP financial measure which was then further uniquely adjusted by NRF, the Proxy states that "NRF defines EBITDA before Equity-Comp as NOI and Other Revenue less general and administrative expenses, straight line rent and above/below market lease adjustments. Cash general and administrative expenses include the annual management fee, salaries and related

8

expenses and other general and administrative expenses and exclude equity-based compensation expense." None of the projections for the metrics used to calculate the non-GAAP metric "EBITDA before Equity-Comp" are disclosed.

26. With respect to NRF's projections for CAD, the Proxy notes that "CAD should not be considered as an alternative to net income (loss) attributable to common stockholders, determined in accordance with GAAP, as an indicator of operating performance." Net income projections are not disclosed in the Proxy, however. The Proxy goes on to state that " NRF defines CAD by subtracting from or adding to net income (loss) attributable to common stockholders, non-controlling interests and the following metrics: depreciation and amortization metrics including depreciation and amortization, straight-line rental income or expense (excluding amortization of rent free periods), amortization of above/below market leases, amortization of deferred financing costs, amortization of discount on financings and other and equity-based compensation; cash flow related to N-Star CDO equity interests; accretion of consolidated N-Star CDO bond discounts; non-cash net interest income in consolidated N-Star CDOs; unrealized gain (loss) from the change in fair value; realized gain (loss) on investments and other, excluding accelerated amortization related to sales of CDO bonds or other investments; provision for loan losses, net; impairment on depreciable property; non-recurring bad debt expense; deferred tax benefit (expense); acquisition gains or losses; distributions and adjustments related to joint venture partners; transaction costs; foreign currency gains (losses); impairment on goodwill and other intangible assets; gains (losses) on sales; and one-time events pursuant to changes in GAAP and certain other non-recurring metrics." None of the projections for the metrics used to calculate the non-GAAP metric "CAD" are disclosed.

27.     In sum, the Proxy provides stockholders with a hodge-podge of various non-GAAP financial projections, each of which are inherently misleading and none of which stockholders can actually use or rely on to make sense of the information that is disclosed in the Proxy or to assess the fairness of the Proposed Transaction.  By way of example, with respect to NSAM's and NRF's projections for CAD, the Proxy notes that their "**methodology for calculating CAD involves subjective judgment and discretion and may differ from the methodologies used by other comparable companies, including other REITs, when calculating the same or similar supplemental financial measures and may not be comparable with these companies**."  CAD projections are not included in the Proxy for Colony.

28.     In other words, each company involved in the Proposed Transaction has their own unique ways of preparing their various non-GAAP projections, and stockholders are left scratching their heads trying to make sense of it all.  Indeed, the inconsistencies between the projections disclosed in the Proxy for each company impede stockholders from assessing the relative valuations of each company and the fairness of the exchange ratios; stockholders simply cannot accurately compare Colony's projections for Net Revenue, EBITDA, or Core FFO with NRF's projections for NOI & Other Revenue, EBITDA before Equity-Comp, and CAD or with NSAM's projections for Net Revenue, EBITDA or CAD, because doing so based on the currently disclosed projections would be comparing apples to oranges.  The line item projections for the various adjustments that were made to each of Colony's, NRF's and NSAM's financial projections must be disclosed to stockholders in order to make the currently disclosed projections not misleading.

10

29.     The SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses material information in a Proxy that includes non-GAAP financial measures, the Company must also disclose that non-GAAP financial measure along with comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

30.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with stockholders.  The SEC Chair, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Colony and NorthStar have included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

---

[2] *See* Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), www.sec.gov/news/speech/chair-white-icgn-speech.html#_ftnref38 (emphasis added) (footnotes omitted).

11

31.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[3]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.  The above-referenced line item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to stockholders.

32.     The Proxy also fails to disclose the unlevered, after-tax free cash flows that Colony, NRF and NSAM were forecasted to generate through 2018.  Proxy at 186.  Cash flow projections are amongst the most important valuation metrics when attempting to value a company.  The omission of the cash flow projections from the Proxy render the Proxy's summary of each company's financial projections materially incomplete and therefore misleading.

33.     Lastly, the Proxy fails to disclose the projected standalone quarterly dividend payments to be received by holders of NRF common stock from June 30, 2016 through December 31, 2018 based on projections received from the management of NRF.  Proxy at 157.

---

[3] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

Such projections are material to NRF stockholders and necessary for them to assess the fairness of the Merger Consideration. The omission of such projections from the Proxy render the Proxy's summary of NRF's financial projections materially incomplete and therefore misleading.

34. Based on the foregoing disclosure deficiencies in the Proxy, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that NRF stockholders will suffer if they are required to vote on the Proposed Transaction without the above-referenced material misstatements and omissions being remedied.

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of NRF common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

36. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable. As of September 1, 2016, there were over 182 million outstanding shares of NRF common stock. The holders of these shares are believed to be geographically dispersed throughout the United States;

(b) There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

  i. Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

  ii. Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

13

    iii. Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Transaction based upon a Definitive Proxy that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated.

  (c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

  (d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

  (e) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

  (f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

  (g) A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

  37. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

38. Defendants have filed the Proxy with the SEC with the intention of soliciting NRF shareholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

39. In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of NRF, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

40. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

41. Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the financial projections for NRF, Colony, and NSAM, which were relied upon by the Board in assessing the fairness of the Merger Consideration and by UBS in connection with preparing its fairness opinion; and (ii) certain information regarding the valuation analyses UBS performed in support of its fairness opinion.

42. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. The Proxy makes clear that the Individual Defendants reviewed and relied upon the omitted information identified above in connection with their

decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. The Individual Defendants were therefore negligent in preparing and reviewing the Proxy.

43. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. The Individual Defendants acted as controlling persons of NRF within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Colony and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

46. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

47. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

48. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

49. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

50. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

51. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with the NRF shareholder vote on the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 18, 2016

        **BROWER PIVEN**
        A Professional Corporation

        <u>/s/ Yelena Trepetin</u>
        Charles J. Piven (Md. Fed. Bar No. 00967)
        Email: piven@browerpiven.com
        Yelena Trepetin (Md. Fed. Bar No. 28706)
        Email: trepetin@browerpiven.com
        1925 Old Valley Road
        Stevenson, MD 21153
        Tel: (410) 332-0030
        Fax: (410) 685-1300

        Nadeem Faruqi
        James M. Wilson, Jr.
        **FARUQI & FARUQI, LLP**
        685 Third Avenue, 26th Floor
        New York, NY 10017
        Tel: 212-983-9330
        Fax: 212-983-9331

        *Counsel for Plaintiff*