## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM CARTER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16-cv-03282-JKB |
| v. | ) ) | |
| COLONY CAPITAL, INC., *et al.* | ) ) | |
| Defendants. | ) ) ) | |
| JACK BOOTHE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16-cv-03742-JKB |
| v. | ) ) | |
| NORTHSTAR REALTY FINANCE CORP., *et al.* | ) ) ) ) | |
| Defendants. | ) ) | |
| CINDY KESSLER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16-cv-03745-JKB |
| v. | ) ) | |
| NORTHSTAR ASSET MANAGEMENT GROUP, INC., *et al.* | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THE RENEWED
JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS
FILED IN EACH OF THE ABOVE-REFERENCED ACTIONS**

**BROWER PIVEN, A**
**Professional Corporation**
Charles J. Piven
Yelena Trepetin
1925 Old Valley Road
Stevenson, MD 21153
Tel: (410) 332-0030
Fax: (410) 685-1300

*Attorneys for Plaintiffs William Carter,*
*Jack Boothe and Cindy Kessler*


Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331

*Attorneys for Plaintiff Jack Boothe*


**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 971-1341

*Attorneys for Plaintiff William Carter*


Guri Ademi
Shpetim Ademi
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave.
Cudahy, WI 53110
Tel: (414) 482 -8000
Fax: (414) 482-8001

*Attorneys for Plaintiff Cindy Kessler*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................... 1

PLAINTIFFS' COUNSEL ACHIEVED SIGNIFICANT EQUITABLE...................................... 2

RELIEF FOR THE CLASSES ON AN EXPEDITED BASIS, FOLLOWED BY A
    THOROUGH INVESTIGATION OF ADDITIONAL CLAIMS THE RENWED FEE
    AND EXPENSE REQUESTS SHOULD BE  APPROVED BASED ON THE
    STANDARDS ADOPTED BY THE FOURTH CIRCUIT................................. 4

    A.    Contingency of the Fee is a Significant Factor (Factor 6) .................................... 5

    B.    The Award Sought is Commensurate with the Results Obtained (Factor 8).......... 7

        1.    Plaintiffs Obtained the Primary Result Sought........................................... 8

        2.    The Results Achieved Benefitted the Classes and Merits Approval of
            the Revised Fee ........................................................................................ 9

    C.    The Revised Fees are Customary for this Type of Work and Litigation
        (Factors 5 & 12)................................................................................................. 13

    D.    Time and Labor Expended (Factor 1).................................................................. 14

    E.    The Novelty and Difficulty of Questions Raised by the Litigation (Factor 2),
        the Skill Required to Properly Perform the Legal Services Rendered
        (Factor 3), and the Time Limitations Imposed by the Circumstances
        (Factor 7)............................................................................................................ 15

    F.    Opportunity Cost Due to Acceptance of these Cases (Factor 4) .......................... 16

    G.    Experience, Reputation and Ability of Plaintiffs' Counsel (Factor 9).................. 17

THE REVISED FEE AND EXPENSE AWARD IS REASONABLE UNDER A
    LODESTAR ANALYSIS  APPLYING THE LOCAL RULES' GUIDELINES IN
    APPENDIX B ............................................................................... 18

    A.    The Revised Fee Requests are Reasonable Measured Against Plaintiffs'
        Counsels' Lodestar............................................................................................. 18

PLAINTIFFS RENEW THE MOTION THAT THE CLASS BE CERTIFIED FOR
    SETTLEMENT PURPOSES .......................................................... 21

CONCLUSION.............................................................................. 22

## PRELIMINARY STATEMENT

Plaintiffs[1], by their undersigned attorneys, respectfully submit this Joint Memorandum of Law in Support of their Renewed Joint Motion for Final Approval of Class Action Settlements ("Renewed Motion").[2]  Plaintiffs submit this Renewed Motion pursuant to the Court's October 27, 2017 Memorandum and Order ("October 27 Order") (ECF No. 29 in the *Colony* Action; ECF No. 25 in the *NRF* Action; ECF No. 32 in the *NSAM* Action) entered after the final approval hearing ("Final Approval Hearing") to address the following issues in support of a total fee and expense award of $987,196.50: (i) the short period of time between the filing of suit and the objectives achieved; (ii) the outcome of the case in relation to the fee sought; and (iii) information regarding counsel's fees and expenses consistent with the standards set forth in *In re Abrams & Abrams*, 605 F.3d 238, 244 (4th Cir. 2010) and the methodology set out in this Court's Rules and Guidelines for Determining Attorneys' Fees in Certain Cases (" Appendix B").[3]

---

[1]     Plaintiff Carter and Colony Capital shareholders are represented by Monteverde & Associates PC; Plaintiff Kessler and NSAM shareholders are represented by Ademi & O'Reilly, LLP; and Plaintiff Boothe and NRF shareholders are represented by Faruqi & Faruqi, LLP. Brower Piven, P.C. has acted as liaison counsel in each Action ("Plaintiffs' Counsel").

[2]     Plaintiffs incorporate by reference the prior filings made in support of their motion for final approval of the proposed settlements in these Actions ("Motion for Final Approval") (ECF Nos. 21 to 21-4 in the *Colony* Action; ECF Nos. 14 to 14-4 in the *NRF* Action; ECF Nos. 17 to 17-4 in *NSAM* Action), response to the objections ("Response") (ECF Nos. 26 to 26-6 in the *Colony* Docket; ECF Nos. 23 to 23-6 in *NRF* Action; ECF Nos. 28 to 28-6 in *NSAM* Action).  All capitalized terms that are not otherwise defined herein shall have the same definitions as set forth in the Motion for Final Approval.

