Exhibit 2

1    IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND

2

WILLIAM CARTER, *Individually and* )
3   *on Behalf of All Others Similarly* )
*Situated,*                          )
4          Plaintiff,                 )
vs.                              )
5                                     ) CIVIL NO.: JKB-16-3282
COLONY CAPITAL, Inc.,                )
6                                     )
Defendant.                   )
7                                     )
_____)
8   CINDY KESSLER, *Individually and* )
*on Behalf of All Others Similarly* )
9   *Situated,*                       )
Plaintiff,                   )
10        vs.                          )
) CIVIL NO.: JKB-16-3745
11  NORTHSTAR ASSET MANAGEMENT GROUP, )
)
12         Defendant.                  )
)
13  _____)
JACK BOOTHE, *Individually and*     )
14  *on Behalf of All Others Similarly* )
*Situated,*                          )
15         Plaintiff,                  )
vs.                              )
16                                     ) CIVIL NO.: JKB-16-3742
NORTHSTAR REALTY FINANCE CORP.,      )
17                                     )
Defendant.                   )
18                                     )
_____)

19

20            Transcript of Proceedings
Before the Honorable James K. Bredar
21            Friday, October 27th, 2017
Baltimore, Maryland

22

_____

23

Christine T. Asif, RPR, FCRR
24         Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
25         Baltimore, Maryland 21201

## APPEARANCES

For Plaintiff William Carter:

        Juan E. Monteverde, Esquire

        Yelena Trepetin, Esquire

For the Defendant Colony Capital, Inc.:

        Tariq Mundiya, Esquire

        Scott R. Haiber, Esquire

For Plaintiff Cindy Kessler:

        Guri Ademi, Esquire

        Yelena Trepetin, Esquire

For the Defendant Northstar Asset Management Group:

        William M. Krulak, Jr., Esquire

For Plaintiff Jack Boothe:

        James M. Wilson, Jr., Esquire

        Yelena Trepetin, Esquire

For the Defendant Northstar Realty Finance Corp.:

        Andrew Gendron, Esquire


Also present:  Lawrence Dvores
              Philip Robinson
              Howard Hoffman

---

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Good morning.  Be seated please.

 3          Mr. Goldsmith, you may call the case.

 4          THE CLERK:  The matters now pending before this

 5   court is Kessler versus Northstar Asset Management Group

 6   Incorporated, et al., civil number JKB-16-3745; Carter versus

 7   Colony Capital Incorporated, et al., case number JKB 16-3282;

 8   Boothe versus Northstar Reality Finance Corp., et al, civil

 9   number JKB-16-3742.  These matters come before this court for

10   a fairness hearing.

11          THE COURT:  Appearances.  Plaintiffs.

12          MS. TREPETIN:  Good morning, Your Honor, Yelena

13   Trepetin with Brower Piven, local counsel for all the

14   plaintiffs.

15          MR. MONTEVERDE:  Good morning, Your Honor, Juan

16   Monteverde with Monteverde and Associates, counsel in the

17   Colony Capital matter.

18          MR. WILSON:  Your Honor, James Wilson from Faruqi

19   and Faruqi for plaintiffs in the Boothe v. NRF, 16-CV-3742.

20          MR. ADEMI:  Guri Ademi for the plaintiffs, from

21   Ademi & O'Reilly, for plaintiff Cindy Kessler.

22          MR. MUNDIYA:  Good morning, Your Honor.  Tariq

23   Mundiya from the Willkie Farr firm in New York for the Colony

24   defendants in 16-CV-3282.

25          MR. HAIBER:  Your Honor, Scott Haiber from Hogan
```

1    Lovells, I'm local counsel in the same case, the Colony

2    case.

3              MR. GENDRON:  Good morning, Your Honor, Andrew

4    Gendron from Venable on behalf of the defendants in 16-3742,

5    the Boothe case.

6              MR. KRULOK:  Good morning, Your Honor, Bill Krulok

7    from Miles & Stockbridge, on behalf of the NSAM defendants in

8    3745.

9              THE COURT:  Thank you, gentleman.  You may be

10   seated.

11             Good morning, sir, you are Lawrence Dvores?

12             MR. DVORES:  Yes, I am.

13             THE COURT:  Did I pronounce your name correctly?

14             MR. DVORES:  That's correct.

15             THE COURT:  Okay.  And Mr. Dvores you are an

16   interested party here today, and are here in the status of an

17   objector; is that correct?

18             MR. DVORES:  Correct.

19             THE COURT:  Good morning to you.

20             Mr. Robinson?

21             MR. ROBINSON:  Good morning, Your Honor.  I'm

22   representing Mr. Hoffman as an objector today.

23             THE COURT:  And good morning to you Mr. Robinson

24   and --

25             MR. ROBINSON:  Mr. Hoffman is sitting to my left.

1          THE COURT:  Right.  That's fine.  You can stay

2     there.  Ordinarily, counsel sits further in and the client

3     sits further out, but that's no problem.  I've got it.

4          Okay.  So we'll hear first on behalf of the

5     plaintiffs why they think it is that the Court should go ahead

6     and ratify this agreement.  I will tell you at the outset, I

7     have some concerns.  Some are less specific and less strongly

8     held and some are quite strongly held.  In the former

9     category, I'm most interested in hearing about how the

10    coordination of plaintiffs counsel in the circumstances of

11    this case, with these entities seeming to have distinctly

12    different interests, at least at the beginning of the merger

13    process, how that coordination doesn't give rise to a conflict

14    on the plaintiff's side.  But far and away my greatest concern

15    with respect to what's been submitted to the Court is the

16    total amount of the attorney's fees, which I'm unlikely to

17    approve.  But I will hear from the plaintiffs on that.

18          But make whatever presentation you wish.  I'll hear

19    from you first.  We'll see if the defendants wish to speak

20    before we go to the objectors.

21          MR. MONTEVERDE:  Thank you, Your Honor.  Juan

22    Monteverde with Monteverde and Associates.  And I'll start by

23    saying, because we are coordinated, I will be speaking on

24    behalf of all plaintiffs.  I have also prepared a Power Point.

25    I think Your Honor was given a booklet of it, that I will use

1    today to assist in this hearing.

2            Just for formality purpose, Your Honor, we're before

3    you pursuant to Your Honor's July 10th, 2017, preliminary

4    order --

5            THE COURT:  Well, that suggests that you're not as

6    prepared as I thought you would be, it wasn't my order, it was

7    Judge Motz' order.

8            MR. MONTEVERDE:  I apologize it was Judge Motz.

9    You're actually correct.  Sorry, Your Honor.  And that's on

10   slide 2, Your Honor.  So we had 141,000 notices that went out.

11   And we provide the breakdown of how they went on each action.

12   And we only have two objections for NSAM and NRF, we'll be

13   referring as such Northstar, as a management of Northstar

14   Reality Finance.

15           I think I'll just go right on Your Honor's concern,

16   because I think it's going to be more efficient than what I

17   had anticipated presented Your Honor, if I may.

18           My firm Monteverde and Associates, me personally,

19   I'm a former partner of Faruqi & Faruqi.  I've been working

20   with them for several years.  I also have been working with

21   Ademi & O'Reilly for several years.  It's not unusual, Your

22   Honor, to coordinate litigation.  We've done that in a number

23   of cases.  And there was no conflict at any given time, Your

24   Honor.  Because this was a disclosure case.  This was not a

25   monetary case.  We were concerned with the proxy statement.

1    And the proxy statement affected all three members of the

2    class.  And all three had to present or cast an informed vote.

3    So I think that's really where we started the case and why

4    there's no conflict whatsoever.

5              I think I understand the objectors to raise the

6    issue that there are different prices and there's different

7    claims on the price.  Accept if I take a step back, this would

8    be under a state claim, a breach of fiduciary duty.  You would

9    have a claim for price, if this were a cash deal.  But this

10   was a stock transaction for all three members of the

11   transactions, for Colony Capital shareholders, NSAM

12   shareholders, and NRF, they were exchanging shares.  So

13   there's no *Revlon* duty under Delaware law for stock deals --

14             THE COURT:  There's no what?

15             MR. MONTEVERDE:  *Revlon*, R-e-v-l-o-n, It's what's

16   referred to as *Revlon* -- that's the duty to maximize

17   shareholder value.

18             THE COURT:  Yes.

19             MR. MONTEVERDE:  And, similarly, under Maryland law,

20   under *Laureate*, you don't have a duty either to maximize

21   shareholder value when it's not a cash transaction.  We were

22   not suing on that any way, but let's keep that in mind.  There

23   was no claim where we could sue for price under fiduciary duty

24   claims.  I think that's a very important distinction, which

25   gives rise to why there's no conflict and why coordination

1    made sense in this case.  And each member of the class was

2    entitled to cast an informed vote and needed to receive what

3    we felt were essentially the efficient disclosures related to

4    the projections.  And that's what this case involved.

5          And we were before Judge Motz on a preliminary

6    injunction or were heading towards a preliminary injunction

7    that was set for December 1st, if I recall correctly, and we

8    settled on the eve of that.  And the injunction, Your Honor,

9    was just for that, please disclose all material information

10   related to the projections.

11         I'm not sure if I'm persuading Your Honor, but I

12   think it's an important distinction, that this case could not

13   arise a conflict because the claims didn't give for a

14   conflict.  And it was investigation of the case after we

15   settled, Your Honor, after we settled each group conducted

16   depositions and they took the lead for their respective class.

17   So I took the depositions in the Colony Capital.  And Mr.

18   Wilson's firm, Faruqi, took the depositions for the NRF

19   shareholders.  And Mr. Ademi's firm took the depositions for

20   the NSAM group.

21         And I can assure you if any evidence would have been

22   uncovered, either group would have then not proceeded with the

23   settlement.  And this is not just lip service.  I can tell you

24   from personal experience, I've done that several times in the

25   last couple years.  I did that in Mavenir in Delaware Chancery

1    Court, after entering into a disclosure and therapeutic MOU.

2    I uncovered some issues that gave rise to being able to

3    recover money for shareholders.  We blew our own settlement,

4    or we walked away from our own settlement, to pursue damages.

5          I did that in Syntroleum with my old firm Faruqi &

6    Faruqi, and with Ademi & O'Reilly in Oklahoma.  We obtained

7    disclosures, gave us the opportunity to then conduct

8    discovery.  And we uncovered information that we were able to

9    use to pursue a case for damages.  But those two cases, for

10   example, had what I called earlier *Revlon* duties, duty to

11   maximize shareholder value.  That's not here, Your Honor.

12         And in one case that comes to mind, it's on one of

13   my slides, slide seven.  Corwin v. KKR, Your Honor, I mean,

14   essentially shareholder rights are -- every day are getting

15   extinguished by some of the recent case law being developed in

16   Delaware Chancery Court.  And essentially it says you can

17   ratify an arm's length transaction if you disclose all the

18   material information.  So that defendants cannot get sued for

19   damages after the transaction closes.  That's the law on a

20   state fiduciary duty case.

21         And Colony Capital, it's a Maryland corporation, but

22   NSAM and NRF are Delaware corporations.  And it would

23   certainly apply to NSAM and NRF.  And on Colony Capital,

24   Maryland has pretty much adopted Delaware law.  So I think it

25   should also apply.  And that is if the information disclosed,

1       and there's an informed vote, you cannot sue for damages.  The

2       only exception is if there's entire fairness.  That's if it's

3       a controlled transaction, which wasn't the case here.  That's

4       normally when the CO takes a company private.

5               THE COURT:  How does this intersect with the

6       agreement then for the bar going forward to future litigation?

7       Are you saying that it really just flows naturally from law

8       that would be governing regardless of your agreement.

9               MR. MONTEVERDE:  Yes.  And that's why we can easily

10      give up claims because, frankly, there were no viable claims.

11      And we conducted deposition to ensure there was nothing that

12      could even arise to a potential argument for entire fairness,

13      which can be the traditional procedure where you have a lead

14      buyout, or it could be that someone is receiving a unique

15      benefit, sometimes there's an exception that allows sometimes

16      to argue entire fairness.  And no conflict existed here.

17              This was a process where there were different

18      bankers for each company.  We conducted depositions of each of

19      the investment bankers and of each of the directors for each

20      board.  And it was clear there was an informed board and there

21      were no issues of conflict of transactions, for example, that

22      were not disclosed or agreements -- consulting agreements that

23      had not been disclosed, things of that nature.

24              I will even point out one of our earlier claims was

25      that the Colony Northstar board was going to be excessive.  I

1    think originally they had 13 board members, that perhaps was

2    one of the angles we could have pushed for.  But they mooted

3    that, because they changed the board constitution.  I forget

4    the timetable, but it was a few months after the transaction

5    was announced.  They reduced the board to 10.  So that

6    argument that it was excessive and onerous went out the window

7    and it got mooted.

8           There were no claims whatsoever that we felt could

9    be pursued.  On the federal side, the Exchange Act, the

10   statute is -- its purpose is to ensure an informed vote.

11   That's its purpose.  And if you have the disclosure of

12   material information done before the vote, which is what the

13   statute tends to ensure, there's no damages that you can

14   pursue after.

15          And the disclosures we obtained, Your Honor, were

16   significant here.  And I'll walk briefly through it, Your

17   Honor.  It's on page 11, 12, and 13 of my Power Point.  What

18   we had before we were involved essentially were revenues.

19   Problem with revenues is it's just earnings, it's not

20   profitability.  You don't really know what profits are.  And

21   that's what we got.  We got net income for each of the three

22   companies.  That is very important information.  If the

23   objectors don't appreciate it, that's not really the issue.

24   Who does appreciate it is the market.  Shareholders and the

25   market appreciate that.  That's how you value companies.

1          And frankly, honest markets can only be honest if

2     there is adequate disclosure of material financial

3     information.  And that was really -- that was the purpose of

4     the case, Your Honor.  And the injunction we filed was from

5     that issue.  And they agreed to give us the information.  And

6     then they agreed -- and the reason you enter into a settlement

7     is you can do two things:  They could give information, claim

8     victory and seek a mootness fee, if the lawyers are just

9     thinking about making money, which is the angle objectors are

10     advancing here today; or you can do the right thing and used

11     that as leverage to say we'll settle the litigation but we

12     want discovery, which you couldn't have.

13          On an Exchange Act claim you would have a mandatory

14     stay, or a PSLRA until you defeat a motion to dismiss.  And

15     under the state claims, post close you're very unlikely to be

16     able to survive.  There would be no set of facts.  Unless you

17     had some information that could show egregious fact pattern

18     with a potential conflict, we may be able to argue a unique

19     benefit for entire fairness.  You can only get timely

20     documents.  So that's a good position to be in as a plaintiff

21     lawyer, because we're doing the right thing to make sure

22     there's an informed vote.  And we get access to discovery that

23     otherwise no one would ever get.  And that's what we did to

24     ensure that we were not giving up claims that have value.

25          And objectors are not here today saying, Your Honor,

1    we have a claim that we want to advance.  They're not saying

2    that.  At best they speculate that there could be claims, but

3    no one is really identifying them.  At heart they're upset

4    with the attorney fee.  And I hear Your Honor also thinks

5    that's an unreasonable attorney fee.  I submit to this Court,

6    the attorney fee is well in line with other cases.

7              THE COURT:  Other cases where what was achieved?

8              MR. MONTEVERDE:  What's that?

9              THE COURT:  Other cases where what was achieved?

10             MR. MONTEVERDE:  Same result, disclosure of

11   projections.  For example, *Affymetrix,* which I know we cited

12   in our brief and in our Power Point.  *Douglas versus Witney,*

13   that was in the Northern District of California last December,

14   before Judge Orrick.  I obtained an attorney fee of a million

15   dollars there for obtaining projections and the disclosure of

16   a conflict by the buyer investment banker.  Very similar type

17   of case.

18             The going rate for the disclosure only settlement

19   for average disclosures, Your Honor, is $500,000.  Projection

20   cases tend to yield higher attorney's fees.  DPL in Ohio

21   Federal Court yielded $700,000.  Tellabs in Illinois federal

22   court yielded $750,000.  Brightpoint in Indiana yielded

23   $600,000.  These are all federal cases.  And here we obtained

24   three sets of projections.  You could argue that our fee

25   should be $2.1 million, or $1.8 million in the aggregate.  And

```
1    we're not asking for that.  It's a reduced fee, frankly, Your

2    Honor.  It may sound high, but it's not.  And our lodestar

3    also supports that, Your Honor.  I'm not sure what I can --

4              THE COURT:  What relationship should your fee

5    petition bear to our own local rule schedule of appropriate

6    fees in --

7              MR. MONTEVERDE:  We cited the --

8              THE COURT:  -- in attorney's fees cases?

9              MR. MONTEVERDE:  We cited -- I know it's in the

10   briefing, we're in line with -- the name is escaping me,

11   Lafferty matrix (sic), I think it -- the name is escaping

12   me.