[3]     Plaintiffs continue to assert that Appendix B rates should not apply here because "the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials", *In re Microstrategy, Inc. Securities Litigation*, 172 F. Supp. 2d 778, 788-788 & n.33 (E.D. Va. 2001), and the non-binding Appendix B rates are more appropriate in cases involving public institutions in which taxpayers ultimately bear the fee, not private parties. *See e.g., Dillon v. Maryland-National Capital Park & Planning Comm'n*, No. WGC-04-994, 2007 U.S. Dist. LEXIS 94000, at *34 (D. Md. Mar. 9, 2007) (fee petition for claims brought against a Maryland state agency); *In re Mkt. Ctr. E. Retail Prop., Inc.*, 730 F.3d 1239, 1247 (10th Cir. 2013) (rejecting argument that lodestar should not be enhanced by multiplier in actions where fees are

**PLAINTIFFS' COUNSEL ACHIEVED SIGNIFICANT EQUITABLE
RELIEF FOR THE CLASSES ON AN EXPEDITED BASIS, FOLLOWED
BY A THOROUGH INVESTIGATION OF ADDITIONAL CLAIMS**

The proposed Settlements should be approved in view of the significant benefits obtained

for each Class and the lack of any viable additional claims to pursue regarding the Transaction.

These cases were brought under Section 14(a) of the Securities Exchange Act of 1934

("Exchange Act") based on the joint proxy statement/prospectus issued by Colony Capital, NSAM,

and NRF ("Proxy Statement") to each company's shareholders.  Plaintiffs alleged that the Proxy

Statement was false and/or misleading in violation of Section 14(a) due to the following material

omissions and/or deficiencies: (i) incorrect financial metrics that were utilized by NSAM's

financial advisor Goldman Sachs & Co. ("Goldman Sachs") to opine to NSAM's board of directors

that the Merger Consideration was fair; and (ii) the omission of projections that were necessary to

properly assess the non-GAAP (generally accepted accounting principles) financial measures for

each company included in the Proxy Statement.  As discussed with the Court at the Final Approval

Hearing, Plaintiffs sought equitable relief in the form of a corrected Proxy Statement prior to the

shareholders' votes.

The determination that the financial metrics and complex valuation analyses in the Proxy

Statement[4] (a hundreds-page long document concerning three separate entities participating in a

merger of equals) were false and/or misleading required extensive review by Plaintiffs' Counsel.

Further, the review of the Proxy Statement and various other SEC filings and public information

---

borne by private parties instead of taxpayers).  Regardless, as set forth below, the requested fees
are reasonable applying either the requested hourly rates or those set forth in Appendix B.

[4]     Defendants filed three amended Proxy Statements on September 15, October 17 and
November 14, 2016, each of which had to be reviewed to determine if Defendants addressed the
Section 14(a) allegations.

related to the Transaction had to be performed on a truncated basis in view of the fact that a vote date was imminent.  Indeed, shortly after the filing of the Kessler Complaint (for the NSAM shareholders) and Boothe Complaint (for the NRF shareholders) on November 18, 2016, Defendants set December 20, 2016 as the date for the special meetings at which shareholders would cast their votes regarding the Transaction.

When the vote date was established, Plaintiffs' Counsel moved quickly to enjoin the Transaction unless and until the material deficiencies in the Proxy Statement were corrected. As discussed with the Court at the Final Approval Hearing, an agreement on the substance of the corrected and supplemented Proxy Statement was reached after hard fought negotiations over several days.  However, the agreement on the Supplemental Disclosures did not end the cases.[5] To be clear, the entry into the Memorandums of Understanding ("MOU") on December 9, 2016 was not a settlement, but rather was the beginning of the next stage of the litigation.  The MOU reflected the conditions that had to be met to proceed with a settlement, which included the production of discovery and taking two depositions in each case (a board member and a financial advisor) sufficient for Plaintiffs' Counsel to determine if there were additional viable claims pertaining to the Transaction and whether the dissemination of the Supplemental Disclosures was a fair and adequate basis to settle claims.  This additional investigation into claims (which involved

---

[5]     Moreover, even if, as recognized by the Court, Plaintiffs' objectives were achieved in a short period of time, the Fourth Circuit Court of Appeals has made clear that a plaintiff's counsel working solely on a contingency basis should not be penalized with a fee reduction for comprehending strategic implications of defendant's positions that can work to plaintiff's advantage, resulting in a quick settlement. *In re Abrams & Abrams*, 605 F.3d at 248; *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002) ("We do not mean to imply that class counsel should necessarily receive a lesser fee for settling a case quickly; in many instances, it may be a relevant circumstance that counsel achieved a timely result for class members in need of immediate relief.").

the examination of internal financial information prepared by the financial advisors and presented

to each Company's board of directors) was conducted primarily from April through June 2017.

Thereafter, the parties reached the terms of a final settlement.  As pointed out to the Court at the

Final Approval Hearing, the terms of the Settlement Agreement, including the scope of the release

of claims, were reached *prior to* an agreement on the payment by Defendants of the requested

attorney's fees and expenses.[6]

In sum, Plaintiffs' Counsel worked diligently in a truncated period of time to ensure that

each company's shareholders had the material information they needed to cast an informed vote

regarding the Transaction, and thereafter conducted significant additional work during the

discovery process to investigate whether there were any additional claims related to the

Transaction that warranted pursuing.  The benefits obtained for the Classes, both as a result of the

Supplemental Disclosures and the discovery process, warrant approving the proposed Settlements

and the revised requested fee and expense awards.  As discussed below, when the benefits obtained

for the Classes and all the additional applicable factors are analyzed, the revised requested fee and

expense awards in the aggregate for $987,196.50 is fair and reasonable and allocated as follows:

(i) $321,721.55 in the *Colony Capital* Action; (ii) $328,315.81 in the *NRF* Action; and (iii)

$337,159.14 in the *NSAM* Action ("the Fee and Expense Awards").