13             THE COURT:  Yes.

14             MR. MONTEVERDE:  Thank you.  We're in line with

15   those hourly rates, Your Honor.  So I'm not sure that is

16   different.

17             THE COURT:  At $950 an hour.

18             MR. MONTEVERDE:  That's the highest rate.  The

19   blended rate is $600, Your Honor.  I think Mr. Faruqi's hourly

20   rate is $950.  He's an individual who has been practicing for

21   over two or three decades and --

22             THE COURT:  I saw paralegal rates in the 300s,

23   unless I was misreading it.

24             MR. MONTEVERDE:  Well, I know it's not mine, because

25   I don't have paralegals that I'm billing for.  But it could be
```

1    that it's Faruqi Faruqi, but I know that they have very

2    skilled paralegals.  I think they're all in line with New York

3    market rates.  And I think Your Honor can rely on national

4    rates on these type of cases and you don't only need to focus

5    on locality.  That's -- normally judges do look at the

6    national rates.  I can assure you our hourly rates are less

7    than the adversaries that we're fighting against.  And courts

8    have also used that as an indication of fairness of hourly

9    rate of your opponent.  I know defense firms of the caliber as

10   these defense firms are in New York, do bill north of $1,000

11   an hour, some of the partners.  That's not unheard of, Your

12   Honor.

13         I don't think -- and the lodestar is just one

14   aspect.  I think precedent of other cases is more analogous to

15   show what the benefit and the value of it is.  We don't get

16   paid more money, for example, in a projections case if we work

17   3,000 hours.  Because courts have said projection cases are

18   worth what they are.  And typically it's around $6- to

19   $750,000, in my experience.

20         THE COURT:  Regardless of the size of the underlying

21   entities that are parties to the merger?

22         MR. MONTEVERDE:  Yeah, there's actually case law.

23   We've tried to argue the opposite.  We've tried to argue in a

24   case like this, where the transaction of equity was $9 billion

25   that the fee should be larger.  And courts -- and I should say

1    this is mainly out of Delaware Chancery Court -- have said

2    pretty much any entity above $100 million and on is going to

3    have the same benefit on attorney's fees.

4              THE COURT:  What's the total equity involved in the

5    merger of the three companies?

6              MR. MONTEVERDE:  9 billion with a B, roughly was 3

7    billion each.

8              THE COURT:  Okay.

9              MR. MONTEVERDE:  So this was a large transaction,

10   which is, again, I don't think the Court uses that, but I

11   think that if the Court were to consider that, it emphasizes

12   that the benefit was for a large combination.  And there were

13   over 140,000 notices.  So that's how many people benefit from

14   this information.

15             THE COURT:  Let me hear from defense counsel.

16             MR. MUNDIYA:  Good morning, Your Honor.

17             THE COURT:  Good morning.  Talk to me about the

18   disclosures that your opponents persuaded you make that you

19   weren't evidently previously inclined to make in order for all

20   of this to go through.

21             MR. MUNDIYA:  Your Honor, they -- they obviously

22   filed a lawsuit, they filed an application for some interim

23   emergency relief seeking disclosures about the projections and

24   the core FFO and a bunch of other things.  And they were

25   pretty aggressive about those disclosures.  We decided that it

1   made sense to expand those disclosures because we didn't want

2   the risk of an injunction.  This was an important deal, I

3   think, for all of the defendant corporations.  And the risk of

4   a injunction simply wasn't worth it.

5           And it -- these disclosures, we could readily make.

6   We had them.  We didn't think we had to make them in the first

7   instance.  But given the risk of an injunction, a small.  Risk

8   to be sure, but a risk, that it wasn't in the defendant's

9   interest to take that risk.  And we decided to go back, look

10  at what else we could put in the proxy statement and made the

11  supplemental disclosures.

12          THE COURT:  So you're in a complicated spot here, as

13  counsel in your position frequently are.  You want the

14  settlement to go through.

15          MR. MUNDIYA:  We do.  We do.

16          THE COURT:  Your principals have committed to it.

17  And I understand that completely.  But I have separate

18  responsibilities.

19          MR. MUNDIYA:  And --

20          THE COURT:  And in pursuit of those, I have

21  questions, to which I need candid answers from you as an

22  officer of the Court.  And I know you'll provide them.

23          MR. MUNDIYA:  Absolutely.

24          THE COURT:  How bad of a fight was it really to

25  persuade you and the others to turn over the information?  It

1     strikes me that it wasn't much.

2             MR. MUNDIYA:  It was a few days of --

3             THE COURT:  Yeah, a few days.  That's what the

4     calendar would suggest.

5             MR. MUNDIYA:  You're absolutely right, Your Honor.

6     It was a few days of negotiations.  There was a lot of back

7     and forth on the issue of free cash flows.  They insisted on

8     those.  We pushed back.  There was -- it was a few days, very

9     candidly, Your Honor.  There was a few days of pushing back.

10    And Mr. Monteverde may get to this, with respect to one of the

11    other defendants there was some disclosures with respect to

12    the discount cash flow analyses by the Goldman Sachs firm.

13    That didn't involve our clients.  But that raised issues.  And

14    there was a lot of back and forth on that issue, which didn't

15    involve the current defendants.  But it was a few days of hard

16    fought negotiations.

17            Thereafter, Judge, once we entered into the

18    settlement agreement, there was extensive discovery to be

19    sure.  There were depositions of our bankers, of our

20    directors.  So Mr. Monteverde is correct on that score, that

21    they did do a --

22            THE COURT:  They did their diligence.

23            MR. MUNDIYA:  They did their diligence.  They did

24    their diligence.

25            THE COURT:  And tested the representations.

1          MR. MUNDIYA:  Right.  Right.  And they tested the

2     viability of a potential claim for price.  And they asked the

3     directors, what else did you do?  What other things did you

4     look at?  What valuations did you see?  I mean, they asked the

5     type of questions that they normally ask.  But, you know, we

6     support the settlement.  We think it's fair.  We think it's

7     reasonable.

8          But to answer your question directly, there were

9     negotiations.  This is not a collusive settlement by any

10     means.  They pushed.  We pushed back on some.  And we came to

11     a meeting of the minds on the disclosures you see before

12     you.

13          THE COURT:  I appreciate it.  Mr. Dvores, do you

14     want to speak first or Mr. Robinson do you want to speak

15     first?

16          MR. ROBINSON:  I will defer to Mr. Dvores.

17          MR. DVORES:  Thank you.  So, Judge, I would like to

18     continue on your first thought that this case represents a

19     conflict where attorneys are representing two or more of the

20     parties where they should have only represented one.  And the

21     excuse given that we have some joint interests in disclosure

22     is not enough to overcome the fact that the individual

23     shareholders in each of these individual companies had

24     directly -- had direct interests which conflicted with the

25     shareholders of the other two companies.  It's already stated

in the complaints that were made by each of these parties that
each one was representing someone, some group of shareholders,
and they thought that their company was in a stronger
financial position than the other two companies.

So let me quote from their complaints.  This is from
the Boothe Northstar Reality Finance Corporation complaint.
The proposed transaction is not in the best interest of NRF
shareholders.  The merger -- quoting, the merger consideration
fails to adequately compensate NRF's stockholders in light of
the company's recent and historical performance and strong
growth prospects, as shown in NRF's stock chart for the year
to date.  Despite NRF's strong stand alone prospects, the
board has agreed with a three-way merger of purported equals,
in quotes, with Colony and NSAM.  If the proposed transaction
is consummated, NRF's current shareholders will only own 33.9
percent of the combined share entity.

Furthermore, if the proposed transaction is
consummated, NRF's executives will receive significant amounts
in executive compensation, money which otherwise would have
remained in the coffers of the combined company.  In sum, NRF
is well-positioned to generate significant earnings in the
foreseeable future.  Despite NRF's bright financial prospects
the board now agreed to combine the company with two potential
weaker entities and without obtaining an adequate premium for
their company's stockholders.  It is therefore imperative that

1    NRF and the stockholders receive all material information

2    concerning the proposed transaction, so that they may properly

3    evaluate whether or not it is in their best interest --

4         THE COURT:  So even at the end of the day, even at

5    that high water mark of when they're drafting their complaint,

6    the petition, the request, the demand in the lawsuit is for

7    disclosure.

8         MR. DVORES:  Right.  But the disclosure here is

9    limited to the information that's contained in their notice

10   that was sent to shareholders, it was filed with the SEC.

11   There may well have been other issues to have been disclosed.

12   But these plaintiffs' attorneys weren't interested in other

13   issues.  They weren't interested in the issue of breach of

14   fiduciary duty.  They said they wouldn't file under Delaware

15   law.  They didn't want any part of looking for breach of

16   fiduciary duties.

17        Well, in fact, their complaint, in between the

18   lines, says there's a breach of fiduciary duty, in that the

19   executives of this company were getting undue compensation as

20   a result of this merger.  So there was a breach of fiduciary

21   duty.  Or at least there is a colorable claim of that.  And

22   that's going to be extinguished if this settlement goes

23   through.

24        THE COURT:  Tell me what you think about the fees

25   that they're seeking.

1              MR. DVORES:  I'm not really competent to talk about

2     fees, because I have no experience with billing.  I was a

3     legal services attorney, we never charged for our service.

4     However, it seems to me that there's a lot of duplication of

5     effort in this case.  If you look at the complaints that were

6     filed by each of the plaintiff parties as class members --

7              THE COURT:  Maybe the fact that there's all that

8     duplication reflects -- maybe that reflects on your first

9     argument as to how -- the extent to which they were looking

10    after their separate interests.

11             MR. DVORES:  Well, my -- the way I read it is each

12    of those complaints made an identical statement about the

13    separate interest of the particular group of shareholders that

14    they claim to be representing.  But they never pursued those

15    claims of inadequate compensation, which would result in a

16    better ratio of shares that were going to be given in the new

17    company, to their particular group of shareholders.

18             They never pursued that.  They only pursued the

19    issue of disclosure.  And the disclosure was limited to, as

20    Mr. Monteverde was saying, this very interesting but very

21    complex issue of cash flow accounting, EBT accounting, all

22    these various measures, all of which are used.  But you single

23    out and you want to use this one.  Or if it wasn't disclosed

24    you should have used it.

25             Okay.  But the point is they didn't pursue the

1    claims that they could have pursued in terms of other matters.

2    They were only focused on this one issue.  And this was the

3    end of it.  I'm saying to you, that because they were united,

4    they never got to represent their clients independently as

5    they would have been if they weren't united.  And that's the

6    issue for me, that there's that conflict of interest that

7    these attorneys just ignored.  This is basic.

8             THE COURT:  Thank you, Mr. Dvores.

9             MR. DVORES:  And if I may say something --

10            THE COURT:  Yes, sir.

11            MR. DVORES:  On the notice itself, the SEC filing

12   was done December 9th, 2016, the shareholder vote was done on

13   December 20, 2016.  The filing of the notice was really not

14   effective notice to the shareholders.  That notice really is

15   given by the brokerage firms, which hold the stock in street

16   name, which then do a mailing of the notice to the

17   shareholders.  So, in fact, there was really no notice given

18   here.

19            THE COURT:  Well, what does the case law say,

20   though, about notice to brokers?

21            MR. DVORES:  You know, I don't know the case law.

22   All right.  I'm simply saying practical notice.  All right.

23   There may be legal notice.  But as far as if you're going to

24   rely on legal notice, you're relying on a fiction, because

25   it's never going to get to the actual shareholders who have to

1    vote.  You're doing all of this to benefit the shareholders

2    and yet you're doing it in a way which doesn't benefit them --

3              THE COURT:  But the shareholders have made the

4    decision about how they want to acquire and hold the stock;

5    right?

6              MR. DVORES:  Actually, they don't.  Because under

7    the present way that stocks are bought and sold, everything is

8    done by broker entry and it's held in street name.  There's no

9    registered stock anymore.  And I happen to be a stockbroker.

10   Okay.  So, in fact, they had to rely on distribution by way of

11   brokerage firms, clearing firms, to get this notice out to the

12   individual shareholders.  All of which takes time.  It takes

13   weeks.

14             It took weeks for the notice of this proposed

15   settlement to get to me, to Mr. Hoffman, to all the other

16   shareholders.  It doesn't happen that quickly.  But all I'm

17   saying is, if you're talking about this notice being so

18   material, it wasn't in fact actually delivered to the people

19   they say that they were intending.  The only way that they

20   could have done it, if they were really serious about getting

21   notices out.  They should have made arrangements with the

22   defendants to delay this -- the merger vote.  Maybe then there

23   could have been a chance for this information to get into the

24   hands of the stockholders.  But to give it just the time from

25   December 9th to December 20th doesn't mean anything.  It's not

1    going to work.

2              Beyond that, when you get your notice of the merger,

3    and your right to vote on it, you get it months before the

4    actual merger vote.  Most people when they get it, if they're

5    going to do anything with it, they're going to do something

6    with it that time they get the notice.  Many people,

7    therefore, who got the notice, much earlier, entered their

8    vote.  They didn't wait for the last week to enter their vote,

9    they entered their vote when they got the original proxy

10   statement and notice that there was going to be a vote on the

11   merger.

12             The question I would ask the plaintiffs attorneys

13   is, how many votes were changed after the date of December

14   9th?  How many shareholders wrote in or otherwise notified the

15   proxy agents that they wanted to change their vote?

16             THE COURT:  Which way would favor your argument, a

17   lot or a few?

18             MR. DVORES:  Very few.

19             THE COURT:  Well, Mr. Monteverde, you get the

20   opportunity to answer that question and respond to the other