## THE RENWED FEE AND EXPENSE REQUESTS SHOULD BE
## APPROVED BASED ON THE STANDARDS ADOPTED BY THE FOURTH CIRCUIT

The Fee and Expense Awards in each of these cases is reasonable under the factors adopted

by the Fourth Circuit Court of Appeals.  *See* Fed. R. Civ. P. 23(h) ("[i]n a certified class action,

---

[6]     This fact is important to the Court's review of the revised fee applications. *See Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 U.S. Dist. LEXIS 15609, at *48 (N.D. Cal. Feb. 5, 2013) (noting that party agreeing to pay attorneys' fees as part of settlement has one "ultimate objective - paying as little as possible. . . .").

the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or

by the parties' agreement."); *see In re Abrams & Abrams*, 605 F.3d at 244 (directing district courts

to follow the twelve factors set forth in *Johnson v. Georgia highway Express, Inc.,* 488 F.2d 714,

717-19 (5th Cir. 1974) as adopted in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir. 1978)

(applied to an action under the fee-shifting Truth in Lending Act) and *Allen v. U.S.,* 606 F.2d 432,

433 n.1 (4th Cir. 1979) (applied when fee request is based on a private fee agreement)).

In *In re Abrams & Abrams*, the Fourth Circuit reiterated the factors that district courts

should consider when assessing a fee request:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

605 F.3d at 244, citing *Allen*, 606 F.2d at 436 n. 1.[7]

## A.     Contingency of the Fee is a Significant Factor (Factor 6)

The Court should give considerable weight to the fact that each firm in these cases

undertook representation on a contingency basis.[8]

As the Fourth Circuit long ago recognized:

> The contingency of compensation . . . is highly relevant in the appraisal of the reasonableness of any fee claim. The effective lawyer will not win all of his cases, and any determination of the

---

[7]     Although some factors may not apply in every case, those that do should be examined. *In re Abrams & Abrams*, 605 F.3d at 244.

[8]     Factor 10, the undesirability of the action, is relevant only to the extent that the contingency element of these putative class actions represents excessive risk for many firms. Additionally, Factor 11, the nature and length of the professional relationship with the client, should not be considered, as the litigation centered on a Transaction that was first announced on June 3, 2016.

> reasonableness of his fees in those cases in which his client prevails
> must take account of the lawyer's risk of receiving nothing for his
> services.  Charges on the basis of a minimal hourly rate are surely
> inappropriate for a lawyer who has performed creditably when
> payment of any fee is so uncertain.

*McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967).  The significance of this factor has been

reaffirmed on numerous occasions. Indeed, in *In re Abrams & Abrams*, the Fourth Circuit

emphasized the importance of this factor – which allows access to the courts to those not otherwise

able to pursue claims, and transfers significant risk onto plaintiff's counsel.  As the Fourth Circuit

explained in holding that a district court failed to properly factor the contingent nature of the fee

into its analysis:

> [C]ontingency fees provide access to counsel for individuals who
> would otherwise have difficulty obtaining representation . . . . [I]t
> may be necessary to provide a greater return than an hourly fee
> offers to induce lawyers to take on representation for which they
> might never be paid . . . . In other words, plaintiffs may find it
> difficult to obtain representation if attorneys know their reward for
> accepting a contingency case is merely payment at the same rate
> they could obtain risk-free for hourly work, while their downside is
> no payment whatsoever.[9]

605 F.3d at 245-46.

Other courts have similarly emphasized the significance of the risks assumed by plaintiff's

counsel in contingency cases, including those cases where a resolution is achieved early in the

litigation:

> Here the district court erred in basing its denial of a risk multiplier
> on the fact that the parties settled at a relatively early stage in the
> litigation.  The point at which plaintiffs settle with defendants (or
> win a judgment against defendants) is simply not relevant to
> determining the risks incurred by their counsel in agreeing to
> represent them . . . . when attorneys' receipt of payment is contingent

---

[9]     Importantly in this regard, the fee guidelines of Appendix B do not account for any risks
assumed by counsel in contingency cases, and as far as negotiated fee agreements between private
parties are concerned, Appendix B veers far from the Fourth Circuit's directions. *See In re Abrams
& Abrams*, 605 F.3d at 246.

> on the success of the litigation, reasonable compensation may
> demand more than the hourly rate multiplied by the hours worked,
> for that is exactly what the attorneys would have earned from clients
> who agreed to pay for services regardless of success. Thus, to
> account for the contingent nature of the compensation, a court
> should assess the riskiness of litigation.

*Skelton v. General Motors Corp.*, 860 F.2d 250, 257-58 (7th Cir. 1988) (emphasis added); *see also*

*In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001) ("to reward lead

counsel for the favorable result achieved for the class and to provide an incentive for competent

lawyers to pursue such actions in the future on an essentially contingent basis, the ultimate award

must be substantially greater than the lodestar figure."); *In re Schering-Plough/Merck Merger*, No.

09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121, at *55-58 (D.N.J. Mar. 26, 2010) (applying

multiplier of 2.18 in disclosure-only settlement and noting that a multiplier of 3 may be awarded

even in "a simple case where no risks pertaining to liability or collection were pertinent," and that

"the application of a multiplier of 2.18 is not uncommon where the lodestar method is applied.")