21   points that Mr. Dvores has made before we turn to Mr.

22   Robinson.  Go ahead.

23             MR. MONTEVERDE:  Sure, I will.  I think we have a

24   little bit of a disconnect on really the law.  Let me start

25   with the notice issue, I guess.  The disclosures need to be

1      made pursuant to Securities and Exchange Commission rules 10

2      days before the vote.  We did it 11 days before the vote.

3      That's the law.  They don't get mailed.  They get disseminated

4      immediately through a filing of a form 8-K with the Securities

5      and Exchange Commission.  We're operating in efficient

6      markets.  That information is captured in the market the

7      second you file it.  And that's what is using for shareholders

8      to casting for votes.  Because what shareholders look at is

9      how the price of their stock gets effected.

10             From personal experience I can tell you, if you

11     disclose valuable information, the price will be affected.  It

12     happens.  It's not something that happens regularly.  But

13     that's the kind of markets we live in.  So I think there's a

14     disconnect of what's required.  Everything done here was done

15     as the law states.  So arguing that should be differently,

16     well, that's not the law.  And we follow the law.  And the

17     Court has to follow the law.

18             The mailing of the notice, I think there was

19     confusion.  That's the settlement notice.  That was also

20     mailed pursuant to what courts have approved in the past,

21     which goes to brokers, as Your Honor was discussing with Mr.

22     Dvores, that was done here.  There were over 141,000 notices.

23     So the filing was done the same way it's done in every

24     transaction that has been done in the past, that has supported

25     approval of settlement in every court in this country, federal

1     and state.  And in every case that we cited to Your Honor, I

2     think page 22 and 23 of my Power Point.  That's just the way

3     it's done.  We follow the law.

4             As to the claims, again, I wish I could walk into a

5     courtroom and say, Your Honor, price is not fair and therefore

6     I can defeat a motion to dismiss.  That's not the law.  I

7     mean, I would wish for that.  You actually have to have

8     liability.  And we are actually pursuing right now a case like

9     that in Rockville, Maryland, in front of Judge Rubin, the

10    American Capital litigation.  Which we ended up just settling

11    actually a couple weeks ago and recovering %17.5 million for

12    shareholders.  I like those cases, Your Honor.  I get paid

13    much better in those cases.  I have an incentive to find

14    viable claims.  And my history shows it that, one, I know how

15    to find it and that when I find it I pursue it.

16            So the notion that there were claims is just

17    erroneous.  Legally there were no claims.  We didn't file a

18    claim for state law, and this recitation of facts, that the --

19    you paint a picture when you draft a complaint.  That these

20    companies could be more valuable and that's why you need the

21    projections.  You tie things together.  That's what we do as

22    lawyers.  It's not every allegation in a complaint is

23    actionable.  It's what you use to draft a complaint in order

24    to demonstrate to a court why you want information you were

25    asking for.  In this case we wanted projections so we could

1   assess the value of each entity.

2          There was no conflict.  Just because we were

3   coordinated doesn't mean that if one of us thought there was a

4   better case we would not pursue it, of course we would.  We're

5   officers of the Court, as the Court pointed out earlier, we

6   have an obligation.  But more importantly, we have an

7   incentive.  We do a lot better if you can find a viable claim

8   for damages.

9          I think those were the two highlighted points I

10  noted.  I don't know if --

11         THE COURT:  I think you've addressed them.  Thank

12  you, Mr. Monteverde.

13         MR. WILSON:  Your Honor, can I just --

14         THE COURT:  Yes.

15         MR. WILSON:  James Wilson of Faruqi for -- I think

16  it was --

17         THE COURT:  You can just go to podium there, Mr.

18  Wilson.

19         MR. WILSON:  Just very briefly.  I just wanted to

20  touch on --

21         THE COURT:  Yes, sir.

22         MR. WILSON:  I just to assure the Court that at all

23  times plaintiffs counsels' loyalties were to the shareholders

24  they represented in each of the cases.  We filed originally in

25  the Colony case with Mr. Monteverde.  A shareholder came to

1    us, we later filed in the NRF case.  We represented solely the

2    NRF shareholders in that litigation.  That was formalized in

3    the preliminary approval order where my firm was appointed

4    class rep -- class counsel for the NRF, Monteverde was

5    appointed class counsel for Colony, and the Ademi O'Reilly

6    firm was appointed class counsel in the NSAM case.

7             That is the formalized -- formalization of the

8    reality that there was no actual conflict, Your Honor.  Our

9    loyalties ran to each of our class members.  And that is how

10   we conducted ourselves in the litigation.  I just wanted to

11   emphasize that and address Mr. Dvores's argument on the

12   conflicts issue.  And I believe the Court recognized that in

13   the records that we submitted we devoted our time to

14   investigate the claims, with respect to the release, for the

15   NRF shareholders.  And each firm did the same thing.  Thank

16   you.

17             THE COURT:  Thank you, Mr. Wilson.

18             Mr. Robinson.

19             MR. ROBINSON:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. ROBINSON:  If I may, I'm just going to address a

22   couple issues that have already come up.  And then sort of

23   summarize a couple issues that were in Mr. Hoffman's

24   objection, but not repeat the entire objection.

25             THE COURT:  Right.

1          MR. ROBINSON:  So if I understood sort of correctly

2     the chronology of the litigation after it commenced through

3     this interim period, the supplemental disclosures, it sounded

4     as if potentially there were damages initially, but those

5     claims went by the wayside.  And Mr. Monteverde explains that

6     he -- after their investigation there are no damages.  So

7     clearly the fundamental question, if there are no damages,

8     does the Court even have jurisdictions?  The Court's a limited

9     court.  It's true the state court might have jurisdiction.

10    But if we're just talking about what, in essence, if I'm just

11    sitting back and listening to that argument, it's an

12    informational case.

13          And as the Court is aware, and Mr. Hoffman didn't

14    object on this basis per se, I'm just raising it listening to

15    the argument, Your Honor.  I just sort of wonder whether or

16    not the Court even has jurisdiction over what the plaintiff's

17    counsel has argued this morning is essentially an

18    informational case at best.  Without even getting to the

19    merits about whether the information was valuable and all that

20    kind of thing.  So that's sort of one thing I would say.

21          And then they say quite clearly, if there were no

22    claims they would have pursued them.  Well, on that point if

23    there were no claims, why is the release -- Mr. Hoffman did

24    talk about in his objection -- why is the release there?

25    They're releasing all sorts of potential claims.  We don't

1    know, we haven't articulated what potential claims might

2    exist.  But it sort of is counter-intuitive to the argument

3    there was nothing here to pursue damage-wise, but we're going

4    to agree to a settlement bar.  It's a non optout settlement

5    that they present to the Court and the classes.

6         And they -- but the defendants -- and I understand

7    why the defendants want it, it's a good thing.  And you know,

8    Your Honor, the few cases that I've had before Your Honor on a

9    class-wide basis, there's benefit to defendants to getting rid

10   of uncertainty.  But here you have what is, in essence, at

11   best, an informational claim.  And whether that's meritorious

12   or not, don't need to get -- I don't need to get into.  But if

13   the claims had no value, then why is there a broad release for

14   the defendants?

15        THE COURT:  By the same token, the point that you

16   make with respect to the defendants, and what their incentive

17   might be here, and why they might be more passive than others

18   might suggest they should be in the circumstances, what about

19   a view that the same principle applies to the vast majority of

20   those who are in the class, and that it is in their best

21   interest too, and accordingly, I've only got two objectors

22   here.

23        MR. ROBINSON:  I'm going to get to that point in a

24   moment.  But let me, before I get to the notice of the class

25   and the number of objectors that are here, Your Honor, let me

just make clear for the record, I cast no dispersions on

defense counsel.  And what a defendant typically wants in

these cases, they've achieved in their settlement agreement,

which is bar.  But the point I was just trying to make is, if

there are no damages, as plaintiff's counsel has articulated,

that can be compensable in this case, then why is that a

negotiated term of the settlement?  The first step that the

Court has to consider today --

          THE COURT:  If that is such a problem, though, where

is my prairie fire?  Where's my outrage among shareholders?

          MR. ROBINSON:  Let me --

          THE COURT:  Where's the revolution?

          MR. ROBINSON:  Let me address that, Your Honor, as

best I can, based on the record they've created.  So Judge

Motz gave preliminary approval.

          THE COURT:  Yes.

          MR. ROBINSON:  Judge Motz said in the preliminary

approval order, that they prepared for Judge Motz to sign,

that notice shall go out no, I think, less than 60 days before

today's date.  They filed an affidavit just a couple weeks ago

saying, at least as of October 16th, they're still sending out

thousands of notices to class members.

          So the answer to your question, Your Honor, is

partly sort of the first question that I think you have to

address before you get to the attorney fees, was the

1    settlement fair, reasonable, and adequate.  And I think the

2    notice in and of itself, and the problems with the notice that

3    they've provided testimony to the Court about, bear out the

4    class members don't know what's going on.  They weren't sent

5    the notice timely.  And maybe there's a structural defect in

6    how the investments are held and who initially got the notice

7    and did they get the other addresses.

8            But they never once, Your Honor, came back and asked

9    the Court, Judge Motz or Your Honor, or any other judge, to

10   modify the settlement agreement, to change the date, to change

11   the notice to say, hey, we're having problems identifying all

12   the class members.  Instead they kept sending out notices.

13   And I understand that's maybe in good faith.  But the notices,

14   under their sworn testimony, thousands of them were just a

15   couple weeks ago, after the objection deadline.  The objection

16   deadline, according to the Court order, was in early October.

17           So you know, to the extent that there's not a lot of

18   objectors here, I don't think that -- that sometimes is

19   indicative of a reasonable settlement.  There is an inference

20   and there's a body of case law --

21           THE COURT:  Ton of case law that backs up that

22   principle.

23           MR. ROBINSON:  Right.  And here we have, by their

24   own sworn testimony, thousands of notices sent out after the

25   bar date.  And it's pretty clear in the settlement agreement

1    and the notice, if you do not timely object you will not be

2    permitted to appear at court.  Now, when I'm before Your Honor

3    on that table over there, I always invite the class members to

4    come up whether they objected or not.  But that's -- they

5    don't put that kind of language in our settlement agreements

6    and in the orders of the Court.  But the messaging that went

7    out to the class was late, that went out to the class late

8    without approval of the Court late, was if you don't get it in

9    on time you're not going to be able to be here.

10        THE COURT:  Yeah, but if we afford a modicum of

11   intelligence and energy to the fellow class members, we can

12   reasonably expect that they would raise exactly the point that

13   you're raising, which is wait a minute, the objection deadline

14   was X, and I didn't get notice until Y.  Y came after X.  I'm

15   not sure how much of an inference I should draw from the fact

16   that there's silence in the face of that.  My experience,

17   frankly, is to the contrary, people got beefs, they tell you

18   about it.

19        But nonetheless, I've heard the point.  I'll go back

20   to Mr. Monteverde and raise the question with him about notice

21   and its adequacy, and what inference should be drawn from the

22   fact that there are only two objectors here, when there was

23   evidently a less than perfect process of notification.

24        MR. MONTEVERDE:  Thank you, Your Honor.  The process

25   was perfect, it's the way that process works always.  I think

1    what they're complaining is something that there is no legal

2    complaint to be had.  That's with their brokers.  And that's

3    what the law requires and that's what we did.  The notice was

4    sent when it's required to be sent per Judge Motz' order.  If

5    then other notices aren't forwarded by brokers in a timely

6    manner, that's not our fault.  And frankly, Your Honor, they

7    got the notice, we have two objectors here.

8           THE COURT:  What do you say to his point that he

9    contends that you have acknowledged that you were still

10   sending notices --

11          MR. MONTEVERDE:  No, those are forward notices.

12          THE COURT:  Okay.  That's what I'm trying to nail

13   down is whether or not those originated with your servicer or

14   whether that is something that's downstream.

15          MR. MONTEVERDE:  It's downstream.  It's nothing

16   nefarious.  This is how every case -- we used a reputable

17   notice administrator that has done these types of cases, that

18   has been approved by federal courts across the country.  The

19   law supports it.  And the notice was appropriate.  And the

20   fact that you only have two objections out of 141,000 notices

21   that were mailed shows support for the settlement.

22          But the bigger point is, I keep hearing is, the

23   damages.  This was not a damages case because it was an

24   Exchange Act claim.  And maybe there's a misunderstanding of

25   the law.  But that's what we sought an injunction.  And one of

1    the things I need to say when I file an injunction, Your

2    Honor, and Your Honor knows this, I have no remedy in law for

3    damages.  That's called irreparable harm.  I said that in my

4    motion to Judge Motz.  I mean, we're just arguing about

5    something that is just not realistic or supported by law.

6              THE COURT:  Thank you, Mr. Monteverde.

7              MR. MONTEVERDE:  I wanted to clarify that.  Thank

8    you.

9              THE COURT:  Thank you very much.  Mr. Russell -- or

10   Mr. Robinson, I'll let you finish up.  And Mr. Dvores

11   evidently wants to get in something on this point as well.

12   I'll hear from him.

13             MR. ROBINSON:  If I may just add, Your Honor.  In

14   the affidavit that they presented to the Court on October

15   19th, 2017, it says in paragraph 5, that's document 22-1 in

16   the 3742 case, from August 29th, 2017, to August 16th, 2017,

17   GCG, I think that's the provider they used, Your Honor,

18   received from the nominee holders 57,487 additional names and

19   addresses of beneficial owners of NRF common stock.  They're

20   testifying -- basic due process in a class settlement, you're

21   asking the class members, and the absent class members who Mr.