(internal quotation marks omitted).

In this case, the Court should give considerable weight to the fact that each of Plaintiffs'

Counsel undertook representation on a contingency fee basis on behalf of relatively small

shareholders who would have been unable to pay for experienced counsel to protect their corporate

suffrage rights and investigate the fairness of the Transaction.  Plaintiff's Counsel risked receiving

nothing for their work had they been unable to procure the material disclosures.

## B.      The Award Sought is Commensurate with the Results Obtained (Factor 8)

As mentioned above, Plaintiffs in each case alleged that the Defendants' solicitation

materials were false and/or misleading in violation of Section 14(a) of the Exchange Act and

sought primarily to obtain injunctive relief – either to compel the issuance of the Supplemental

Disclosures prior to the vote, or postpone the vote until those disclosures were made – to ensure a

fully informed vote could occur.  "[T]he promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue." *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores*, 54 F.3d 69, 72 (2d Cir. 1995); *see also Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975) (finding fee award warranted where litigation caused company to disclose financial statements).  Plaintiffs obtained the primary relief sought, and the revised fee award is more than reasonable based on the material equitable benefit achieved for the Classes.

### 1.    Plaintiffs Obtained the Primary Result Sought

Where there are material deficiencies in solicitation documents seeking shareholder approval, the preferred remedy is disclosure before the merger.  *See, e.g., Aron v. Crestwood Midstream Partners LP*, No. 4:15-CV-1367, 2016 U.S. Dist. LEXIS 152427, at *11 (S.D. Tex. Oct. 14, 2016) ("In Section 14(a) cases concerning non-disclosure in proxy statements, plaintiffs are made whole where the company fully and adequately discloses material facts before the shareholder vote."); *Nowling v. Aero Servs. Int'l, Inc.*, 734 F. Supp. 733, 741 (E.D. La. Apr. 4, 1990) (finding that injunctive relief is appropriate for Section 14(a) claims involving omissions from a proxy statement).

Plaintiffs sought to obtain the Supplemental Disclosures prior to the December 20, 2016 shareholder vote, as forcing shareholders to vote based on the false and misleading Proxy Statement would have caused them to suffer irreparable harm.  As argued to the Court in their Motion for Preliminary Injunction (ECF Nos. 4 to 4-4 in the *Colony* Action; ECF Nos. 3 to 3-4 in the *NRF* Action; ECF Nos. 3 to 3-4 in the *NSAM* Action), "when it appears likely that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer

is consummated." *Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250-51 (2d Cir. 1973); *Chambers v. Briggs & Stratton Corp.*, 863 F. Supp. 900, 905 (E.D. Wis. 1994) ("Since the defendant's proxy statement contained a material omission, the shareholder vote will go forward on the basis of potentially misleading information unless the court grants the plaintiff's request for injunctive relief.  The Supreme Court has recognized that 'use of solicitation which is materially misleading poses the kind of irreparable injury to stockholders which can justify injunctive relief prior to a shareholder's meeting.'") (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383 (1970)).

### 2.      The Results Achieved Benefitted the Classes and Merits Approval of the Revised Fee

Recognizing that the Exchange Act's "fundamental purpose" is to ensure "full disclosure," *Hunt v. Robinson*, 852 F.2d 786, 787 (4th Cir. 1988), courts have consistently approved settlements and fee awards where corporations agree to provide shareholders with previously withheld material information concerning a corporate transaction in exchange for a release of unviable or mooted fiduciary duty and federal securities law claims related to the transaction.  *See infra* § C. Here, the shareholders of Colony Capital, NSAM and NRF received previously undisclosed material information that was omitted from the Proxy Statement.[10]

The Supplemental Disclosures have been discussed at length in the Motion for Final Approval and the Response, and were discussed with the Court at the Final Approval Hearing. (Motion for Final Approval 13-21; Response 4-9; Tr. of Fairness Hr'g 11-12, 46).  Briefly, they revealed that the estimates of NSAM's levered free cash flows for the second quarter of 2016

---

[10]      A fee award is appropriate under the "common benefit" doctrine when a plaintiff obtains a common benefit for shareholders, such as enhancing proxy disclosures.  *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970); *Schering-Plough/Merck Merger Litig.*, 2010 U.S. Dist. LEXIS 29121, at *47 (awarding $3.5 million fee in disclosure-only settlement because "a common benefit was rendered and a fee award is appropriate.").

through the fourth quarter of 2016 used in the *Illustrative Discounted Cash Flow Analysis* ("DCF") of NSAM did not reflect NSAM's financial forecasts, which error caused certain calculations performed by Goldman Sachs to support its fairness opinion, as summarized in the Proxy Statement, to be incorrect: (i) the range of illustrative present values derived from the DCF analyses; (ii) the range of NSAM's equity percentage of the combined pro forma company resulting from the leveraged discounted cash flow and dividend discount model contribution analysis; and (iii) the range of implied equity values resulting from the illustrative NSAM's standalone levered discounted cash flow to illustrative dividend discount model analysis. The Supplemental Disclosures corrected the NSAM estimates and calculations in the valuation analyses, and were clearly material. *See e.g., In re Pure Res. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) ("The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result."); *In re The Topps Co. S'holders Litig.*, 926 A.2d 58, 76-77 (Del. Ch. 2007) (financial advisor's changes to valuation were not explained and the proxy statement was therefore materially misleading).