22   Hoffman has also objected on behalf of, to waive their claims,

23   but they didn't -- they've acknowledged.

24             Now, I understand that maybe the process in the

25   securities case is little different for getting notice to

1    people.  But shouldn't they have thought of that, Your Honor,

2    to preserve due process, and the rights of the absent class

3    members, when they ask for the particular timetable that they

4    ask for, if they knew that they were going to have to get

5    addresses after the fact, additional addresses and send out

6    notices to people who didn't get it, after the fact, then

7    perhaps they should have asked for more time.  But you know, I

8    point out again, Your Honor --

9         THE COURT:  Let's just nail that down.  Mr.

10   Monteverde, please explain?

11        MR. MONTEVERDE:  This is the standard schedule that

12   has been approved a thousand times before.  And has been found

13   to be legally acceptable for due process.  The Supreme Court

14   has accepted --

15        THE COURT:  That's fine, but rather than tell me

16   that, tell me the mechanics of what happened with respect to

17   the notices.  What is this additional time period during which

18   your administrator was reporting they received additional

19   addresses from you and then mailed out.  What was that about

20   and when did that occur?

21        MR. MONTEVERDE:  Well, I would have to first of all

22   say we don't handle the notice, the notice is handled by the

23   administrator, which works with the defendants to get the

24   record list.  My understanding is they get the list and that's

25   where your notices go out that you're required to give

1   legally.  That's a professional courtesy, you then forward

2   additional notices that brokers request, but that's not

3   required under the law.  We don't have to do that.  That's

4   what the --

5           THE COURT:  So the initial notices that were sent

6   outside the 60 day time period, and I'm going to ask the

7   defendants about this in a second, did occur?

8           MR. MONTEVERDE:  Yes.

9           THE COURT:  It's just that in most instances that's

10  not going to the ultimate beneficial owner of the stock.

11          MR. MONTEVERDE:  Right.

12          THE COURT:  It's going to the representative, it's

13  going to their broker.

14          MR. MONTEVERDE:  And nowadays most brokers, for

15  example, most individual have internet accounts and they get

16  those notices immediately via e-mail, for example, there's

17  people that still want it forward.  But the law requires the

18  record holders be given notice.  And the fact is we have

19  objectors.  And I can tell you, I can represent to the Court

20  we haven't received any late objections, which the Court could

21  still have considered.  I haven't received any phone calls

22  saying, we're objecting, or we want to object, we just

23  received the notice, which was the -- all the notices have

24  been delivered.  I mean, we're arguing over something, again,

25  that there's no legal ground for it, Your Honor.  This is

1    acceptable procedure --

2            THE COURT:  Let me hear from Mr. -- how do I say it

3    Mundiya.

4            MR. MUNDIYA:  Mundiya, yes, Your Honor.  Your Honor,

5    this is typical.  In terms of the mechanics, you nailed it.

6    Basically the notices go out, in accordance with the judge's

7    order, after the 60-day period.  Then the nominees say, okay,

8    these are the people -- these are the names and addresses that

9    we have, you may want to, you know, you have to then submit

10   additional -- those notices to these names and addresses.  But

11   in terms of the due process issue, what the law requires is

12   that those notice get mailed out to the only entities that we

13   have visibility to -- on rather -- has visibility on, which is

14   the nominees.  And we rely upon those nominees to tell us

15   names and addresses.

16           And then Garden City, which is a very reputable

17   entity that does this, you know, has done this for us in

18   thousands of cases, hundreds of cases, you know, this is the

19   way it happens.  And it's only because we don't have

20   visibility into who those shareholders are.  And once we get

21   that information, once Garden City gets that information,

22   those notices then go out.

23           THE COURT:  I got it.

24           MR. MONTEVERDE:  One point I want to make, Your

25   Honor, and I think is important.  The form 8-K we had issued

1   also on December 9th disclosed this litigation --

2           THE COURT:  Are you talking about the 8-K?

3           MR. MONTEVERDE:  Yes, back then.

4           THE COURT:  Yes.

5           MR. MONTEVERDE:  So that's more notice that

6   shareholders know there is ongoing litigation.  I can assure

7   you that when you have shareholders who think a case should be

8   settled for different terms, or there should be a claim

9   pursued, those lawyers out there, like myself, that practice

10  in this space, will start getting involved.  So there's also

11  constructive notice.  I'm just saying, people knew about this

12  case.  This is not like a -- we're not trying to hide

13  anything.  But I will echo Mr. Mundiya, we follow process as

14  required by law as well.

15          THE COURT:  Mr. Robinson, what else did you want to

16  cover?

17          MR. ROBINSON:  Just in sum on that issue and then I

18  have one other minor issue, Your Honor, to summarize for

19  today.  And that issue, the issue that I'm raising, is due

20  process in this case.  Not due process as to the notice that

21  went out, the supplemental notice.  Due process for this case,

22  you're asking the class members who cannot opt out, who did

23  not get the notice within the Court ordered time.  And

24  according to their proffers --

25          THE COURT:  But they did get the notice.

1          MR. ROBINSON:  Well, according to their proffers,

2     they understand the system is they sent them to the first

3     person that they knew.  But they also know from their

4     experience that they would get supplemental addresses for

5     people like Mr. Hoffman, who would get -- then they would

6     resend or they would send the notice out to Mr. Hoffman again.

7     I'm just saying, Your Honor, under due process principles,

8     they know that outcome is inevitable, why condense this down

9     to such a short time period?

10         Moving on, if the Court finds that the settlement

11    the fair, adequate and reasonable, then you can get to the

12    attorney fee issue that you brought up.  And the only issues I

13    would raise there --

14         THE COURT:  I so find it was fair, adequate, and

15    reasonable.  And now I do want to get to the attorney's fees,

16    because I think that's the issue today.

17         MR. ROBINSON:  The three things, not to repeat what

18    was said earlier -- or four things that I would just point

19    out.  I don't believe that this Court has recognized the

20    Laffey matrix as the correct thing.  It might be used on a

21    cross check, Your Honor.  But the first step that most -- that

22    Your Honor, I believe looks at and your colleagues look at,

23    are what the Appendix B says in the local rules for reasonable

24    rates.  They've sought attorney fees for attorneys who aren't

25    entered into the case.  They appear to be duplicative entries.

1    And we think that they're seeking excessive fees for

2    nonattorneys in the case.  And we just we think it's grossly

3    excessive, the number of hours for a case that really didn't

4    exist very long.  Not much work was done in the case.  There

5    was no dispositive motions filed or anything along those --

6              THE COURT:  How reasonable is it for the Court to

7    also look at what was ultimately accomplished through the

8    lawsuit?

9              MR. ROBINSON:  I think under the *Johnson* factors you

10   can consider that, Your Honor.  They address some of the

11   *Johnson* factors, I believe in the case.  But, you know, so you

12   can look at in terms of the -- I believe the case law is, and

13   under the *Johnson* factors, you can look at their

14   reasonableness of the attorney fee award to the outcome that

15   was achieved for the class.  Remembering again the outcome

16   here was a supplemental notice for claims that may not have

17   had any value.  And I'm not sure that there's anything really

18   before the Court to quantify what the value of that notice

19   is.

20             THE COURT:  Well, that's a really hard problem;

21   isn't it?

22             MR. ROBINSON:  Correct.

23             THE COURT:  But on the other hand, if we didn't

24   think that disclosure had value, I suppose we wouldn't require

25   it under our extensive legal apparatus for regulating the

1    securities industry, would we.  So it must have some value.

2         MR. ROBINSON:  Unless the Court has any other

3    questions for me that summarizes what I wanted to present to

4    the Court.

5         THE COURT:  I started to get into the metaphysical

6    and that's when you wanted to sit down, Mr. Robinson.  Okay.

7         Mr. Dvores, you want to say something about the

8    fees?

9         MR. DVORES:  I want to say something, yes.  Not

10   necessarily limited to what he said about the fees.

11        THE COURT:  Well, the only topic that's on the table

12   is the fees.

13        MR. DVORES:  All right.  You said before, and he

14   made the point, that this case turns a lot on the fact that

15   there are only two objectors that have come forward here.  And

16   somehow that means that the other parties are not interested,

17   because the other parties didn't see any issue here.  Well,

18   let me just quote or cite one case that I was personally

19   involved with, where there were 112,000 -- it was a federal

20   case in U.S. District Court, Southern District of Manhattan,

21   New York.

22        There were 112,000 notices mailed out in this case,

23   In re: Tower Group International Litigation, it was a merger

24   case.  It was only one objector of the 112,000 notices that

25   were mailed out, that was myself.  As soon as I got involved

1    with the case and filed my objection, somehow the attorneys

2    got together with the defendant attorneys and they reduced the

3    claim from $395,000 in attorney's fees down to $250,000.  The

4    Court said, sorry, I have to look at it myself.  I'm not

5    persuaded by what you have consented to among yourselves.

6           The Court then reviewed all of the disclosures and

7    found that under the Court's finding they were of marginal

8    value.  They were not corrective of anything.  And determined

9    that -- reduced the fee down to $75,000 for -- and this was

10    two sets of attorneys, one Robbins Arroyo from California, the

11    other one Rice Law from New York City.

12           I still thought that was excessive in the situation,

13    because I had found in the course of doing my research that

14    there were SEC filings that showed that this company that had

15    been acquired and which the plaintiffs attorneys were claiming

16    had received inadequate compensation for the shareholders, it

17    was phony.  There was filings that showed that this was a

18    failing insurance company.  It was going out of business

19    basically.  And they had said so in filings.

20           I had filed an appeal with the 2nd circuit.  After I

21    filed my brief the plaintiffs' attorneys came to me, I never

22    said anything about settling.  I wanted to see this case

23    through.  They said, you won, we can't argue with you.  And

24    what will you take for your time?  I said, I don't want

25    anything for myself.  Well, they said we're going to give back

1    the $75,000 and dismiss the case.  It will be moot.  The 2nd

2    Circuit will have nothing to decide on, the case will be

3    dismissed.  So I said, okay.  I took half of the money,

4    $37,500 for charity.

5            This shows nothing, the fact that it's only two

6    people that wanted to object.  The fact is, if this case

7    doesn't involve money, which it doesn't, most people when they

8    get this notice, when they look at how complex it is.  When

9    they look at the fact that it says NSAM on it, and their case

10   involves NRF, they're going to say what's this all about and

11   throw it in the wastebasket.  When they do read it, if they

12   did, they'll find that the accounting business is so complex

13   they can't understand it.  They need help.  But by golly, they

14   don't have help.  Because it's all over.  There's two -- it's

15   just too expensive and too soon for them to react.

16           And to file an objection takes some degree of time.

17   I can tell you.  And I'm a former attorney -- I am an

18   attorney, I'm retired for 35 years.  So I don't really know

19   anything about the modern law.  But I do know some modern

20   concept -- some old concepts of fairness.  And pursuit of your

21   fiduciary duty to your client.  These attorneys took this case

22   and shaped it into a disclosure case under the federal law,

23   when they could have taken the same facts and shaped it into a

24   breach of fiduciary duty under Delaware law, because they

25   said -- in their own complaint there's a question of excessive

1    compensation, taking advantage of the share owners by

2    management.  This is all common place stuff that happens all

3    the time.  But they never pursued it.  And that's the question

4    I have.

5              THE COURT:  Thank you, Mr. Dvores.

6              Mr. Monteverde, let me tell you that where I end up

7    on this is actually in a very different place from where the

8    objectors are.  My view is I don't think there was much here

9    from -- on the plaintiff's side.  And I think you pursued a

10   resolution of the dispute.  I think relatively quickly.  You

11   achieved one.  You had defendants that had every incentive to

12   remove impediments and to get their deal done.  And I, in

13   looking at the total picture here, don't see that there was

14   some enormously tall or difficult mountain that was climbed.

15             Not that you're not, obviously, capable of that.

16   I'm sure that you are.  You've done a fine job here this

17   morning representing the -- your interests.  And those of

18   the -- your clients.  But at the end of the day, it's going to

19   take some Herculean effort on your part and that of your

20   colleagues to persuade me that this is a million dollar fee

21   case.  Have at it.

22             MR. MONTEVERDE:  I don't think it's a hard thing to

23   do, Your Honor.  Maybe it's because I'm a finance person

24   before going into law.  And I understand how this is very

25   important for financial markets, Your Honor.  I'll make a

quick point, not to start telling tales.  Just two weeks ago I
was before the 9th Circuit.  I'm trying to change the law on
tender offers, 14(e) statute, because the standard is
scienter, I believe it should be negligence.  So I believe in
what I do Your Honor, and my record shows it.

The markets without projections, the stock is
worthless.  And defendants sometimes fight very hard, because
they want a deal to go through to preserve employment, or
because they have a buyer that they think the CO will get a
job with, and they don't show the projections.  Or what they
do, and we have experience handling those cases also, they
change the set of projections six months before the deal is
reached.  They just lower expectations.

Projections is what makes the stock market work,
Your Honor.  And that's why we're entitled for multimillion
dollar fee.  The reason why I'm not asking for a multiple
million dollar fee, because there were three sets of
projections, and I would argue under *Affymetrix*, the *Douglas
versus Witney* case that I just did in the Northern District of
California last year, I got paid $1 million.  I would say I
should be getting $3 million.  One for me, one for Mr. Wilson,
and one for Mr. Ademi.

And I was ready to walk into court asking for that.
I had a negotiation with Mr. Mundiya.  Who I've had him as an
adversary and we've had fights in the past.  So it's not like