Plaintiffs also alleged that Defendants' failure to reconcile certain of management's non-GAAP projected financial measures to the most equivalent GAAP measure in the Proxy Statement violated SEC Regulation G, which mandates that when an issuer discloses a non-GAAP measure, the issuer must provide reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). The newly disclosed projected financial measures were material to each company's shareholders, and were necessary to properly understand the non-GAAP measures in the Proxy. *See e.g., Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493, at *15-16 (D. Or. Mar. 20, 2017) (collecting cases and explaining "[t]he established case law shows the importance (and,

hence, materiality) of financial projections to shareholders' decision-making.")); *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, at *70 (C.D. Cal. June 17, 2010) ("A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. There is a substantial likelihood that a reasonable shareholder would consider it important in making his decision") (internal quotation marks omitted); *Schulein v. Petroleum Dev. Corp.*, No. SACV 11-1891 AG (ANx), 2014 U.S. Dist. LEXIS 71236, at *19 (C.D. Cal. May 19, 2014) (same).  Further, "if a Proxy discloses valuation information, it must be complete and accurate."  *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013) (quoting *Brown*, 2010 U.S. Dist. LEXIS 60863, at *69-70); *see SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 707 (D.D.C. 1978) ("[i]n a merger transaction such as that presented here, accurate financial information is necessary in order for a shareholder fairly to be able to vote."); *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (material facts "include any fact 'which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities.'"). The Supplemental Disclosures provided a reconciliation of certain critical non-GAAP financial metrics to their most comparable GAAP equivalents in the financial projections for Colony Capital, NSAM and NRF, respectively.

In sum, the Settlements provided the Classes with the precise relief that Plaintiffs sought to obtain and *were* the exact same as the "reward[] the class would have received following a successful" litigation outcome.  *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).  The Supplemental Disclosures were necessary to properly demonstrate the value of each company's prospects in relation to the Merger Consideration, *i.e.,* to inform shareholders of what they were giving up in exchange for the Merger Consideration.  Courts across the country have uniformly recognized such information is beneficial to shareholders.  As set forth at length in the

Affidavit of Plaintiffs' Valuation and Financial Expert, M. Travis Keath, CFA, CPA/ABV ("Keath Aff.") (ECF No. 21-2 in the *Colony* Action; ECF No. 14-2 in the *NRF* Action; ECF No. 17-2 in the *NSAM* Action):

> **[T]he Supplemental Disclosures provided material additional information necessary to further stockholders' understanding of key financial information and pricing calculations related to the Merger. As such, the Supplemental Disclosures represented a substantial benefit to the respective stockholders of Colony Capital, NSAM and NRF in their evaluation of the Merger and the sufficiency of the Merger Consideration.**

Keath Aff. ¶ 19 (emphasis added).

Further, the Settlements entitled Plaintiffs, on behalf of the Classes, to conduct discovery and independently vet the fairness of the Transaction to each group of shareholders. Courts have recognized this process, by which "the merits of the proposed merger have been independently vetted and revealed to the class members", also constitutes a benefit to shareholders. *Brody v. Catell*, No. 8835/06, 2007 N.Y. Misc. LEXIS 4647, at *22 (N.Y. Sup. Ct. June 27, 2007) ("The Settlement does not afford a monetary return to the plaintiff class. However, through the efforts of plaintiffs' counsel, the merits of the proposed merger have been independently vetted and revealed to the class members, who have determined that it is desirable and provides a favorable return on their investment. Such benefit is both sufficient and meaningful."); *Jiannaras v. Alfant*, No. 21262/09, 2012 N.Y. Misc. LEXIS 6692, at *21-22 (N.Y. Sup. Ct. Jan. 10, 2012) (same); *see also Schering-Plough/Merck Merger Litig.*, 2010 U.S. Dist. LEXIS 29121, at *55-58 (approving agreed to fee of $3.5 million in disclosure-only settlement where lodestar included time spent on discovery conducted after the dissemination of the supplemental information). The additional benefit of discovery to independently vet the Transaction was meaningful to the Classes, particularly in light

of the significant information asymmetry problems shareholders face in assessing the fairness of

major corporate transactions.  As one legal scholar recently explained:

> Shareholders also face acute AIPs [asymmetrical information
> problems] when they decide whether they should file lawsuits and
> when they prosecute such lawsuits. The most sensitive and delicate
> facts crucial to the court's determination on the merits of the
> shareholders' fiduciary duty claims against Gatekeepers are in the
> hands (or minds) of the fiduciaries or those on the fiduciaries' side.
> Shareholders are not necessarily privy to the intricacies of the
> Gatekeepers' decision-making processes during the Gatekeeping
> Phase. Of course, extensive disclosures may be made to the public.
> Such information, however, is typically insufficient to evaluate
> whether the Gatekeepers have complied with their duties. Moreover,
> it is difficult for shareholders to know if the disclosure is adequate
> unless they have access to undisclosed information. In addition,
> agents may try to finesse their public disclosure to avoid giving any
> hint of impropriety. In short, shareholder lawsuits are "outsider-
> looking-in litigation" and are plagued by acute AIPs.

Kenju Watanabe, *Control Transaction Governance: Collective Action and Asymmetric*

*Information Problems and Ex post Policing*, 36 NW J. Int'l L. & Bus. 45, 68 (Winter 2016).