```
 1    we're best friends.  And he has no incentive whatsoever --
 2              MR. MUNDIYA:  We're not friends.
 3              MR. MONTEVERDE:  We're not friends.  -- has no
 4    incentive to overpay me.  The negotiation --
 5              THE COURT:  Well, he has every incentive --
 6              MR. MONTEVERDE:  No he doesn't.
 7              THE COURT:  Absolutely he does.  To close his
 8    deal.
 9              MR. MONTEVERDE:  No.  You know what he has an
10    incentive to do?  And that's what we did here, Your Honor.  We
11    reached a settlement without a fee number.  Mr. Mundiya and I
12    were negotiating the fee until the day the notice had to go
13    out.  That's why there was that supplement to the back.  To
14    the last minute we were negotiating.  He didn't want to pay
15    me, I wanted 3 million.  And I'm not going to get into the
16    back and forth, it's inadmissible and it's irrelevant.  But we
17    had a deal, and the disclosures already done.  We had a deal
18    that I was going to give him a release because I already
19    conducted discovery and so did my colleagues, without
20    agreement on the fee.
21              I can assure you they had no incentive whatsoever.
22    The reason they agreed to a number is because they knew I
23    would come into this court, with all the cases on my slide, 22
24    and 23, and show Your Honor exactly identical cases paid a lot
25    more than $4- or $450,000.  The reason we're asking for 450,
```

1    and Mr. Ademi is asking for that, instead of 400 like the

2    rest, is because they had the Goldman error, so they deserve a

3    little bit more money.  But I think Your Honor is thinking,

4    well, it's a $1,250,000.  Yes, but there's three cases.

5             THE COURT:  Yeah, but is it three cases and should

6    it be treated that way?

7             MR. MONTEVERDE:  No.  They are three cases.  We were

8    coordinated.  This happened in Atlas Energy.  Atlas Energy was

9    with Atlas Pipeline, we're doing a combination.  And there

10   were, I think, four or five law firms in there, in both.  And

11   I think the fee paid there was $1 million.  $500,000 for Atlas

12   Energy, $500,000 for Atlas Pipeline.  Here we're getting paid

13   less.  And that was in state court in Pennsylvania, which is a

14   very difficult jurisdiction on a contested fee.  In federal

15   court it's easier for a plaintiff to get paid for an Exchange

16   Act claim.

17            And defendants have an incentive not to pay.  And,

18   Your Honor, I want to make sure the record's clear, it's not

19   true they have an incentive to pay us, the opposite.  They

20   don't want to pay us well because they want to avoid getting

21   sued again for their other clients.  If they're known as

22   people that pay a lot of money, they're putting a target on

23   their client's back.  And the negotiation here was ruthless,

24   Your Honor.  We were on the phone.  We were -- there were --

25            THE COURT:  You all look badly beaten to me.  You

1    haven't eaten in weeks.

2         MR. MONTEVERDE:  Your Honor, just because we

3    preserve our good looks, that has nothing to do.  No, but in

4    all seriousness, Your Honor, this is done by lawyers on both

5    sides, we know what we're doing.  And we fight for a living.

6    I have cases where we're appealing, I have cases where we are

7    set for trial, I have cases we have settled, I have cases that

8    I lost.  These is what we do.  We're not getting paid -- I

9    want Your Honor to give me the entire fee.  And giving me the

10   entire fee is not a windfall.  It's just what's fair.

11        And, frankly, I should get paid more, Your Honor.  I

12   have authority.  And just to make that point, on page 15 of a

13   reply brief talks about it, the Appendix B.  Those are civil

14   right cases where it is a fee shifting.  That's not the case.

15   This is not a fee shifting.  This is a contractual, we have

16   reached an agreement that defendants will pay the fee up to

17   $1,250,000 for all three cases.  And we're asking that Your

18   Honor pay it.

19        And we have expenses.  I have a chart.  I know my

20   Power Point was not the success I was hoping for.  But slide

21   21 shows Your Honor we spent $37,196.50.  That's money out of

22   our pocket.  We spent it before we reached an agreement,

23   because that's for filing the case, for financial advisors we

24   retained, for depositions, for travel to those depositions.

25   The deposition I took were in Tampa, Florida, Your Honor.

1          And just to give you a sense, it wasn't let's go to

2     Florida and make a weekend out of it.  I flew into Tampa in

3     the 6:00 a.m. flight.  I didn't even go the night before to

4     save money for the clients, so we don't have a hotel charge.

5     I went to a Marriott right inside the airport, so I didn't

6     even pay for a taxi to go to an office.  Mr. Mundiya was

7     awaiting me.  And we had a room with not even windows, Your

8     Honor, with the deponent there.  I conducted the deposition.

9     And both Mr. Mundiya and I rushed back to take separate

10    flights, we actually ended up going to different airports,

11    because we're on the clock.  We're working.  I have other

12    cases, Your Honor, I'm not here to make vacation out of going

13    to take a deposition.  That's how we handled this case.  We

14    were very efficient.  And yet with that efficiency we still

15    incurred $37,000 out of my pocket that I may never get back.

16          THE COURT:  Thank you, counsel.  I need to start a

17    sentencing hearing here in nine minutes.  I have heard what I

18    need to hear.  I am not prepared to enter the agreement or the

19    order that has been proposed.  I will signal counsel that I

20    would expect to enter an approval of the global arrangement

21    provided that the total attorney's fees that were submitted

22    amounted to a million dollars or less.  I'll look forward to a

23    resubmittal, ten days, Counsel, and expect to proceed to a

24    conclusion of this on the papers without a further hearing.  I

25    know counsel have heard the signal that I have sent.  Thank

1    you.

2              MR. MONTEVERDE:  Okay, sir -- Your Honor.  Thank

3    you.

4              (The proceedings were concluded.)

5

6              I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

7

8                       _____/s/_____
                            Christine T. Asif
                         Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
August 16th, 2017
    36:17.
August 29th, 2017
    36:17.
December 1st 8:7.
December 20, 2016
    23:14.
December 9th 25:1,
    25:14, 40:2.
December 9th, 2016
    23:13.
October 16th
    32:22.
October 19th, 2017
    36:15.
$1 47:21, 49:12.
$1,000 15:11.
$1,250,000 50:18.
$1,250,000. 49:5.
$100 16:3.
$250,000. 44:4.
$3 47:22.
$37,000 51:16.
$37,196.50. 50:22.
$37,500 45:5.
$395,000 44:4.
$4- 49:1.
$450,000. 49:1.
$500,000 49:12,
    49:13.
$500,000. 13:21.
$6- 15:19.
$600 14:20.
$600,000. 13:25.
$700,000. 13:23.
$75,000 44:10,
    45:2.
$750,000 15:20.
$750,000. 13:24.
$9 15:25.
$950 14:18.
$950. 14:21.
%17.5 27:12.
.
.
< 1 >.
1.8 14:2.
10 26:2.
10. 11:7.

101 1:48, 2:47.
10th 6:3.
11 11:19, 26:3.
112,000 43:20,
    43:23, 43:25.
12 11:19.
13 11:3, 11:19.
140,000 16:14.
141,000 6:10, 26:23,
    35:21.
15 50:13.
16-3282 3:7.
16-3742 4:4.
16-CV-3282 3:24.
16-CV-3742 3:19.
.
.
< 2 >.
2 6:10.
2.1 14:2.
2017 1:41, 6:3.
20th 25:1.
21 50:22.
21201 1:49, 2:48.
22 27:3, 48:24.
22-1 36:16.
23 27:3, 48:25.
2nd 44:21, 45:2.
.
.
< 3 >.
3 16:7, 48:16.
3,000 15:18.
300s 14:23.
33.9 20:16.
35 45:19.
3742 36:17.
3745 4:8.
.
.
< 4 >.
400 49:2.
450 49:1.
4th 1:48, 2:47.
.
.
< 5 >.
5 36:16.
57,487 36:19.
.

.
< 6 >.
60 32:20, 38:7.
60-day 39:8.
6:00 51:4.
.
.
< 8 >.
8-K 26:5, 40:1,
    40:3.
.
.
< 9 >.
9 16:7.
9th 47:3.
=Affymetrix 13:13,
    47:19.
=bry 13:24.
=dandy 12:21.
=DPL 13:22.
=efficient 8:2.
=forteny 47:4.
=gang 24:9.
=lackey 41:21.
=lafferty 14:13.
=lead 10:15.
=lorette 7:19.
=Mavenir 8:25.
=orick 13:16.
=robbins 44:11.
=telapse 13:23.
_____/s/_____
    _____ 52:11.
.
.
< A >.
a.m. 51:4.
able 9:3, 9:9,
    12:18, 12:20,
    34:10.
above 16:3.
above-entitled
    52:9.
absent 36:22,
    37:3.
Absolutely 17:24,
    18:6, 48:8.
Accept 7:6.
acceptable 37:14,
    39:2.

accepted 37:15.
access 12:24.
accomplished 42:8.
accordance 39:7.
according 33:17,
    40:25, 41:2.
accordingly 31:22.
accounting 22:22,
    45:13.
accounts 38:16.
achieved 13:9,
    13:11, 32:4,
    42:16, 46:12.
acknowledged 35:10,
    36:24.
acquire 24:5.
acquired 44:16.
across 35:19.
Act 11:11, 12:15,
    35:25, 49:17.
action 6:11.
actionable 27:24.
actual 24:1, 25:5,
    29:9.
Actually 6:9, 15:23,
    24:7, 24:19, 27:8,
    27:9, 27:12, 46:8,
    51:11.
add 36:14.
additional 36:19,
    37:6, 37:18,
    37:19, 38:3,
    39:11.
address 29:12,
    29:22, 32:14,
    33:1, 42:11.
addressed 28:12.
addresses 33:8,
    36:20, 37:6,
    37:20, 39:9,
    39:11, 39:16,
    41:5.
Ademi 2:18, 3:20,
    3:21, 6:19, 8:19,
    9:7, 29:6, 47:23,
    49:2.
adequacy 34:22.
adequate 12:4,
    20:25, 33:2,
    41:12, 41:15.

adequately 20:10.
administrator 35:18,
    37:19, 37:24.
adopted 9:24.
advance 13:3.
advancing 12:12.
advantage 46:2.
adversaries 15:8.
adversary 48:1.
advisors 50:24.
affected 6:25,
    26:12.
affidavit 32:21,
    36:15.
afford 34:11.
agents 25:16.
aggregate 14:2.
aggressive 17:1.
ago 27:12, 32:21,
    33:16, 47:2.
agree 31:5.
agreed 12:7, 12:8,
    20:14, 20:24,
    48:23.
agreement 5:6, 10:7,
    10:9, 18:19, 32:4,
    33:11, 34:1,
    48:21, 50:17,
    50:23, 51:19.
agreements 10:24,
    34:6.
ahead 5:5, 25:23.
airport 51:6.
airports 51:11.
al 3:6, 3:7, 3:8.
allegation 27:23.
allows 10:16.
alone 20:13.
already 20:1, 29:23,
    48:18, 48:19.
American 27:11.
among 32:11, 44:6.
amount 5:16.
amounted 51:23.
amounts 20:19.
analogous 15:15.
analyses 18:13.
Andrew 2:34, 4:3.
angle 12:11.
angles 11:4.

announced 11:7.
answer 19:9, 25:21,
    32:24.
answers 17:22.
anticipated 6:16.
apologize 6:8.
apparatus 43:1.
appeal 44:21.
appealing 50:7.
appear 34:3, 42:1.
Appearances 2:1,
    3:11.
Appendix 41:24,
    50:14.
application 16:23.
applies 31:20.
apply 9:23, 9:25.
appointed 29:4,
    29:6, 29:7.
appreciate 11:25,
    12:1, 12:2,
    19:14.
appropriate 14:7,
    35:20.
approval 27:1, 29:4,
    32:16, 32:19,
    34:9, 51:21.
approve 5:17.
approved 26:21,
    35:19, 37:13.
argue 10:17, 12:20,
    14:1, 15:24,
    44:24, 47:19.
argued 30:18.
arguing 26:16, 36:5,
    38:25.
argument 10:13,
    11:8, 22:10,
    25:17, 29:12,
    30:12, 30:16,
    31:3.
arise 8:13, 10:13.
arm 9:18.
around 15:19.
arrangement 51:21.
arrangements
    24:22.
articulated 31:2,
    32:6.
Asif 1:46, 2:45,

52:7, 52:12.
aspect 15:15.
assess 28:2.
Asset 1:21, 2:22,
  3:5.
assist 6:1.
Associates 3:16,
  5:22, 6:17.
assure 8:21, 15:7,
  28:23, 40:7,
  48:22.
Atlas 49:9, 49:10,
  49:12, 49:13.
attorney 5:16, 13:6,
  13:7, 13:8, 13:16,
  13:22, 14:10,
  16:4, 22:4, 33:1,
  41:13, 41:16,
  41:25, 42:15,
  44:4, 45:18,
  45:19, 51:22.
attorneys 19:20,
  21:13, 23:8,
  25:13, 41:25,
  44:2, 44:3, 44:11,
  44:16, 44:22,
  45:22.
authority 50:13.
average 13:21.
avoid 49:21.
awaiting 51:8.
award 42:15.
aware 30:14.
away 5:14, 9:4.
.
.
< B >.
B. 50:14.
back 7:6, 17:10,
  18:7, 18:9, 18:10,
  18:15, 19:11,
  30:12, 33:9,
  34:20, 40:4, 45:1,
  48:14, 48:17,
  49:24, 51:10,
  51:16.
backs 33:22.
bad 17:25.
badly 50:1.
Baltimore 1:42,

1:49, 2:48.
banker 13:18.
bankers 10:20,
  10:21, 18:20.
bar 10:7, 31:5,
  32:5, 34:1.
based 32:15.
basic 23:8, 36:21.
Basically 39:7,
  44:20.
basis 30:15,
  31:10.
bear 14:7, 33:4.
beaten 50:1.
beefs 34:18.
beginning 5:12.
Behalf 1:5, 1:16,
  1:27, 4:4, 4:7,
  5:4, 5:24,
  36:23.
believe 29:13,
  41:20, 41:23,
  42:12, 42:13,