### C.     The Revised Fees are Customary for this Type of Work and Litigation (Factors 5 & 12)

As illustrated by the table below for comparable disclosure merger settlements, the

requested Fee and Expense Awards are well within the range of attorneys' fees and expenses

approved in similar cases where the settlement consisted of supplemental disclosures in company

filings prior to a scheduled shareholder vote, which required short but quick action by plaintiff's

attorneys on a truncated time frame to ensure an informed vote as required by the law.

| Case | Supplemental Disclosures | Approved Attorney's Fees |
|---|---|---|
| *Douglas v. Witney*, No. 16-cv-00921, | Financial projections and additional information concerning the financial advisor's conflict of interest | $1 million (Trepetin Decl. Ex. 1)[11] |

---

[11]     The Declaration of Yelena Trepetin in Support of Plaintiffs' Renewed Joint Motion for Final Approval of Class Action Settlements and Award of Fees and Costs filed herewith is referred

| Final Order and J. 4 (N.D. Cal Dec. 27, 2016) | | |
|---|---|---|
| *In re Broadcom Corp. Stockholder Litig.*, No. SA 15-cv-00979 JVS (PJWx), Order on Lead Counsel's Mot. For Award of Attys' Fees and Expenses (C.D. Cal. Feb. 27, 2017) | Additional information concerning financial advisor's analyses, financial projections, and additional information regarding the background of the merger | $1.125 million (Trepetin Decl. Ex. 2) |
| *Lambert v. Tellabs, Inc.*, No. 1:13-cv-07945, Final Order and J. 9 (N.D. Ill. Sept. 11, 2015) | Additional information concerning financial advisor's analyses and additional information regarding the background of the merger | $750,000 (Trepetin Decl. Ex. 3) |
| *Nichting v. DPL Inc.*, No. 3:11-cv-141, Order and Final J. 7 (S.D. Ohio Feb. 24, 2012) | Unlevered free cash flow projections | $700,000 (Trepetin Decl. Ex. 4) |
| *In re Crestwood Midstream Partners Unitholder Litig.*, No. 4:13-cv-01528, Order and Final J. 7 (S.D. Tex. May 16, 2014) | Financial projections | $595,000 (Trepetin Decl. Ex. 5) |
| *Collier v. BrightPoint, Inc.*, No. 1:12-cv-1016-TWP-DKL, 2013 U.S. Dist. LEXIS 62125, at *9 (S.D. Ind. May 1, 2013) | Additional information concerning financial advisor's analyses | $600,000 fee |
| *Cooke v. Equal Energy Ltd.*, No. 5:14-cv-00087-C, Fed. Court Order and Final J. 8 (W.D. Okla. Apr. 8, 2015) | Additional information concerning financial advisor's compensation, financial analyses, and financial projections | $650,000 fee (Trepetin Decl. Ex. 6) |
| *In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121, at *58 (D.N.J. Mar. 25, 2010) | Information regarding company's stock price, background of the merger, and a news article that impacted the company's stock price. | $3.5 million fee |

## D.    Time and Labor Expended (Factor 1)

Plaintiffs' Counsel have expended substantial time and resources to litigate the Actions.

As discussed above, this case was diligently prosecuted to obtain relief prior to the December 20,

---

to as "Trepetin Decl.".

2016 shareholder vote on the Transaction, and thereafter significant time was invested to investigate class claims prior to reaching the final proposed settlement terms. *See also infra* at 20 (setting forth the lodestar for each firm).

### E.     The Novelty and Difficulty of Questions Raised by the Litigation (Factor 2), the Skill Required to Properly Perform the Legal Services Rendered (Factor 3), and the Time Limitations Imposed by the Circumstances (Factor 7)

Successfully litigating these Actions required Plaintiffs' Counsel to conduct thorough factual investigations under significant time pressure. Specifically, Plaintiffs' Counsel reviewed voluminous corporate filings and analyzed complex valuation analyses and financial data on an expedited basis. Plaintiffs' Counsel then acted diligently in preparing detailed pleadings and/or preliminary injunction motions, which were necessary to prevent the Classes from suffering the irreparable harm of an uninformed shareholder vote. Substantial experience and skill in corporate law and merger and acquisition transactions was required in reviewing all the relevant SEC filings regarding each of the companies and the Transaction (including the various iterations of the Proxy Statements regarding the Transaction, Annual Proxy Statements, 10-Ks, 10-Qs, and 8-Ks), public news articles and analyst reports regarding each company, and the non-public documents obtained through discovery in order to assess the adequacy of the disclosures.

Plaintiffs' Counsel also conducted thorough discovery after the Supplemental Disclosures were issued, including six depositions, to assess whether any post-close claims were viable, which required expertise in applicable corporate and securities law. Plaintiffs' Counsel researched, reviewed and analyzed the legal issues presented by the merger-related claims and the Individual Defendants' fiduciary duties under the laws of Maryland and Delaware in the merger context as well as their available defenses. All of this review was necessary to assess the scope for continuing litigation.

All of the services provided by Plaintiffs' Counsel required not only substantial experience and expertise in shareholder litigation, but also the ability to provide expert services under tight time constraints against Defendants represented by large, highly-regarded law firms. Plaintiffs' Counsel faced time pressures to obtain equitable relief prior to the shareholder vote on the Transaction.   Given the short time frame to obtain this equitable benefit, the primary relief sought in the complaints, Plaintiffs' Counsel were under pressure to ensure the shareholders of Colony Capital, NSAM and NRF were equipped with all material information necessary to make a fully informed decision.   This accelerated process is unique to the merger-related litigation context, and Plaintiffs' Counsel respectfully submit that the Settlements are an excellent result for the shareholders of each company.   Courts have recognized that class counsel should not receive a lesser fee for settling a case quickly because in many instances, such as in this litigation, "it may be a relevant circumstance that counsel achieved a timely result for class members in need of immediate relief." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002); *see also General Motors*, 860 F.2d at 257-58 ("[T]he district court erred in basing its denial of a risk multiplier on the fact that the parties settled at a relatively early stage in the litigation.").   As another court noted, "because of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained.  The attorney's fees awarded should reflect this goal." *Cohn*, 375 F. Supp. 2d at 866.