  47:5.
beneficial 36:20,
  38:11.
benefit 10:16,
  12:21, 15:16,
  16:4, 16:13,
  16:14, 24:2, 24:3,
  31:10.
best 13:4, 20:8,
  21:4, 30:19,
  31:12, 31:21,
  32:15, 48:2.
better 22:17, 27:14,
  28:5, 28:8.
Beyond 25:3.
bigger 35:23.
Bill 4:6, 15:11.
billing 15:1,
  22:3.
billion 15:25, 16:7,
  16:8.
bit 25:25, 49:4.
blenda 14:20.
blew 9:3.
board 10:22, 11:2,
  11:3, 11:5, 11:7,
  20:14, 20:24.

body 33:21.
book 24:9.
booklet 5:25.
Boothe 1:26, 2:26,
  3:8, 3:19, 4:5,
  20:7.
bought 24:8.
breach 7:7, 21:14,
  21:16, 21:19,
  21:21, 45:25.
breakdown 6:11.
brief 13:14, 44:22,
  50:14.
briefing 14:12.
briefly 11:18,
  28:20.
bright 20:23.
broad 31:14.
broker 38:14.
brokerage 23:16,
  24:12.
brokers 23:21,
  26:22, 35:3, 35:6,
  38:3, 38:15.
brought 41:13.
Brower 3:13.
bunch 16:25.
business 44:19,
  45:13.
buyer 13:18,
  47:10.
buyout 10:15.
.
.
< C >.
calendar 18:5.
caliber 15:10.
California 13:15,
  44:11, 47:21.
call 3:3, 9:11.
called 36:4.
calls 38:22.
candid 17:22.
candidly 18:10.
capable 46:16.
Capital 2:10, 3:7,
  3:17, 7:10, 8:17,
  9:21, 9:24,
  27:11.
captured 26:7.

Carter 2:4, 3:6.
cases 6:21, 9:10,
    13:8, 13:9, 13:11,
    13:22, 13:25,
    14:10, 15:5,
    15:15, 15:18,
    27:13, 27:14,
    28:25, 31:9, 32:4,
    35:18, 39:19,
    47:12, 48:24,
    48:25, 49:5, 49:6,
    49:8, 50:7, 50:8,
    50:15, 50:18,
    51:13.
cash 7:8, 7:20,
    18:8, 18:13,
    22:22.
cast 7:1, 8:1,
    32:2.
casting 26:9.
category 5:9.
Syntroleum 9:6.
certainly 9:23.
certify 52:7.
chance 24:24.
Chancery 9:1, 9:17,
    16:2.
change 25:16, 33:11,
    47:3, 47:13.
changed 11:5,
    25:14.
charge 51:5.
charged 22:4.
charity 45:5.
chart 20:12,
    50:20.
check 41:22.
Christine 1:46,
    2:45, 52:7,
    52:12.
chronology 30:3.
Cindy 1:15, 2:16,
    3:21.
Circuit 44:21, 45:3,
    47:3.
circumstances 5:10,
    31:19.
cite 43:19.
cited 13:13, 14:9,
    14:11, 27:2.

City 39:17, 39:22,
    44:12.
CIVIL 1:9, 1:20,
    1:31, 3:6, 3:8,
    50:14.
claim 7:7, 7:8,
    7:22, 12:9, 12:15,
    13:3, 19:3, 21:22,
    22:15, 27:19,
    28:8, 31:12,
    35:25, 40:9, 44:4,
    49:17.
claiming 44:16.
claims 7:6, 7:23,
    8:13, 10:11, 11:1,
    11:10, 12:17,
    13:1, 13:4, 22:16,
    23:2, 27:5, 27:15,
    27:17, 27:18,
    29:15, 30:6,
    30:23, 30:24,
    31:1, 31:2, 31:14,
    36:23, 42:17.
clarify 36:8.
class 6:25, 8:1,
    8:16, 22:7, 29:5,
    29:6, 29:7, 29:10,
    31:21, 31:25,
    32:23, 33:5,
    33:13, 34:4, 34:8,
    34:12, 36:21,
    36:22, 37:3,
    40:23, 42:16.
class-wide 31:10.
classes 31:6.
clear 10:22, 32:2,
    34:1, 49:19.
clearing 24:12.
clearly 30:8,
    30:22.
client 5:2, 45:22,
    49:24.
clients 18:14, 23:5,
    46:19, 49:22,
    51:5.
climbed 46:15.
clock 51:12.
close 12:17, 48:8.
closes 9:20.
CO 10:4, 47:10.

coffers 20:21.
colleagues 41:23,
    46:21, 48:20.
collusive 19:10.
Colony 2:10, 3:7,
    3:17, 3:23, 4:1,
    7:10, 8:17, 9:21,
    9:24, 11:2, 20:15,
    29:1, 29:6.
COLONY CAPITAL, Inc.
    1:10.
colorable 21:22.
combination 16:13,
    49:10.
combine 20:24.
combined 20:17,
    20:21.
comes 9:13.
commenced 30:3.
Commission 26:2,
    26:6.
committed 17:17.
common 36:20,
    46:3.
companies 11:24,
    12:2, 16:6, 19:24,
    20:1, 20:5,
    27:21.
company 10:5, 10:20,
    20:4, 20:11,
    20:21, 20:24,
    21:1, 21:20,
    22:18, 44:15,
    44:19.
compensable 32:7.
compensate 20:10.
compensation 20:20,
    21:20, 22:16,
    44:17, 46:2.
competent 22:2.
complaining 35:2.
complaint 20:7,
    21:6, 21:18,
    27:20, 27:23,
    27:24, 35:3,
    46:1.
complaints 20:2,
    20:6, 22:6,
    22:13.
completely 17:18.

complex 22:22, 45:9,
   45:13.
complicated 17:13.
concept 45:21.
concepts 45:21.
concern 5:14,
   6:14.
concerned 6:24.
concerning 21:3.
concerns 5:7.
concluded. 52:5.
conclusion 51:25.
condense 41:9.
conduct 9:8.
conducted 8:15,
   10:12, 10:20,
   29:11, 48:20,
   51:9.
conflict 5:13, 6:22,
   7:2, 7:24, 8:13,
   8:14, 10:17,
   10:23, 12:20,
   13:18, 19:20,
   23:7, 28:3,
   29:9.
conflicted 19:25.
conflicts 29:13.
confusion 26:20.
consented 44:6.
consider 16:12,
   32:9, 42:11.
consideration
   20:9.
considered 38:22.
constitution 11:5.
constructive
   40:12.
consulting 10:24.
consummated 20:16,
   20:19.
contained 21:10.
contends 35:10.
contested 49:15.
continue 19:19.
contractual 50:16.
contrary 34:18.
controlled 10:3.
coordinate 6:20.
coordinated 5:23,
   28:4, 49:9.

coordination 5:10,
   5:13, 7:25.
core 16:25.
Corp. 1:32, 2:32,
   3:8.
Corporation 9:22,
   20:7.
corporations 9:23,
   17:4.
Correct 4:14, 4:17,
   4:18, 6:9, 18:21,
   41:21, 42:23,
   52:8.
corrective 44:9.
correctly 4:13, 8:7,
   30:2.
Corwin 9:14.
Counsel 3:13, 3:16,
   4:1, 5:2, 5:10,
   16:16, 17:14,
   29:5, 29:6, 29:7,
   30:18, 32:3, 32:6,
   51:17, 51:20,
   51:24, 52:1.
counsels 28:24.
counter-intuitive
   31:3.
country 27:1,
   35:19.
couple 8:25, 27:12,
   29:23, 29:24,
   32:21, 33:16.
course 28:5,
   44:14.
courtesy 38:2.
courtroom 27:6.
courts 15:8, 15:18,
   16:1, 26:21,
   35:19.
cover 40:17.
created 32:15.
cross 41:22.
current 18:16,
   20:16.
.
.
< D >.
damage-wise 31:4.
damages 9:5, 9:10,
   9:20, 10:2, 11:15,

28:9, 30:5, 30:7,
   30:8, 32:6, 35:24,
   36:4.
date 20:13, 25:14,
   32:21, 33:11,
   34:1.
day 9:15, 21:5,
   38:7, 46:19,
   48:13.
days 18:3, 18:4,
   18:7, 18:9, 18:10,
   18:16, 26:3,
   32:20, 51:24.
deadline 33:16,
   33:17, 34:14.
deal 7:8, 17:3,
   46:13, 47:9,
   47:13, 48:9,
   48:18.
deals 7:12.
decades 14:22.
December 13:15,
   25:1.
decide 45:3.
decided 17:1,
   17:10.
decision 24:5.
defeat 12:16,
   27:7.
defect 33:6.
Defendant 1:12,
   1:23, 1:34, 2:10,
   2:22, 2:32, 17:4,
   17:9, 32:3,
   44:3.
defendants 3:24,
   4:4, 4:7, 5:19,
   9:19, 18:12,
   18:16, 24:23,
   31:7, 31:8, 31:10,
   31:15, 31:17,
   37:24, 38:8,
   46:12, 47:8,
   49:18, 50:17.
defense 15:10,
   15:11, 16:16,
   32:3.
defer 19:17.
degree 45:17.
Delaware 7:12, 9:1,

9:17, 9:22, 9:25,
16:2, 21:15,
45:25.
delay 24:23.
delivered 24:19,
38:25.
demand 21:7.
demonstrate 27:25.
deponent 51:9.
deposition 10:12,
51:1, 51:9,
51:14.
depositions 8:16,
8:17, 8:18, 8:19,
10:20, 18:20,
50:25.
deserve 49:3.
Despite 20:13,
20:23.
determined 44:9.
developed 9:16.
devoted 29:14.
different 5:12, 7:5,
10:19, 14:17,
37:1, 40:9, 46:8,
51:11.
differently 26:16.
difficult 46:15,
49:15.
diligence 18:23,
18:24, 18:25.
direct 19:25.
directly 19:9,
19:25.
directors 10:21,
18:21, 19:4.
disclose 8:9, 9:18,
26:12.
disclosed 10:1,
10:24, 10:25,
21:12, 22:24,
40:2.
disclosure 6:23,
9:1, 11:13, 12:4,
13:12, 13:17,
13:20, 19:22,
21:8, 21:9, 22:20,
42:25, 45:23.
disclosures 8:3,
9:8, 11:17, 13:21,

16:19, 16:24,
17:1, 17:2, 17:6,
17:12, 18:12,
19:12, 26:1, 30:4,
44:7, 48:18.
disconnect 25:25,
26:15.
discount 18:13.
discovery 9:8,
12:14, 12:24,
18:19, 48:20.
discussing 26:22.
dismiss 12:16, 27:7,
45:2.
dismissed 45:4.
dispersions 32:2.
dispositive 42:6.
dispute 46:11.
disseminated 26:4.
distinction 7:23,
8:12.
distinctly 5:11.
distribution
24:12.
District 1:1, 1:2,
13:15, 43:21,
47:20.
document 36:16.
documents 12:22.
doing 12:23, 24:2,
24:3, 44:14,
49:10, 50:6.
dollar 46:21, 47:17,
47:18.
dollars 13:17,
51:23.
done 6:21, 8:24,
11:14, 23:13,
24:9, 24:21,
26:15, 26:23,
26:24, 26:25,
27:4, 35:18,
39:18, 42:5,
46:13, 46:17,
48:18, 50:5.
Douglas 13:14,
47:19.
down 35:14, 37:10,
41:9, 43:7, 44:4,
44:10.

downstream 35:15,
35:16.
draft 27:20,
27:24.
drafting 21:6.
draw 34:16.
drawn 34:22.
Due 36:21, 37:3,
37:14, 39:12,
40:20, 40:21,
40:22, 41:8.
duplication 22:5,
22:9.
duplicative 42:1.
during 37:18.
duties 9:11,
21:17.
duty 7:7, 7:12,
7:15, 7:19, 7:23,
9:11, 9:21, 21:15,
21:19, 21:22,
45:22, 45:25.
Dvores 2:38, 4:11,
4:14, 4:15, 19:14,
19:17, 23:9,
25:22, 26:23,
29:12, 36:11,
43:8, 46:6.
.
.
< E >.
e-mail 38:17.
E. 2:6.
earlier 11:1, 25:8,
28:6, 41:19.
early 33:17.
earnings 11:21,
20:22.
easier 49:16.
easily 10:10.
eaten 50:2.
EBT 22:22.
echo 40:14.
effected 26:10.
effective 23:15.
efficiency 51:15.
efficient 6:15,
26:6, 51:15.
effort 22:6,
46:20.

egregious 12:19.
either 7:19, 8:22.
emergency 16:24.
emphasize 29:12.
emphasizes 16:12.
employment 47:9.
end 21:5, 23:4,
  46:7, 46:19.
ended 27:11,
  51:11.
Energy 34:12, 49:9,
  49:13.
enormously 46:15.
enough 19:23.
ensure 10:12, 11:12,
  11:15, 13:1.
enter 12:8, 25:9,
  51:19, 51:21.
entered 18:18, 25:8,
  25:10, 42:1.
entering 9:1.
entire 10:3, 10:13,
  10:17, 12:21,
  29:25, 50:10,
  50:11.
entities 5:11,
  15:22, 20:25,
  39:13.
entitled 8:1,
  47:16.
entity 16:3, 20:17,
  28:2, 39:18.
entries 42:1.
equals 20:14.
equity 15:25,
  16:5.
erroneous 27:18.
error 49:3.
escaping 14:12,
  14:13.
Esquire 2:6, 2:8,
  2:12, 2:14, 2:18,
  2:20, 2:24, 2:28,
  2:30, 2:34.
essence 30:11,
  31:11.
essentially 8:2,
  9:15, 9:17, 11:20,
  30:18.
et 3:6, 3:7, 3:8.

evaluate 21:4.
eve 8:8.
Everything 24:8,
  26:15.
evidence 8:21.
evidently 16:20,
  34:24, 36:12.
exactly 34:13,
  48:25.
example 9:10, 10:23,
  13:13, 15:17,
  38:16, 38:17.
exception 10:2,
  10:16.
excessive 11:2,
  11:8, 42:2, 42:4,
  44:13, 46:1.
Exchange 11:11,
  12:15, 26:2, 26:6,
  35:25, 49:16.
exchanging 7:11.
excuse 19:22.
executive 20:20.
executives 20:19,
  21:20.
exist 31:3, 42:5.
existed 10:17.
expand 17:2.
expect 34:13, 51:21,
  51:24.
expectations
  47:14.
expenses 50:20.
expensive 45:16.
experience 8:24,
  15:20, 22:3,
  26:11, 34:17,
  41:5, 47:12.
explain 37:11.
explains 30:6.
extensive 18:19,
  43:1.
extent 22:10,
  33:18.
extinguished 9:16,
  21:23.
.
.
< F >.
face 34:17.

fact 12:19, 19:23,
  21:18, 22:8,
  23:18, 24:11,
  24:19, 34:16,
  34:23, 35:21,
  37:6, 37:7, 38:19,
  43:15, 45:6, 45:7,
  45:10.
factors 42:10,
  42:12, 42:14.
facts 12:18, 27:19,
  45:24.
failing 44:19.
fails 20:10.
fair 19:7, 27:6,
  33:2, 41:12,
  41:15, 50:11.
fairness 3:10, 10:3,
  10:14, 10:17,
  12:21, 15:9,
  45:21.
faith 33:14.
far 5:14, 23:24.
Farr 3:23.
Faruqi 3:18, 3:19,
  6:18, 8:18, 9:6,
  9:7, 14:20, 15:2,
  28:16.
fault 35:7.
favor 25:17.
FCRR 1:46, 2:45,
  52:7.
Federal 1:47, 2:46,
  11:11, 13:23,
  13:25, 27:1,
  35:19, 43:20,
  45:23, 49:15.
fee 12:10, 13:6,
  13:7, 13:8, 13:16,
  14:1, 14:3, 14:6,
  16:1, 41:13,
  42:15, 44:10,
  46:21, 47:17,
  47:18, 48:12,
  48:13, 48:21,
  49:12, 49:15,
  50:10, 50:11,
  50:15, 50:16,
  50:17.
fees 5:16, 13:22,

14:8, 14:10, 16:4,
21:25, 22:3, 33:1,
41:16, 41:25,
42:2, 43:9, 43:11,
43:13, 44:4,
51:22.
fellow 34:12.
felt 8:2, 11:10.
few 11:6, 18:3,
18:4, 18:7, 18:9,
18:10, 18:16,
25:18, 25:19,
31:9.
FFO 16:25.
fiction 23:25.
fiduciary 7:7, 7:22,
9:21, 21:15,
21:17, 21:19,
21:21, 45:22,
45:25.
fight 17:25, 47:8,
50:6.
fighting 15:8.
fights 48:1.
file 21:15, 26:8,
27:18, 36:2,
45:17.
filed 12:6, 16:23,
21:11, 22:7,
28:25, 29:2,
32:21, 42:6, 44:2,
44:21, 44:22.
filing 23:12, 23:14,
26:5, 26:24,
50:24.
filings 44:15,
44:18, 44:20.
Finance 1:32, 2:32,
3:8, 6:13, 20:7,
46:24.
financial 12:4,
20:5, 20:23, 47:1,
50:24.
find 27:14, 27:16,
28:8, 41:15,
45:13.
finding 44:8.
finds 41:11.
fine 5:1, 37:16,
46:17.

finish 36:11.
fire 32:11.
firm 3:23, 6:16,
8:18, 8:19, 9:6,
18:13, 29:4, 29:7,
29:16.
firms 15:10, 15:11,
23:16, 24:12,
49:11.
first 5:4, 5:19,
17:7, 19:15,
19:16, 19:19,
22:9, 32:8, 32:25,
37:22, 41:3,
41:22.
five 49:11.
flew 51:3.
flight 51:4.
flights 51:11.
Floor 1:48, 2:47.
Florida 51:1,
51:3.
flow 18:13, 22:22.
flows 10:8, 18:8.
focus 15:5.
focused 23:3.
follow 26:17, 26:18,
27:4, 40:14.
foregoing 52:8.
foreseeable 20:23.
forget 11:5.
form 26:5, 40:1.
formality 6:2.
formalization
29:8.
formalized 29:3,
29:8.
former 5:8, 6:17,
45:18.
forth 18:8, 18:15,
48:17.
forward 10:7, 35:12,
38:2, 38:18,
43:16, 51:23.
forwarded 35:6.
fought 18:17.
found 37:13, 44:8,
44:14.
four 41:19, 49:11.
frankly 10:11, 12:3,

14:3, 34:18, 35:7,
50:12.
free 18:8.
frequently 17:14.
Friday 1:41.
friends 48:2, 48:3,
48:4.
front 27:10.
fundamental 30:8.
future 10:7,
20:23.
.
.
< G >.
Garden 39:17,
39:22.
gave 9:2, 9:8,
32:16.
GCG 36:18.
Gendron 2:34, 4:4.
generate 20:22.
gentleman 4:9.
gets 26:10, 39:22.
getting 9:15, 21:20,
24:21, 30:19,