**F.    Opportunity Cost Due to Acceptance of these Cases (Factor 4)**

Plaintiff's Counsel was also precluded from other employment due to this litigation.  As set forth above, Plaintiff's Counsel collectively expended approximately 1,084.5 hours litigating this matter, which time could have been spent on other matters involving less or no risk.  Litigating these Actions under time pressure also precluded Plaintiffs' Counsel from devoting resources to other litigation and prosecuting additional cases.  Indeed, Plaintiffs' Counsel are boutique law

firms, and litigating these Actions in a successful manner required them to devote a significant percentage of their respective firms' man power and resources. This factor further supports awarding the requested Fee and Expense Awards in full. *See Denton v. Pennymac Loan Servs., LLC*, No. 4:16cv32, 2017 U.S. Dist. LEXIS 74037, at *24 (E.D. Va. May 12, 2017) (accounting for fact that counsel "is a small law firm and thus representing a client on a contingent fee or fee-shifting basis necessarily involved loss of other opportunities.").

### G.   Experience, Reputation and Ability of Plaintiffs' Counsel (Factor 9)

Plaintiffs' Counsel have extensive experience in the field of shareholder and complex class action litigation and submit that they are highly regarded in this specialized area of practice. As reflected in each firm's resume, their attorneys have obtained significant corporate benefits and monetary recoveries for classes as sole or co-lead counsel in numerous complex class actions across the nation. *See* Motion for Final Approval, Trepetin Decl. Exs. A to Exs. 9-12 (ECF No. 21-3 in the *Colony* Action; ECF No. 14-3 in the *NRF* Action; ECF No. 17-3 in the *NSAM* Action). Mr. Dvores recognized as much in his objection papers. Dvores Objection at 11 ("I concede that each of these firms is well qualified to serve as class action counsel based on their achievements and participation in various class action cases involving complex issues and multi-million dollar settlements for class members.") (ECF No. 22 in the *NSAM* Action).

The quality of opposing counsel is also relevant in assessing the quality of Plaintiffs' Counsels' work. *See Reed v. Big Water Resort, LLC*, No. 2:14-cv-01583-DCN, 2016 U.S. Dist. LEXIS 187745, at *26 (D.S.C. May 26, 2016) (quoting *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05CV00187, 2007 U.S. Dist. LEXIS 2392, at *6 (M.D.N.C. Jan. 10, 2007) ("Additional skill is required when the opponent is a sophisticated corporation with sophisticated counsel.")). Here, Defendants were represented by prestigious, experienced and highly capable law firms with a

national reputation for vigorous advocacy in the defense of complex shareholder class and derivative cases.[12]

**THE REVISED FEE AND EXPENSE AWARD IS
REASONABLE UNDER A LODESTAR ANALYSIS
APPLYING THE LOCAL RULES' GUIDELINES IN APPENDIX B**

**A.      The Revised Fee Requests are Reasonable Measured Against Plaintiffs' Counsels' Lodestar**

Where, as here, there is no "common fund" out of which attorneys' fees can be awarded, the lodestar method is the appropriate method to measure a requested fee award.  *See e.g., Clark v. Experian Info. Solutions, Inc.*, No. 8:00-1217-22, 2004 U.S. Dist. LEXIS 32063, at *41-45 (D.S.C. Apr. 22, 2004); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3rd Cir. 1998) (lodestar method appropriate "where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method."); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 54 F.3d 69, 73 (2d Cir. 1995) (affirming order awarding fees for enhanced disclosure based on lodestar and multiplier).

In calculating the lodestar amount (as reflected in the revised time and expenses affidavits that comport with the format provided in Appendix B (*see* Trepetin Decl, Exs. 7 - 10), Plaintiffs' Counsel have applied their regular hourly rates, which are reasonable for litigation of this nature and are in line with rates approved by courts within the Fourth Circuit in securities class actions. *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 & n.33 (E.D. Va. 2001) (suggesting

---

[12]      Counsels' experience and views as to what is appropriate fee award also should be afforded significant weight.  *See e.g., Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246, at *17-18 (D.N.J. Oct. 27, 2005) (awarding $9.2 million fee in non-pecuniary corporate governance based settlement, and giving weight to fact that defendant agreed to pay the fee "based on its perceived value of the settlement, that the fee negotiations were based upon a knowledgeable analysis of the appropriate fee for the benefits achieved, and that the end result reflects the parties' experience as to what is appropriate and fair.").

plaintiff's class action attorneys' rates were reasonable where "*the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials*," and rates were "not inconsistent with the rates charged by lawyers in large, prominent, and, as here, expert law firms that typically represent defendants in securities class actions.") (emphasis added); *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 U.S. Dist. LEXIS 60950, at *23-24 (M.D.N.C. May 9, 2016) (same, referring to partners' hourly rates of $640 to $880 per hour and associates rates of $375 to $550 per hour); *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 575-76 (E.D. Va. 2016) (holding "[a]n attorney's actual billing rate provides a starting point for purposes of establishing a prevailing market rate" and collecting cases within the Fourth Circuit with approved rates ranging from up to $310 for paralegals, $700 for associates, and $975 for partners) (internal quotation marks omitted); *see also Spencer v. Comserv Corp.*, No. 4-84-794, 1986 U.S. Dist. LEXIS 15863, at *32-33 (D. Minn. Dec. 30, 1986) ("Compensating a nationally recognized securities class action attorney at his hourly rate is entirely appropriate.").[13] These rates also are appropriate even in light of Appendix B, which expressly provides that "*[t]he Court recognizes that there are attorneys for whom, and cases for which, the market rate differs from these guideline rates*." Appendix B ¶ 3 n.*.