31:10, 37:1,
40:11, 47:22,
49:13, 49:21,
50:9.
give 5:13, 8:13,
10:11, 12:7, 12:9,
24:25, 38:1, 45:1,
48:19, 50:10,
51:2.
given 5:25, 6:22,
17:8, 19:22,
22:17, 23:16,
23:18, 38:19.
gives 7:24.
giving 13:1,
50:10.
global 51:21.
Goldman 18:13,
49:3.
Goldsmith 3:3.
golly 45:14.
governing 10:9.
greatest 5:14.
grossly 42:3.
ground 39:1.

Group 1:21, 2:22,
    3:5, 8:15, 8:20,
    8:22, 20:3, 22:14,
    22:18, 43:24.
growth 20:12.
guess 26:1.
Guri 2:18, 3:20.
.
.
< H >.
Haiber 2:14, 3:25.
half 45:4.
hand 42:24.
handle 37:23.
handled 37:23,
    51:14.
handling 47:12.
hands 24:25.
happen 24:10,
    24:17.
happened 37:17,
    49:9.
happens 26:13,
    39:20, 46:3.
hard 18:16, 42:21,
    46:23, 47:8.
harm 36:4.
heading 8:6.
hear 5:4, 5:17,
    5:18, 13:6, 16:16,
    36:13, 39:3,
    51:19.
heard 34:20, 51:18,
    52:1.
hearing 3:10, 5:9,
    6:1, 35:23, 51:18,
    51:25.
heart 13:5.
held 5:8, 24:9,
    33:7.
help 45:14, 45:15.
Herculean 46:20.
hereby 52:7.
hide 40:13.
high 14:4, 21:6.
higher 13:22.
highest 14:19.
highlighted 28:10.
historical 20:11.
history 27:15.

Hoffman 2:40, 4:22,
    4:25, 24:16,
    29:24, 30:14,
    30:24, 36:23,
    41:6, 41:7.
Hogan 3:25.
hold 23:16, 24:5.
holders 36:19,
    38:19.
honest 12:3.
Honorable 1:40.
hoping 50:21.
hotel 51:5.
hour 14:18, 15:12.
hourly 14:16, 14:20,
    15:7, 15:9.
hours 15:18, 42:4.
Howard 2:40.
hundreds 39:19.
.
.
< I >.
identical 22:13,
    48:25.
identifying 13:5,
    33:12.
ignored 23:8.
Illinois 13:23.
immediately 26:5,
    38:17.
impediments 46:13.
imperative 21:1.
important 7:23,
    8:12, 11:24, 17:3,
    40:1, 47:1.
importantly 28:7.
in. 26:14.
inadequate 22:16,
    44:17.
inadmissible
    48:17.
Inc. 2:10.
incentive 27:14,
    28:8, 31:17,
    46:12, 48:2, 48:5,
    48:6, 48:11,
    48:22, 49:18,
    49:20.
inclined 16:20.
income 11:23.

Incorporated 3:6,
    3:7.
incurred 51:16.
independently
    23:5.
Indiana 13:24.
indication 15:9.
indicative 33:20.
individual 14:21,
    19:23, 19:24,
    24:13, 38:16.
Individually 1:4,
    1:15, 1:26.
industry 43:2.
inevitable 41:9.
inference 33:20,
    34:16, 34:22.
information 8:9,
    9:9, 9:19, 10:1,
    11:14, 11:24,
    12:5, 12:7, 12:9,
    12:19, 16:15,
    18:1, 21:2, 21:10,
    24:24, 26:7,
    26:12, 27:25,
    30:20, 39:22.
informational 30:13,
    30:19, 31:12.
informed 7:1, 8:1,
    10:1, 10:22,
    11:12, 12:24.
initial 38:6.
initially 30:5,
    33:7.
injunction 8:6, 8:8,
    12:6, 17:3, 17:5,
    17:8, 36:1,
    36:2.
inside 51:6.
insisted 18:8.
instance 17:8.
instances 38:10.
Instead 33:13,
    49:2.
insurance 44:19.
intelligence
    34:12.
intending 24:20.
interest 17:10,
    20:8, 21:4, 22:14,

23:7, 31:22.
interested 4:16,
   5:9, 21:13, 21:14,
   43:17.
interesting 22:21.
interests 5:12,
   19:22, 19:25,
   22:11, 46:18.
interim 16:23,
   30:4.
International
   43:24.
internet 38:16.
intersect 10:6.
investigate 29:15.
investigation 8:14,
   30:7.
investment 10:21,
   13:18.
investments 33:7.
invite 34:4.
involve 18:14,
   18:16, 45:8.
involved 8:4, 11:20,
   16:5, 40:11,
   43:20, 44:1.
involves 45:11.
irrelevant 48:17.
irreparable 36:4.
issue 7:5, 11:25,
   12:7, 18:8, 18:15,
   21:14, 22:20,
   22:22, 23:3, 23:7,
   26:1, 29:13,
   39:12, 40:18,
   40:19, 40:20,
   41:13, 41:17,
   43:18.
issued 40:1.
issues 9:2, 10:23,
   18:14, 21:12,
   21:14, 29:23,
   29:24, 41:13.
itself 23:12,
   33:3.
.
.
< J >.
Jack 1:26, 2:26.
James 2:28, 3:18,

28:16.
James K. Bredar
   1:40.
JKB 3:7.
JKB-16-3282 1:9.
JKB-16-3742 1:31,
   3:9.
JKB-16-3745 1:20,
   3:6.
job 46:17, 47:11.
Johnson 42:10,
   42:11, 42:14.
joint 19:22.
Jr 2:24, 2:28.
Juan 2:6, 3:15,
   5:21.
Judge 6:7, 6:8, 8:5,
   13:16, 18:18,
   19:18, 27:10,
   32:15, 32:18,
   32:19, 33:10,
   35:5, 36:5,
   39:7.
judges 15:6.
July 6:3.
jurisdiction 30:10,
   30:17, 49:15.
jurisdictions
   30:9.
.
.
< K >.
keep 7:21, 35:23.
kept 33:13.
Kessler 1:15, 2:16,
   3:5, 3:21.
kind 26:14, 30:21,
   34:6.
KKR 9:14.
known 49:22.
knows 36:3.
Krulak 2:24.
Krulok 4:6.
.
.
< L >.
language 34:6.
large 16:10,
   16:13.
larger 16:1.

last 8:25, 13:15,
   25:9, 47:21,
   48:15.
late 34:8, 34:9,
   38:21.
later 29:2.
Lawrence 2:38,
   4:11.
lawsuit 16:23, 21:7,
   42:9.
lawyer 12:23.
lawyers 12:10,
   27:23, 40:10,
   50:5.
lead 8:16.
least 5:12, 21:22,
   32:22.
left 4:25.
legal 22:4, 23:24,
   23:25, 35:2, 39:1,
   43:1.
Legally 27:18,
   37:14, 38:2.
length 9:18.
less 5:7, 15:7,
   32:20, 34:24,
   49:14, 51:23.
leverage 12:13.
liability 27:9.
light 20:10.
limited 21:10,
   22:20, 30:9,
   43:11.
line 13:8, 14:12,
   14:15, 15:3.
lines 21:19.
lip 8:23.
list 37:25.
listening 30:12,
   30:15.
Litigation 6:21,
   10:7, 12:13,
   27:11, 29:3,
   29:11, 30:3, 40:2,
   40:7, 43:24.
little 25:25, 37:1,
   49:4.
live 26:14.
living 50:6.
local 3:13, 4:1,

14:7, 41:24.
locality 15:6.
lodestar 14:4,
    15:14.
Lombard 1:48,
    2:47.
long 42:5.
look 15:6, 17:10,
    19:5, 22:6, 26:9,
    41:23, 42:8,
    42:13, 42:14,
    44:5, 45:9, 45:10,
    50:1, 51:23.
looking 21:16,
    22:10, 46:14.
looks 41:23, 50:4.
lost 50:9.
lot 18:7, 18:15,
    22:5, 25:18, 28:8,
    33:18, 43:15,
    48:25, 49:23.
Lovells 4:1.
lower 47:14.
loyalties 28:24,
    29:10.
.
.
< M >.
M. 2:24, 2:28.
mailed 26:4, 26:21,
    35:22, 37:20,
    39:13, 43:23,
    44:1.
mailing 23:17,
    26:19.
mainly 16:2.
majority 31:20.
Management 1:21,
    2:22, 3:5, 6:13,
    46:3.
mandatory 12:15.
Manhattan 43:21.
manner 35:7.
marginal 44:8.
mark 21:6.
market 12:1, 12:2,
    15:4, 26:7,
    47:15.
markets 12:3, 26:7,
    26:14, 47:1,

47:7.
Marriott 51:6.
Maryland 1:2, 1:42,
    1:49, 2:48, 7:18,
    9:22, 9:24,
    27:10.
material 8:9, 9:19,
    11:14, 12:4, 21:2,
    24:19.
matrix 14:13,
    41:21.
matter 3:17, 52:9.
matters 3:4, 3:9,
    23:2.
maximize 7:15, 7:19,
    9:11.
mean 9:14, 19:5,
    25:1, 27:8, 28:4,
    36:5, 38:25.
means 19:11,
    43:17.
measures 22:23.
mechanics 37:17,
    39:6.
meeting 19:12.
member 7:25.
members 6:25, 7:9,
    11:3, 22:7, 29:10,
    32:23, 33:5,
    33:13, 34:4,
    34:12, 36:22,
    37:4, 40:23.
merger 5:12, 15:22,
    16:6, 20:9, 20:14,
    21:21, 24:23,
    25:3, 25:5, 25:12,
    43:24.
meritorious 31:12.
merits 30:20.
messaging 34:7.
metaphysical 43:6.
Miles 4:7.
million 13:16, 14:2,
    16:3, 27:12,
    46:21, 47:18,
    47:21, 47:22,
    48:16, 49:12,
    51:23.
mind 7:21, 9:13.
minds 19:12.

mine 14:25.
minor 40:19.
minute 34:14,
    48:15.
minutes 51:18.
misreading 14:24.
misunderstanding
    35:25.
modern 45:20.
modicum 34:11.
modify 33:11.
moment 31:25.
monetary 6:23.
money 9:3, 12:11,
    15:17, 20:20,
    45:4, 45:8, 49:4,
    49:23, 50:22,
    51:5.
MONTEVERDE 2:6,
    3:16, 5:22, 6:17,
    18:11, 18:21,
    22:21, 25:20,
    28:13, 29:1, 29:5,
    30:6, 34:21, 36:7,
    37:11, 46:7,
    48:4.
months 11:6, 25:4,
    47:13.
moot 45:2.
mooted 11:4, 11:9.
mootness 12:10.
morning 3:2, 3:12,
    3:15, 3:22, 4:3,
    4:6, 4:11, 4:19,
    4:21, 4:23, 16:17,
    16:18, 29:20,
    29:21, 30:18,
    46:18.
motion 12:16, 27:7,
    36:5.
motions 42:6.
Motz 6:7, 6:8, 8:5,
    32:16, 32:18,
    32:19, 33:10,
    35:5, 36:5.
MOU 9:2.
mountain 46:15.
Moving 41:11.
MR. ADEMI 3:20.
MR. DVORES 4:12,

4:18, 19:18, 21:9,
22:2, 22:12,
23:10, 23:12,
23:22, 24:7,
25:19, 43:10,
43:14.
MR. GENDRON 4:3.
MR. HAIBER 3:25.
MR. KRULOK 4:6.
MR. MUNDIYA 3:22,
  16:17, 16:22,
  17:16, 17:20,
  17:24, 18:3, 18:6,
  18:24, 19:2,
  39:5.
MR. ROBINSON 4:21,
  19:17, 29:20,
  29:22, 30:2,
  32:12, 32:14,
  32:18, 33:24,
  40:18, 41:2,
  41:18, 42:23,
  43:3.
MR. WILSON 3:18,
  28:14, 28:20.
MS. TREPETIN 3:12.
multimillion
  47:16.
multiple 47:17.
Mundiya 2:12, 3:23,
  39:4, 39:5, 40:14,
  47:25, 48:3,
  48:12, 51:7,
  51:10.
myself 40:10, 44:1,
  44:5, 45:1.
.
.
< N >.
nail 35:13, 37:10.
nailed 39:6.
name 4:13, 14:12,
  14:13, 23:17,
  24:9.
names 36:19, 39:9,
  39:11, 39:16.
national 15:4,
  15:7.
naturally 10:8.
nature 10:25.

necessarily 43:11.
need 15:5, 17:22,
  26:1, 27:21,
  31:13, 36:2,
  45:14, 51:17,
  51:19.
needed 8:1.
nefarious 35:17.
negligence 47:5.
negotiated 32:8.
negotiating 48:13,
  48:15.
negotiation 47:25,
  48:5, 49:24.
negotiations 18:7,
  18:17, 19:10.
net 11:23.
New 3:23, 15:3,
  15:11, 22:17,
  43:22, 44:12.
night 51:4.
nine 51:18.
No. 1:9, 1:20, 1:31,
  48:10, 49:8.
nominee 36:19.
nominees 39:8,
  39:15.
nonattorneys 42:3.
nonetheless 34:20.
nonoptout 31:5.
normally 10:4, 15:6,
  19:6.
north 15:11.
Northern 1:2, 13:15,
  47:20.
Northstar 1:21,
  1:32, 2:22, 2:32,
  3:5, 3:8, 6:13,
  11:2, 20:7.
noted 28:11.
nothing 10:12, 31:4,
  35:16, 45:3, 45:6,
  50:4.
notices 6:10, 16:14,
  24:22, 26:23,
  32:23, 33:13,
  33:14, 33:25,
  35:6, 35:11,
  35:12, 35:21,
  37:7, 37:18, 38:1,

38:3, 38:6, 38:17,
  38:24, 39:7,
  39:11, 39:23,
  43:23, 43:25.
notification
  34:24.
notified 25:15.
notion 27:17.
nowadays 38:15.
NRF 3:19, 6:12,
  7:11, 8:18, 9:22,
  9:23, 20:8, 20:10,
  20:12, 20:13,
  20:16, 20:19,
  20:21, 20:23,
  21:2, 29:2, 29:3,
  29:5, 29:16,
  36:20, 45:11.
NSAM 4:7, 7:10,
  8:20, 9:22, 9:23,
  20:15, 29:7,
  45:10.
number 3:6, 3:7,
  3:9, 6:21, 32:1,
  42:4, 48:12,
  48:23.
.
.
< O >.
O'reilly 3:21, 6:19,
  9:7, 29:6.
object 30:15, 34:2,
  38:23, 45:7.
objected 34:5,
  36:23.
objecting 38:23.
objection 29:25,
  30:25, 33:16,
  34:14, 44:2,
  45:17.
objections 6:12,
  35:21, 38:21.
objector 4:17, 4:22,
  43:25.
objectors 5:20, 7:4,
  11:25, 12:11,
  13:2, 31:22, 32:1,
  33:19, 34:23,
  35:8, 38:20,
  43:16, 46:9.

obligation 28:7.
obtained 9:7, 11:17,
  13:16, 13:25.
obtaining 13:17,
  20:25.
obviously 16:22,
  46:16.
occur 37:21, 38:8.
October 33:17.
October 27th 1:41.
offers 47:4.
office 51:7.
officer 17:23.
officers 28:6.
Official 1:47, 2:46,
  52:13.
Ohio 13:22.
Okay 4:15, 5:4,
  16:9, 23:1, 24:11,
  35:13, 39:8, 43:7,
  45:4, 52:3.
Oklahoma 9:7.
old 9:6, 45:21.
once 18:18, 33:9,
  39:21, 39:22.
One 9:13, 11:1,
  11:4, 12:25, 13:5,
  15:14, 18:11,
  20:3, 23:3, 27:15,
  28:4, 30:21, 36:1,
  39:25, 40:19,
  43:19, 43:25,
  44:11, 44:12,
  47:22, 47:23.
one. 19:21, 22:24,
  46:12.
onerous 11:8.
ongoing 40:7.
operating 26:6.
opponent 15:10.
opponents 16:19.
opportunity 9:8,
  25:21.
opposite 15:24,
  49:20.
opt 40:23.
order 6:4, 6:6, 6:7,
  16:20, 27:24,
  29:4, 32:19,
  33:17, 35:5, 39:8,

  51:20.
ordered 40:24.
orders 34:7.
Ordinarily 5:2.
original 25:10.
originally 11:3,
  28:25.
originated 35:14.
Others 1:5, 1:16,
  1:27, 18:1,
  31:18.
otherwise 12:25,
  20:20, 25:15.
ourselves 29:11.
outcome 41:9, 42:15,
  42:16.
outrage 32:11.
outset 5:6.
outside 38:7.
overcome 19:23.
overpay 48:5.
own 9:3, 9:4, 14:7,
  20:16, 33:25,
  46:1.
owner 38:11.
owners 36:20,
  46:2.
.
.
< P >.
page 11:19, 27:3,
  50:13.
paid 15:17, 27:13,
  47:21, 48:25,
  49:12, 49:13,
  49:16, 50:9,
  50:12.
paint 27:20.
papers 51:25.
paragraph 36:16.
paralegal 14:23.
paralegals 15:1,
  15:3.
part 21:16, 46:20.
particular 22:14,
  22:18, 37:4.
parties 15:22,
  19:21, 20:2, 22:7,
  43:17, 43:18.
partly 32:25.

partner 6:17.
partners 15:12.
party 4:16.
passive 31:18.
past 26:21, 26:25,
  48:1.
pattern 12:19.
pay 48:15, 49:18,
  49:20, 49:21,
  49:23, 50:17,
  50:19, 51:7.
pending 3:4.
Pennsylvania
  49:14.
people 16:14, 24:19,
  25:5, 25:7, 34:18,
  37:2, 37:7, 38:18,
  39:9, 40:12, 41:6,
  45:7, 45:8,
  49:23.
per 30:15, 35:5.
percent 20:17.
perfect 34:24,
  35:1.
performance 20:11.
perhaps 11:3,
  37:8.
period 30:4, 37:18,
  38:7, 39:8,
  41:10.
permitted 34:3.
person 41:4,
  46:24.
personal 8:24,
  26:11.
personally 6:17,
  43:19.
persuade 18:1,
  46:21.
persuaded 16:19,
  44:6.
persuading 8:11.
petition 14:7,
  21:7.
Philip 2:39.
phone 38:22,
  49:25.
phony 44:18.
picture 27:20,
  46:14.

Pipeline 49:10,
  49:13.
Piven 3:13.
place 46:3, 46:8.
Plaintiff 1:7, 1:18,
  1:29, 2:4, 2:16,
  2:26, 3:21, 5:14,
  12:22, 22:7,
  30:17, 32:6,
  46:10, 49:16.
Plaintiffs 3:11,
  3:14, 3:19, 3:20,
  5:5, 5:10, 5:17,
  5:24, 21:13,
  25:13, 28:24,
  44:16, 44:22.
please 3:2, 8:9,
  37:11.
PSLRA 12:16.
pocket 50:23,
  51:16.
podium 28:18.