---

[13]     Plaintiffs' Counsels' hourly rates are undoubtedly in line with or less than the rates charged by Defendants' counsel, which is a relevant consideration.  *See Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case.  Also, when the defendant has hired expensive, out of town counsel, the plaintiffs seem justified in saying that the nature of the case required the skills of out of town specialists."); *Microstrategy*, 172 F. Supp. 2d at 788 & n.33 (finding rates charged by plaintiff's counsel in securities class action were warranted in part because they were "not inconsistent with the rates charged by lawyers in large, prominent, and, as here, expert law firms that typically represent defendants in securities class actions.").

Pursuant to the Court's October 27 Order, in resubmitting the lodestar calculation, Plaintiffs' Counsel have prepared a table applying both: (i) their regular hourly rates, which are reasonable for litigation of this nature and are in line with rates approved by other courts within the Fourth Circuit in securities class actions; and (ii) the hourly rates set forth in Appendix B.  For the reasons set forth herein, while Plaintiffs' Counsel do not believe the rates in Appendix B should be applied here, even if they are, the requested fee awards are nevertheless fair after applying a reasonable multiplier of 2.42, which is well within the range of multipliers often applied in securities class action litigation.

| Name | Hours | Firm Lodestar | Appendix B Lodestar |
|------|-------|---------------|---------------------|
| Monteverde & Associates PC | 439.75 | $261,687.50 | $141,337.50 |
| Faruqi & Faruqi, LLP | 382.25 | $230,545.00 | $148,475.00 |
| Ademi & O'Reilly, LLP | 211.50 | $135,822.50 | $85,027.50 |
| Brower Piven | 50.0 | $34,160.00 | $18,625.00 |
| **Total** | **1,084.5** | **$662,215.00** | **$393,465.00** |

In this case, after deducting total expenses of $37,168.51, the total Fee and Expense Awards requested are approximately 1.43 times Plaintiffs' Counsels' total lodestar for all three cases utilizing their regular billing rates ($662,215.00).  *See* Declaration of Yelena Trepetin in Support of Plaintiffs' Joint Motion for Final Approval of Class Action Settlements Filed in Each of the Above-Referenced Actions ¶ 37 (ECF No. 21-3 in the *Colony* Action, ECF No. 14-3 in the *NRF* Action, ECF No. 17-3 in the *NSAM* Action) and Trepetin Decl. Exs. 7-10.  And, at the rates

set forth in Appendix B, the total Fee and Expense Awards requested amount to approximately 2.42 times Plaintiff's Counsel's total lodestar ($393,456.00).  Thus, regardless of whether the Court utilizes Plaintiffs' Counsel's regular billing rates or the Appendix B rates, the total Fee and Expense Awards are justified when applying a reasonable multiplier in the range of those typically applied in class action cases.  "Under the lodestar method of calculation, the Court 'multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate.'"  *See Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 470 (S.D. W. Va. 2010) (noting that "[c]ourts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee" and collecting cases in the Fourth Circuit with lodestar multipliers in this range); *Boyd v. Coventry Health Care Inc*., 299 F.R.D. 451, 467 (D. Md. 2014) (same); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 (D. Md. 2013) (same); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation."); *Beckman v. KeyBank, N.A*., 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.") (collecting cases)).

## PLAINTIFFS RENEW THE MOTION THAT THE CLASS BE CERTIFIED FOR SETTLEMENT PURPOSES

As reflected in the Motion for Final Approval, Plaintiffs previously established the elements necessary under Fed. R. Civ. P. 23 to certify the Settlement Classes.  *See* Preliminary Approval Orders ¶¶ 5-7 (ECF No. 19 in the *Colony Capital* Action; ECF No. 11 in the *NRF* Action; ECF No. 16 in the *NSAM* Action).  As shown in the Motion for Final Approval, nothing has occurred that indicates that the Classes do not continue to meet the requirements of Fed. R. Civ. P. 23 and, for all of the reasons set forth in Plaintiffs' Joint Motion for Preliminary Approval and as held in the

Preliminary Approval Orders, incorporated herein by reference, Plaintiffs request that the Court grant final certification of the Settlement Classes.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed Final Orders and Judgments: (i) finally approving the proposed Settlements; (ii) certifying the proposed Settlement Classes for settlement purposes; and (iii) approving the requested revised Fee and Expense Awards.

DATED:  November 6, 2017

**BROWER PIVEN, A Professional Corporation**

/s/ Yelena Trepetin
Charles J. Piven (Md. Fed. Bar No. 00967)
Yelena Trepetin (Md. Fed. Bar No. 28706)
1925 Old Valley Road
Stevenson, MD 21153
Tel: (410) 332-0030
Fax: (410) 685-1300
Email: piven@browerpiven.com
        trepetin@browerpiven.com

*Attorneys for Plaintiffs William Carter, Jack Boothe and Cindy Kessler*

Juan E. Monteverde (pro hac vice)
**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 971-1341
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff William Carter*

Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017

Tel: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
          jwilson@faruqilaw.com

*Attorneys for Plaintiff Jack Boothe*

Guri Ademi
Shpetim Ademi
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave.
Cudahy, WI 53110
Tel: (414) 482 -8000
Fax: (414) 482-8001
gademi@ademilaw.com
sademi@ademilaw.com

*Attorneys for Plaintiff Cindy Kessler*