Point 11:1, 13:24,
  23:1, 30:23,
  31:16, 31:24,
  32:5, 34:13, 35:9,
  35:23, 36:12,
  37:9, 39:25,
  41:19, 43:15,
  47:2, 50:13,
  50:21.
Point. 5:24, 11:19,
  13:14, 27:3,
  34:20.
pointed 28:6.
points 25:22,
  28:10.
position 12:22,
  17:14, 20:5.
post 12:17.
potential 10:13,
  12:20, 19:3,
  20:24, 31:1,
  31:2.
potentially 30:5.
Power 5:24, 11:19,
  13:14, 27:3,
  50:21.
practical 23:23.
practice 40:10.

practicing 14:21.
prairie 32:11.
precedent 15:15.
preliminary 6:3,
  8:5, 8:6, 29:4,
  32:16, 32:18.
premium 20:25.
prepared 5:24, 6:6,
  32:19, 51:19.
present 2:38, 7:1,
  24:8, 31:6,
  43:4.
presentation 5:18.
presented 6:16,
  36:15.
preserve 37:3, 47:9,
  50:4.
pretty 9:24, 16:3,
  17:1, 34:1.
previously 16:20.
price 7:6, 7:8,
  7:22, 19:3, 26:10,
  26:12, 27:6.
prices 7:5.
principals 17:17.
principle 31:20,
  33:23.
principles 41:8.
private 10:5.
Problem 5:3, 11:21,
  32:10, 42:21.
problems 33:3,
  33:12.
procedure 10:14,
  39:2.
proceed 51:24.
proceeded 8:22.
Proceedings 1:39,
  52:5, 52:9.
process 5:13, 10:19,
  34:24, 34:25,
  35:1, 36:21,
  36:25, 37:3,
  37:14, 39:12,
  40:14, 40:21,
  40:22, 41:8.
professional 38:2.
proffers 40:25,
  41:2.
profitability

11:22.
profits 11:22.
Projection 13:21,
  15:18.
Projections 8:3,
  8:10, 13:13,
  13:17, 14:1,
  15:17, 16:24,
  27:22, 28:1, 47:7,
  47:11, 47:13,
  47:15, 47:19.
pronounce 4:13.
properly 21:3.
proposed 20:8,
  20:15, 20:18,
  21:3, 24:15,
  51:20.
prospects 20:12,
  20:13, 20:23.
provide 6:11,
  17:23.
provided 33:4,
  51:22.
provider 36:18.
proxy 6:24, 17:11,
  25:10, 25:16.
purported 20:14.
purpose 6:2, 11:12,
  11:13, 12:5.
pursuant 6:3, 26:2,
  26:21.
pursue 9:4, 9:9,
  11:16, 23:1,
  27:16, 28:5,
  31:4.
pursued 11:11,
  22:15, 22:19,
  23:2, 30:23,
  40:10, 46:4,
  46:10.
pursuing 27:9.
pursuit 17:21,
  45:21.
pushed 11:4, 18:9,
  19:11.
pushing 18:10.
put 17:11, 34:6.
putting 49:23.
.
.

< Q >.
quantify 42:19.
question 19:9,
  25:13, 25:21,
  30:8, 32:24,
  32:25, 34:21,
  46:1, 46:4.
questions 17:22,
  19:6, 43:4.
quick 47:2.
quickly 24:17,
  46:11.
quite 5:8, 30:22.
quote 20:6, 43:19.
quotes 20:15.
quoting 20:9.
.
.
< R >.
R-e-v-l-o-n 7:14.
R. 2:14.
raise 7:4, 34:13,
  34:21, 41:14.
raised 18:14.
raising 30:15,
  34:14, 40:20.
ran 29:10.
rate 13:20, 14:19,
  14:20, 14:21,
  15:10.
rates 14:16, 14:23,
  15:4, 15:5, 15:7,
  41:25.
rather 37:16,
  39:14.
ratify 5:6, 9:18.
ratio 22:17.
re 43:24.
reached 47:14,
  48:12, 50:17,
  50:23.
react 45:16.
read 22:12, 45:12.
readily 17:6.
ready 47:24.
realistic 36:6.
Reality 3:8, 6:13,
  20:7, 29:9.
really 7:1, 10:8,
  11:22, 11:25,

12:5, 13:5, 17:25,
  22:2, 23:14,
  23:15, 23:18,
  24:21, 25:25,
  42:4, 42:18,
  42:21, 45:19.
Realty 1:32, 2:32.
reason 12:8, 47:17,
  48:23, 49:1.
reasonable 19:8,
  33:2, 33:20,
  41:12, 41:16,
  41:24, 42:7.
reasonableness
  42:15.
reasonably 34:13.
recall 8:7.
receive 8:2, 20:19,
  21:2.
received 36:19,
  37:19, 38:21,
  38:22, 38:24,
  44:17.
receiving 10:15.
recent 9:16,
  20:11.
recitation 27:19.
recognized 29:13,
  41:20.
record 32:2, 32:15,
  37:25, 38:19,
  47:6, 49:19,
  52:9.
records 29:14.
recover 9:3.
recovering 27:12.
reduced 11:7, 14:3,
  44:3, 44:10.
referred 7:15.
referring 6:12.
reflects 22:9.
Regardless 10:9,
  15:21.
registered 24:10.
regularly 26:13.
regulating 43:1.
related 8:3, 8:10.
relationship 14:6.
relatively 46:11.
release 29:15,

30:24, 30:25,
  31:14, 48:19.
releasing 31:1.
relief 16:24.
rely 15:4, 23:25,
  24:11, 39:15.
relying 23:25.
remained 20:21.
remedy 36:3.
Remembering 42:16.
remove 46:13.
rep 29:5.
repeat 29:25,
  41:18.
reply 50:14.
Reporter 1:47, 2:46,
  52:13.
reporting 37:19.
represent 23:5,
  38:20.
representations
  19:1.
representative
  38:13.
represented 19:21,
  28:25, 29:2.
representing 4:22,
  19:20, 20:3,
  22:15, 46:18.
represents 19:19.
reputable 35:17,
  39:17.
request 21:7,
  38:3.
require 42:25.
required 26:15,
  35:5, 38:1, 38:4,
  40:15.
requires 35:4,
  38:18, 39:12.
research 44:14.
resend 41:7.
resolution 46:11.
respect 5:15, 18:11,
  18:12, 29:15,
  31:17, 37:17.
respective 8:16.
respond 25:21.
responsibilities
  17:19.

rest 49:3.
resubmittal 51:24.
result 13:12, 21:21,
   22:16.
retained 50:25.
retired 45:19.
revenues 11:20,
   11:21.
reviewed 44:7.
Revlon 7:12, 7:14,
   7:15, 9:11.
revolution 32:13.
Rice 44:12.
rid 31:10.
rights 9:15, 37:3.
rise 5:13, 7:24,
   9:2.
Risk 17:3, 17:4,
   17:8, 17:9,
   17:10.
Robinson 2:39, 4:20,
   4:23, 4:25, 19:15,
   25:23, 29:19,
   31:24, 36:11,
   36:14, 40:16,
   42:10, 43:7.
Rockville 27:10.
room 51:8.
roughly 16:7.
Royal 44:11.
RPR 1:46, 2:45,
   52:7.
Rubin 27:10.
rule 14:7.
rules 26:2, 41:24.
rushed 51:10.
Russell 36:10.
ruthless 49:24.
.
.
< S >.
Sachs 18:13.
save 51:5.
saw 14:23.
saying 5:23, 10:8,
   13:2, 13:3, 22:21,
   23:4, 23:23,
   24:18, 32:22,
   38:23, 40:12,
   41:8.

says 9:17, 21:19,
   36:16, 41:24,
   45:10.
schedule 14:7,
   37:12.
scienter 47:4.
score 18:21.
Scott 2:14, 3:25.
se 30:15.
seated 3:2, 4:10.
SEC 21:11, 23:12,
   44:15.
second 26:8, 38:8.
Securities 26:2,
   26:5, 37:1,
   43:2.
seek 12:10.
seeking 16:24, 22:1,
   42:2.
seeming 5:11.
seems 22:5.
send 37:6, 41:7.
sending 32:22,
   33:13, 35:11.
sense 7:25, 17:2,
   51:2.
sent 21:11, 33:5,
   33:25, 35:5, 38:6,
   41:3, 52:1.
sentencing 51:18.
separate 17:18,
   22:11, 22:14,
   51:10.
serious 24:21.
seriousness 50:5.
service 8:23,
   22:4.
servicer 35:14.
services 22:4.
set 8:7, 12:18,
   47:13, 50:8.
sets 14:1, 44:11,
   47:18.
settle 12:13.
settled 8:8, 8:15,
   40:9, 50:8.
settlement 8:23,
   9:4, 12:8, 13:20,
   17:15, 18:19,
   19:7, 19:10,

21:23, 24:16,
   26:20, 27:1, 31:5,
   32:4, 32:8, 33:2,
   33:11, 33:20,
   34:1, 34:6, 35:22,
   36:21, 41:11,
   48:12.
settling 27:11,
   44:23.
seven. 9:14.
several 6:18, 6:20,
   8:24.
shall 32:20.
shaped 45:23,
   45:24.
share 20:17, 46:2.
shareholder 7:16,
   7:20, 9:11, 9:15,
   23:13, 29:1.
shares 7:11,
   22:17.
shifting 50:15,
   50:16.
short 41:10.
shouldn't 37:2.
show 12:19, 15:16,
   47:11, 48:25.
showed 44:15,
   44:18.
shown 20:12.
shows 27:15, 35:22,
   45:6, 47:6,
   50:22.
side 5:14, 11:11,
   46:10.
sides 50:6.
sign 32:19.
signal 51:20,
   52:1.
significant 11:18,
   20:19, 20:22.
silence 34:17.
similar 13:18.
Similarly 1:5, 1:16,
   1:27, 7:18.
simply 17:5,
   23:23.
single 22:23.
sir 4:11, 23:11,
   28:22, 52:3.

sit 43:7.
sits 5:2.
sitting 4:25,
  30:12.
Situated 1:6, 1:17,
  1:28.
situation 44:13.
six 47:13.
size 15:21.
skilled 15:3.
slide 6:10, 9:14,
  48:24, 50:21.
small 17:8.
sold 24:8.
solely 29:2.
somehow 43:17,
  44:2.
someone 10:15,
  20:3.
sometimes 10:16,
  10:17, 33:19,
  47:8.
soon 44:1, 45:16.
Sorry 6:9, 44:5.
sort 29:23, 30:2,
  30:16, 30:21,
  31:3, 32:25.
sorts 31:1.
sought 36:1,
  41:25.
sound 14:4.
sounded 30:4.
Southern 43:21.
space 40:11.
speaking 5:23.
specific 5:7.
speculate 13:4.
spent 50:22,
  50:23.
spot 17:13.
stand 20:13.
standard 37:12,
  47:4.
start 5:22, 25:25,
  40:11, 47:2,
  51:17.
started 7:2, 43:6.
state 7:7, 9:21,
  12:17, 27:2,
  27:19, 30:10,

49:14.
stated 20:1.
statement 6:24,
  17:11, 22:13,
  25:11.
STATES 1:1, 26:16.
status 4:16.
statute 11:12,
  11:15, 47:4.
stay 5:1, 12:16.
stenographic 52:8.
step 7:6, 32:8,
  41:22.
stock 7:9, 7:12,
  20:12, 23:16,
  24:5, 24:10,
  26:10, 36:20,
  38:11, 47:7,
  47:15.
Stockbridge 4:7.
stockbroker 24:11.
stockholders 20:10,
  21:1, 21:2,
  24:25.
stocks 24:8.
Street 1:48, 2:47,
  23:16, 24:9.
strikes 18:2.
strong 20:11,
  20:13.
stronger 20:4.
strongly 5:7, 5:8.
structural 33:6.
stuff 46:3.
submit 13:7,
  39:10.
submitted 5:15,
  29:14, 51:22.
success 50:21.
sue 7:22, 10:2.
sued 7:21, 9:19,
  49:22.
suggest 18:5,
  31:19.
suggests 6:5.
sum 20:21, 40:18.
summarize 29:24,
  40:19.
summarizes 43:4.
supplement 48:14.

supplemental 17:12,
  30:4, 40:22, 41:5,
  42:17.
support 19:7,
  35:22.
supported 26:25,
  36:6.
supports 14:5,
  35:20.
suppose 42:25.
Supreme 37:14.
survive 12:18.
sworn 33:15,
  33:25.
system 41:3.
.
.
.
< T >.
T. 1:46, 2:45,
  52:12.
table 34:4, 43:12.
tales 47:2.
talks 50:14.
tall 46:15.
Tampa 51:1, 51:3.
target 49:23.
Tariq 2:12, 3:22.
taxi 51:7.
ten 51:24.
tend 13:22.
tender 47:4.
tends 11:15.
term 32:8.
terms 23:2, 39:6,
  39:12, 40:9,
  42:13.
tested 19:1, 19:2.
testifying 36:21.
testimony 33:4,
  33:15, 33:25.
THE CLERK 3:4.
therapeutic 9:2.
Thereafter 18:18.
they'll 45:13.
They've 32:4, 32:15,
  33:4, 36:24,
  41:25.
thinking 12:11,
  49:4.
thinks 13:6.

though 23:21,
    32:10.
thousand 37:13.
thousands 32:23,
    33:15, 33:25,
    39:19.
three 6:25, 7:9,
    11:23, 14:1,
    14:22, 16:6, 24:9,
    41:18, 47:18,
    49:5, 49:6, 49:8,
    50:18.
three-way 20:14.
throw 45:12.
tie 27:22.
timely 33:6, 34:2,
    35:6.
timetable 11:6,
    37:4.
today 4:16, 4:22,
    6:1, 12:12, 13:2,
    32:9, 32:21,
    40:20, 41:17.
together 27:22,
    44:3.
token 31:16.
Ton 33:22.
took 8:16, 8:17,
    8:18, 8:19, 24:15,
    45:4, 45:22,
    51:1.
topic 43:12.
total 5:16, 16:5,
    46:14, 51:22.
touch 28:21.
towards 8:6.
Tower 43:24.
traditional 10:14.
transaction 7:9,
    7:20, 9:18, 9:20,
    10:3, 11:6, 15:25,
    16:10, 20:8,
    20:15, 20:18,
    21:3, 26:25.
transactions 7:10,
    10:23.
Transcript 1:39,
    52:8.
travel 50:25.
treated 49:7.

Trepetin 2:8, 2:20,
    2:30, 3:13.
trial 50:8.
tried 15:24.
true 30:10, 49:20.
trying 32:5, 35:13,
    40:13, 47:3.
turn 18:1, 25:22.
turns 43:15.
two 6:12, 9:10,
    12:9, 14:22,
    19:20, 20:1, 20:5,
    20:24, 28:10,
    31:22, 34:23,
    35:8, 35:21,
    43:16, 44:11,
    45:6, 45:15,
    47:2.
type 13:18, 15:5,
    19:6.
types 35:18.
typical 39:6.
typically 15:19,
    32:3.
.
.
< U >.
U.S. 43:21.
ultimate 38:11.
ultimately 42:8.
uncertainty 31:11.
uncover 9:9.
uncovered 8:22,
    9:2.
underlying 15:21.
understand 7:4,
    17:18, 31:7,
    33:14, 36:25,
    41:3, 45:14,
    46:25.
understanding
    37:25.
understood 30:2.
undue 21:20.
unheard 15:12.
unique 10:16,
    12:20.
UNITED 1:1, 23:4,
    23:6.
Unless 12:18, 14:24,

43:3.
unlikely 5:16,
    12:17.
unreasonable 13:7.
until 12:16, 34:15,
    48:13.
unusual 6:20.
upset 13:5.
uses 16:11.
using 26:8.
.
.
< V >.
v. 3:19, 9:14.
vacation 51:13.
valuable 26:12,
    27:21, 30:20.
valuations 19:5.
value 7:16, 7:20,
    9:11, 12:2, 13:1,
    15:16, 28:2,
    31:14, 42:18,
    42:19, 42:25,
    43:2, 44:9.
various 22:23.
vast 31:20.
Venable 4:4.
versus 3:5, 3:6,
    3:8, 13:14,
    47:20.
via 38:17.
viability 19:3.
viable 10:11, 27:15,
    28:8.
victory 12:10.
view 31:20, 46:9.
visibility 39:14,
    39:21.
vote 7:1, 8:1, 10:1,
    11:12, 11:14,
    12:24, 23:13,
    24:2, 24:23, 25:4,
    25:5, 25:9, 25:10,
    25:11, 25:16,
    26:3.
votes 25:14, 26:9.
vs 1:8, 1:19,
    1:30.
.
.

< W >.
W. 1:48, 2:47.
wait 25:9, 34:14.
waive 36:23.
walk 11:18, 27:5,
  47:24.
walked 9:4.
wanted 25:16, 28:1,
  28:20, 29:11,
  36:8, 43:4, 43:7,
  44:23, 45:7,
  48:16.
wants 32:3, 36:12.
wastebasket 45:12.
water 21:6.
wayside 30:6.
weaker 20:25.
week 25:9.
weekend 51:3.
weeks 24:14, 24:15,
  27:12, 32:21,
  33:16, 47:2,
  50:2.
well-positioned
  20:22.
whatever 5:18.
whatsoever 7:3,
  11:10, 48:2,
  48:22.
whether 21:4, 30:16,
  30:20, 31:12,
  34:5, 35:14,
  35:15.
Witney 13:14,
  47:20.
will 5:6, 5:17,
  5:23, 5:25, 11:1,
  19:17, 20:16,
  20:19, 25:24,
  26:12, 34:2,
  40:11, 40:14,
  44:25, 45:2, 45:3,
  47:10, 50:17,
  51:20.
William 2:4, 2:24.
WILLIAM CARTER
  1:4.
Willkie 3:23.
Wilson 2:28, 3:18,
  8:18, 28:16,

28:19, 28:23,
  29:18, 47:22.
windfall 50:11.
window 11:8.
windows 51:8.
wish 5:18, 5:19,
  27:5, 27:8.
within 40:24.
Without 20:25,
  30:19, 34:9, 47:7,
  48:12, 48:20,
  51:25.
won 44:24.
wonder 30:16.
work 15:17, 25:2,
  42:5, 47:15.
working 6:18, 6:19,
  51:12.
works 35:1, 37:24.
worth 15:19, 17:5.
worthless 47:8.
wrote 25:15.
.
.
< X >.
X. 34:15.
.
.
< Y >.
Y. 34:15.
year 20:12, 47:21.
years 6:19, 6:20,
  8:25, 45:19.
Yelena 2:8, 2:20,
  2:30, 3:12.
yield 13:22.
yielded 13:23,
  13:24.
York 3:23, 15:3,
  15:11, 43:22,
  44:12.
yourselves 44:6.