# Exhibit 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

---

**NorthStar Realty Finance Corp.**

(Name of Registrant as Specified In Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

   (4)   Date Filed:

  

**MERGERS PROPOSED—YOUR VOTE IS VERY IMPORTANT**

Dear Stockholders:

On June 2, 2016, NorthStar Asset Management Group Inc., which we refer to as NSAM, Colony Capital, Inc., which we refer to as Colony, and NorthStar Realty Finance Corp., which we refer to as NRF, and certain subsidiary entities of NSAM and NRF entered into an Agreement and Plans of Merger, which agreement, as amended from time to time, we refer to as the merger agreement, pursuant to which NSAM, Colony and NRF will combine in an all-stock merger of equals resulting in a combined company with an internally managed, diversified real estate and investment management platform. We refer to the mergers contemplated by the merger agreement as the Mergers.

We currently expect that NSAM stockholders will own approximately 32.85%, Colony stockholders will own approximately 33.25% and NRF stockholders will own approximately 33.90% of the combined company upon the closing of the Mergers, on a fully diluted basis, excluding the effect of certain equity-based awards issuable in connection with the Mergers.

Under the terms of the merger agreement, NSAM will redomesticate as a Maryland corporation by merging with and into its wholly owned subsidiary, Colony NorthStar, Inc., which we refer to as Colony NorthStar, with Colony NorthStar surviving, which we refer to as the Redomestication merger. Colony NorthStar will elect to be treated as a real estate investment trust, or REIT, effective January 1, 2017. Following internal reorganization transactions by NRF described in the attached joint proxy statement/prospectus, NRF, and then Colony, will merge with and into Colony NorthStar, with Colony NorthStar surviving as the publicly traded parent company for the combined company.

Common stockholders of NSAM will receive one share of Colony NorthStar class A common stock for each share of NSAM common stock they own. Subject to adjustment only under certain limited circumstances as set forth in the merger agreement, common stockholders of Colony (both class A and class B) will receive 1.4663 shares of Colony NorthStar class A or class B common stock, respectively, for each share of Colony common stock they own, and common stockholders of NRF will receive 1.0996 shares of Colony NorthStar class A common stock for each share of NRF common stock they own. No fractional shares will be issued in connection with the Mergers and the applicable stockholders will receive cash in lieu of any fractional shares. Holders of each series of preferred stock of Colony and NRF will receive one share of a series of preferred stock of Colony NorthStar with substantially the same terms for each share of Colony or NRF preferred stock they own.

In addition, prior to the closing of the Mergers, NSAM expects its board of directors to declare a special cash dividend in an aggregate amount of $228 million to common stockholders of NSAM as of a record date prior to the effective time of the Redomestication merger, which we refer to as the NSAM special dividend. Neither the NSAM special dividend nor the Redomestication merger with Colony NorthStar is conditioned on the other.

The receipt of shares of Colony NorthStar stock as merger consideration is generally expected to be tax-free to the common stockholders of NSAM, Colony and NRF, except with respect to any cash received for fractional shares. Shares of Colony NorthStar class A common stock and each series of Colony NorthStar preferred stock are expected to be listed on the New York Stock Exchange. Colony NorthStar's class A common stock is expected to be listed on the New York Stock Exchange under the trading symbol "CLNS." Although the number of shares of Colony NorthStar common stock that Colony common stockholders and NRF common stockholders will receive in connection with the Mergers is generally fixed and may be adjusted only under certain limited circumstances as set forth in

the merger agreement, the market value of the Colony and NRF merger consideration will fluctuate with the market price of NSAM common stock. **We urge you to obtain current market quotations for NSAM common stock (trading symbol "NSAM"), Colony class A common stock (trading symbol "CLNY") and NRF common stock (trading symbol "NRF").**

Upon the closing of the Mergers, the Colony NorthStar board will consist of 10 members, of whom five will be designated by NSAM and NRF and five will be designated by Colony. Eight of the 10 members of Colony NorthStar's board will be independent directors. The Companies have announced that NSAM and NRF intend to designate David T. Hamamoto (current Executive Chairman of NSAM and Chairman of NRF), Jon A. Fosheim, Douglas Crocker II and two existing independent directors of NSAM and NRF as members of the Colony NorthStar board and Colony intends to designate Thomas J. Barrack, Jr. (current Executive Chairman of Colony) and four other existing independent directors of Colony, Nancy A. Curtin, George G. C. Parker, John A. Somers and John L. Steffens, as members of the Colony NorthStar board. Upon the closing of the Mergers, Thomas J. Barrack, Jr. will be Executive Chairman, David T. Hamamoto will be Executive Vice Chairman, Richard B. Saltzman will be Chief Executive Officer, Darren J. Tangen will be Chief Financial Officer and Mark M. Hedstrom will be Chief Operating Officer.

NSAM, Colony and NRF will each hold a special meeting of stockholders in connection with the Mergers. NSAM, Colony and NRF common stockholders will each be asked to vote to adopt the merger agreement and/or approve the Mergers, which we refer to as the merger proposals, as well as approve other related matters, as described in the attached joint proxy statement/prospectus. Adoption of the applicable merger proposals described in the joint proxy statement/prospectus requires the affirmative vote of the holders of a majority of the outstanding shares of each of NSAM common stock and NRF common stock, and, in the case of Colony, a majority of the votes entitled to be cast by Colony common stockholders at the special meeting. Common stockholders of NSAM, Colony and NRF will be asked to approve certain provisions of the Colony NorthStar charter that will be implemented in connection with the Redomestication merger, which we refer to as the charter proposals. In addition, common stockholders of NSAM, Colony and NRF will be asked to approve, by a non-binding advisory vote, as applicable, the compensation that may become payable to the NSAM, Colony or NRF named executive officers in connection with the Mergers, which we refer to as the compensation proposals. Common stockholders of NSAM, Colony and NRF will also be asked to approve one or more adjournments of their company's special meeting, if necessary or appropriate, as determined by each of NSAM, Colony and NRF, respectively, including adjournments to permit further solicitation of proxies in favor of the merger proposals and other proposals to be presented to stockholders, which we refer to as the adjournment proposals.

Holders of NSAM performance common stock, holders of Colony preferred stock and holders of NRF preferred stock are not entitled to, and are not requested to, vote at the NSAM special meeting, Colony special meeting or NRF special meeting, as applicable. As discussed in the attached joint proxy statement/prospectus, NSAM stockholders, Colony stockholders and NRF stockholders are not entitled to appraisal rights in connection with the Mergers.

The special meeting of NSAM common stockholders will be held on December 20, 2016 at Morgan Stanley, located at 522 5th Avenue, Conference Room 3A, New York, New York 10036, commencing at 10:00 a.m. (Eastern Time). The special meeting of Colony stockholders will be held on December 20, 2016 at Morgan Stanley, located at 522 5th Avenue, Conference Room 3A, New York, New York 10036, commencing at 11:00 a.m. (Eastern Time). The special meeting of NRF stockholders will be held on December 20, 2016 at Morgan Stanley, located at 522 5th Avenue, Conference Room 3A, New York, New York 10036, commencing at 9:00 a.m. (Eastern Time).

The board of directors of NSAM, following the unanimous recommendation of a special committee of the board of directors of NSAM, recommends that NSAM common stockholders vote "FOR" the NSAM merger proposal, "FOR" the NSAM charter proposal, "FOR" the NSAM compensation proposal and "FOR" the NSAM adjournment proposal.

The board of directors of Colony unanimously recommends that Colony common stockholders vote "FOR" the Colony merger proposal, "FOR" the Colony charter proposal, "FOR" the Colony compensation proposal and "FOR" the Colony adjournment proposal.

The board of directors of NRF, following the unanimous recommendation of a special committee of the board of directors of NRF, recommends that NRF common stockholders vote "FOR" the NRF merger proposal, "FOR" the NRF charter proposal, "FOR" the NRF compensation proposal and "FOR" the NRF adjournment proposal.

The attached joint proxy statement/prospectus describes the special meetings of each NSAM, Colony and NRF, the merger agreement and transactions contemplated thereby, the documents related to the Mergers and other related matters. **Please read carefully the entire joint proxy statement/prospectus, including "Risk Factors" beginning on page 61 of this joint proxy statement/prospectus, for a discussion of the risks relating to the Mergers.** You also can obtain information about NSAM, Colony and NRF from documents that each has filed with the Securities and Exchange Commission.

We enthusiastically support this combination of our companies and join with our boards in recommending you vote **"FOR"** the approval of the proposals in this joint proxy statement/prospectus.

Sincerely,

| | | |
|---|---|---|
| David T. Hamamoto | Thomas J. Barrack, Jr. | Jonathan A. Langer |
| *Executive Chairman* | *Executive Chairman* | *Chief Executive Officer and President* |
| NorthStar Asset Management Group Inc. | Colony Capital, Inc. | NorthStar Realty Finance Corp. |

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued in connection with the Mergers or passed upon the adequacy or accuracy of this joint proxy statement/prospectus. Any representation to the contrary is a criminal offense.**

The date of this joint proxy statement/prospectus is November 18, 2016, and it is first being mailed or otherwise delivered to the stockholders of NSAM, Colony and NRF on or about November 18, 2016.



**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

**To Be Held on December 20, 2016**

To the Stockholders of NorthStar Asset Management Group Inc.:

NorthStar Asset Management Group Inc., a Delaware corporation, which we refer to as NSAM, will hold a special meeting of NSAM common stockholders, commencing at 10:00 a.m. (Eastern Time), on December 20, 2016 at Morgan Stanley, located at 522 5th Avenue, Conference Room 3A, New York, New York 10036, which we refer to as the NSAM special meeting, to consider and vote on the following matters:

1. a proposal to approve the merger of NSAM with and into Colony NorthStar, Inc., which we refer to as Colony NorthStar, with Colony NorthStar surviving the merger, which we refer to as the Redomestication merger, and to adopt the Agreement and Plans of Merger, dated as of June 2, 2016, among NSAM, NorthStar Realty Finance Corp., which we refer to as NRF, Colony Capital, Inc., which we refer to as Colony, Colony NorthStar, New Sirius Inc., NorthStar Realty Finance Limited Partnership, Sirius Merger Sub-T, LLC and New Sirius Merger Sub, LLC, as amended from time to time, which we refer to as the merger agreement, pursuant to which NSAM, Colony and NRF through a series of transactions will merge with and into Colony NorthStar as more fully described in this joint proxy statement/prospectus (we refer to the foregoing mergers as the Mergers and the foregoing proposal as the NSAM merger proposal);

2. a proposal to approve a provision in the Colony NorthStar charter containing certain Colony NorthStar stock ownership and transfer restrictions, including a prohibition on any person actually or constructively owning more than 9.8% in value of the aggregate of the outstanding shares of Colony NorthStar's capital stock, or 9.8% (in value or in number of shares, whichever is more restrictive) of the aggregate of the outstanding shares of Colony NorthStar class A common stock, class B common stock and performance common stock, unless the Colony NorthStar board exempts the person from such ownership limitations (we refer to the foregoing proposal as the NSAM charter proposal);

3. a proposal to approve, by non-binding, advisory vote, the compensation that may become payable to the NSAM named executive officers in connection with the Mergers, which we refer to as the NSAM compensation proposal; and

4. a proposal to adjourn the NSAM special meeting, if necessary or appropriate, as determined by NSAM, to solicit additional proxies in favor of the NSAM merger proposal, the NSAM charter proposal and the NSAM compensation proposal, which we refer to as the NSAM adjournment proposal.

We have fixed the close of business on November 2, 2016 as the record date for the NSAM special meeting. Only NSAM common stockholders of record at that time are entitled to notice of, and to vote at, the NSAM special meeting or any adjournment or postponement of the NSAM special meeting. As described in this joint proxy statement/prospectus, we cannot complete the Mergers described above unless holders of a majority of the outstanding shares of NSAM common stock who are entitled to vote at the NSAM special meeting vote to approve the NSAM merger proposal and the NSAM charter proposal.

Your proxy is being solicited by the board of directors of NSAM, which we refer to as the NSAM board. The NSAM board, following the unanimous recommendation of a special committee of the NSAM board, comprised entirely of independent directors who are not also directors of NRF, which we refer to as the NSAM special committee, has: (i) determined that each of the merger agreement, the transactions contemplated by the merger agreement, including the Mergers, the Colony NorthStar charter and the other related matters and agreements described in this joint proxy statement/prospectus are advisable, fair to and in the best interests of NSAM and its stockholders; and (ii) approved, adopted and declared advisable the Redomestication merger, the merger agreement, the Colony NorthStar charter and other related matters as described in this joint proxy statement/prospectus, as well as the other agreements related to the foregoing. **Accordingly, the NSAM board, following the unanimous recommendation of the NSAM special committee, recommends that you vote "FOR" the NSAM merger proposal, "FOR" the NSAM charter proposal, "FOR" the NSAM compensation proposal and "FOR" the NSAM adjournment proposal.**

**Your vote is very important. Regardless of whether you plan to attend the NSAM special meeting, please vote as soon as possible. If you hold stock in your name as a stockholder of record of NSAM, please complete, sign, date and return the accompanying proxy card in the enclosed postage-paid return envelope. If you hold your stock in "street name" through a broker or other nominee, please follow the instructions on the voting instruction card furnished by such firm.**

The enclosed joint proxy statement/prospectus provides a detailed description of the NSAM special meeting, the Mergers, the documents related to the Mergers and other related matters. **We urge you to read the joint proxy statement/prospectus, including any documents incorporated in the joint proxy statement/prospectus by reference, and its annexes carefully and in their entirety.**

If you have any questions regarding the accompanying joint proxy statement/prospectus, you may contact MacKenzie Partners, Inc., NSAM's proxy solicitor, by calling toll-free (800) 322-2885.

**BY ORDER OF THE BOARD OF DIRECTORS,**

David T. Hamamoto
*Executive Chairman*
NorthStar Asset Management Group Inc.

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

**To Be Held on December 20, 2016**

To the Stockholders of Colony Capital, Inc.:

Colony Capital, Inc., a Maryland corporation, which we refer to as Colony, will hold a special meeting of Colony common stockholders, commencing at 11:00 a.m. (Eastern Time), on December 20, 2016, at Morgan Stanley, located at 522 5th Avenue, Conference Room 3A, New York, New York 10036, which we refer to as the Colony special meeting, to consider and vote on the following matters:

1.   a proposal to approve the merger of Colony with and into Colony NorthStar, Inc., which we refer to as Colony NorthStar, with Colony NorthStar surviving the merger, which we refer to as the Colony merger, and the transactions, to the extent applicable to Colony, contemplated by the Agreement and Plans of Merger, dated as of June 2, 2016, among NorthStar Asset Management Group Inc., which we refer to as NSAM, NorthStar Realty Finance Corp., which we refer to as NRF, Colony, Colony NorthStar, New Sirius Inc., NorthStar Realty Finance Limited Partnership, Sirius Merger Sub-T, LLC, and New Sirius Merger Sub, LLC, as amended from time to time, which we refer to as the merger agreement, pursuant to which NSAM, Colony and NRF through a series of transactions will merge with and into Colony NorthStar as more fully described in this joint proxy statement/prospectus (we refer to the foregoing mergers as the Mergers and the foregoing proposal as the Colony merger proposal);

2.   a proposal to approve a provision in the Colony NorthStar charter containing certain Colony NorthStar stock ownership and transfer restrictions, including a prohibition on any person actually or constructively owning more than 9.8% in value of the aggregate of the outstanding shares of Colony NorthStar's capital stock, or 9.8% (in value or in number of shares, whichever is more restrictive) of the aggregate of the outstanding shares of Colony NorthStar class A common stock, class B common stock and performance common stock, unless the Colony NorthStar board exempts the person from such ownership limitations (we refer to the foregoing proposal as the Colony charter proposal);

3.   a proposal to approve, by non-binding, advisory vote, the compensation that may become payable to the Colony named executive officers in connection with the Colony merger, which we refer to as the Colony compensation proposal; and

4.   a proposal to adjourn the Colony special meeting, if necessary or appropriate, as determined by Colony, to solicit additional proxies in favor of the Colony merger proposal, the Colony charter proposal and the Colony compensation proposal, which we refer to as the Colony adjournment proposal.

We have fixed the close of business on November 2, 2016 as the record date for the Colony special meeting. Only Colony common stockholders of record at that time will be entitled to notice of and to vote at the Colony special meeting or any adjournments or postponements of the Colony special meeting. As described in this joint proxy statement/prospectus, we cannot complete the Colony merger described above unless holders of a majority of the votes entitled to be cast by holders of Colony common stock at the Colony special meeting vote as a single class to approve the Colony merger proposal and the Colony charter proposal.

Your proxy is being solicited by the board of directors of Colony, which we refer to as the Colony board. The Colony board has unanimously: (i) determined that the Colony merger and the transactions contemplated by the merger agreement to the extent applicable to Colony are advisable and in the best interests of Colony and recommended for approval by its stockholders; and (ii) approved Colony's entry into the merger agreement, the transactions contemplated by the merger agreement and other related agreements as described in this joint proxy statement/prospectus. **Accordingly, the Colony board recommends that you vote "FOR" the Colony merger proposal, "FOR" the Colony charter proposal, "FOR" the Colony compensation proposal and "FOR" the Colony adjournment proposal.**

**Your vote is very important. Regardless of whether you plan to attend the Colony special meeting, please vote as soon as possible. If you hold stock in your name as a stockholder of record of Colony, please complete, sign, date and return the accompanying proxy card in the enclosed postage-paid return envelope. If you hold your stock in "street name" through a broker or other nominee, please follow the instructions on the voting instruction card furnished by such firm.**

The enclosed joint proxy statement/prospectus provides a detailed description of the Colony special meeting, the Colony merger, the documents related to the Colony merger and other related matters. **We urge you to read the joint proxy statement/prospectus, including any documents incorporated in the joint proxy statement/prospectus by reference, and its annexes carefully and in their entirety.**

If you have any questions regarding the accompanying joint proxy statement/prospectus, you may contact D.F. King & Co., Inc., Colony's proxy solicitor, by calling toll-free (866) 751-6311.

**BY ORDER OF THE BOARD OF DIRECTORS,**

Ronald M. Sanders
*Chief Legal Officer and Secretary*
Colony Capital, Inc.



**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

**To Be Held on December 20, 2016**

To the Stockholders of NorthStar Realty Finance Corp.:

NorthStar Realty Finance Corp., a Maryland corporation, which we refer to as NRF, will hold a special meeting of NRF common stockholders, commencing at 9:00 a.m. (Eastern Time), on December 20, 2016 at Morgan Stanley, located at 522 5th Avenue, Conference Room 3A, New York, New York 10036, which we refer to as the NRF special meeting, to consider and vote on the following matters:

1. a proposal to approve the merger of New Sirius Merger Sub, LLC, which we refer to as New Parent Merger Sub, with and into NRF, with NRF surviving the merger, which we refer to as the New NRF Holdco merger, which will result in NRF becoming a wholly owned subsidiary of NRF's wholly owned subsidiary, New Sirius Inc., which we refer to as New NRF Parent, and related transactions contemplated by the Agreement and Plans of Merger, dated as of June 2, 2016, among NRF, NorthStar Asset Management Group Inc., which we refer to as NSAM, Colony Capital, Inc., which we refer to as Colony, Colony NorthStar, Inc., which we refer to as Colony NorthStar, New NRF Parent, NorthStar Realty Finance Limited Partnership, Sirius Merger Sub-T, LLC and New Parent Merger Sub, as amended from time to time, which we refer to as the merger agreement, pursuant to which NSAM, Colony and NRF through a series of transactions will merge with and into Colony NorthStar as more fully described in this joint proxy statement/prospectus (we refer to the foregoing mergers as the Mergers and the foregoing proposal as the NRF merger proposal);

2. a proposal to approve a provision in the Colony NorthStar charter containing certain Colony NorthStar stock ownership and transfer restrictions, including a prohibition on any person actually or constructively owning more than 9.8% in value of the aggregate of the outstanding shares of Colony NorthStar's capital stock, or 9.8% (in value or in number of shares, whichever is more restrictive) of the aggregate of the outstanding shares of Colony NorthStar class A common stock, class B common stock and performance common stock, unless the Colony NorthStar board exempts the person from such ownership limitations (we refer to the foregoing proposal as the NRF charter proposal);

3. a proposal to approve, by non-binding, advisory vote, the compensation that may become payable to the NRF named executive officers in connection with the Mergers, which we refer to as the NRF compensation proposal; and

4. a proposal to adjourn the NRF special meeting, if necessary or appropriate, as determined by NRF, to solicit additional proxies in favor of the NRF merger proposal, the NRF charter proposal and the NRF compensation proposal, which we refer to as the NRF adjournment proposal.

We have fixed the close of business on November 2, 2016 as the record date for the NRF special meeting. Only NRF common stockholders of record at that time are entitled to notice of, and to vote at, the NRF special meeting, or any adjournment or postponement of the NRF special meeting. As described in this joint proxy statement/prospectus, we cannot complete the Mergers described above

unless holders of a majority of NRF common stock who are entitled to vote at the NRF special meeting vote to approve the NRF merger proposal and the NRF charter proposal.

Your proxy is being solicited by the board of directors of NRF, which we refer to as the NRF board. The NRF board, following the unanimous recommendation of a special committee of the NRF board, comprised entirely of independent directors who are not also directors of NSAM, which we refer to as the NRF special committee, has: (i) determined that each of the merger agreement, the Mergers and related transactions contemplated by the merger agreement are advisable and in the best interests of NRF; (ii) approved, subject to any stockholder approval required by law, NRF's entry into the merger agreement, the transactions contemplated by the merger agreement and other related agreements as described in this joint proxy statement/prospectus and authorized NRF to execute and deliver the merger agreement and the other related agreements described in this joint proxy statement/prospectus; and (iii) directed that the New NRF Holdco merger and related transactions contemplated by the merger agreement be submitted for consideration at a meeting of the NRF common stockholders, with the recommendation that holders of NRF common stock vote to approve the same. **Accordingly, the NRF board, following the unanimous recommendation of the NRF special committee, recommends that you vote "FOR" the NRF merger proposal, "FOR" the NRF charter proposal, "FOR" the NRF compensation proposal and "FOR" the NRF adjournment proposal.**

**Your vote is very important. Regardless of whether you plan to attend the NRF special meeting, please vote as soon as possible. If you hold stock in your name as a stockholder of record of NRF, please complete, sign, date and return the accompanying proxy card in the enclosed postage-paid return envelope. If you hold your stock in "street name" through a broker or other nominee, please follow the instructions on the voting instruction card furnished by such firm.**

The enclosed joint proxy statement/prospectus provides a detailed description of the NRF special meeting, the Mergers, the documents related to the Mergers and other related matters. **We urge you to read the joint proxy statement/prospectus, including any documents incorporated in the joint proxy statement/prospectus by reference, and its annexes carefully and in their entirety.**

If you have any questions regarding the accompanying joint proxy statement/prospectus, you may contact Saratoga Proxy Consulting LLC, NRF's proxy solicitor, by calling toll-free (888) 368-0379.

**BY ORDER OF THE BOARD OF DIRECTORS,**

Jonathan A. Langer
*Chief Executive Officer and President*
NorthStar Realty Finance Corp.

## ADDITIONAL INFORMATION

This joint proxy statement/prospectus incorporates by reference important business and financial information about NSAM, Colony and NRF from documents filed with the Securities and Exchange Commission, which we refer to as the SEC, that are not included in or delivered with this joint proxy statement/prospectus. You can obtain any of the documents filed with or furnished to the SEC by NSAM, Colony or NRF at no cost from the SEC's website at http://www.sec.gov or at the SEC's public reference room located at 100 F Street, N.E. Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for additional information on the Public Reference Room. You may also request copies of these documents, including documents incorporated by reference in this joint proxy statement/prospectus, at no cost by contacting the appropriate company at the following addresses, telephone numbers or websites:

| NSAM | COLONY | NRF |
|---|---|---|
| 399 Park Avenue, 18th Floor | 515 S. Flower Street, 44th Floor | 399 Park Avenue, 18th Floor |
| New York, New York 10022 | Los Angeles, California 90071 | New York, New York 10022 |
| Attention: General Counsel | Attention: Investor Relations | Attention: Secretary |
| Telephone: (212) 547-2600 | Telephone: (310) 282-8820 | Telephone: (212) 547-2600 |
| www.nsamgroup.com | www.colonyinc.com | www.nrfc.com |

NSAM common stockholders can also contact MacKenzie Partners, Inc., NSAM's proxy solicitor, Colony common stockholders can also contact D.F. King & Co., Inc., Colony's proxy solicitor, and NRF common stockholders can also contact Saratoga Proxy Consulting LLC, NRF's proxy solicitor, at the following addresses and telephone numbers:

| NSAM | COLONY | NRF |
|---|---|---|
| MacKenzie Partners, Inc. | D.F. King & Co., Inc. | Saratoga Proxy Consulting LLC |
| 105 Madison Avenue | 48 Wall Street, 22nd Floor | 520 8th Avenue, 14th Floor |
| New York, New York 10016 | New York, New York 10005 | New York, New York 10018 |
| (212) 929-5500 | (212) 269-5550 | (212) 257-1311 |
| (800) 322-2885 | (866) 751-6311 | (888) 368-0379 |
| (NSAM common stockholders only) | (Colony common stockholders only) | (NRF common stockholders only) |

**You will not be charged for any of the documents that you request.**

**To obtain timely delivery of these documents, you must request them no later than five business days before the date of your company's special meeting. This means that if you wish to request documents, you must do so by December 13, 2016, in order to receive them before your company's special meeting.**

Investors may also consult NSAM's, Colony's or NRF's website for additional information about NSAM, Colony or NRF, respectively. NSAM's website is http://www.nsamgroup.com, Colony's website is http://www.colonyinc.com and NRF's website is http://www.nrfc.com. Information included on these websites is not incorporated by reference into, and does not form a part of, this joint proxy statement/prospectus.

Refer to the section entitled "Where You Can Find More Information; Incorporation by Reference" beginning on page 420 of this joint proxy statement/prospectus for more details.

**ABOUT THIS JOINT PROXY STATEMENT/PROSPECTUS**

This joint proxy statement/prospectus, which forms part of a registration statement on Form S-4 filed by Colony NorthStar with the SEC, constitutes a prospectus of Colony NorthStar for purposes of the Securities Act of 1933, as amended, which we refer to as the Securities Act, with respect to the shares of Colony NorthStar class A common stock and Colony NorthStar preferred stock to be issued to NSAM stockholders, Colony stockholders and NRF stockholders in connection with the Mergers. This joint proxy statement/prospectus also constitutes a proxy statement for each of NSAM, Colony and NRF for solicitation of proxies in connection with its special meeting for purposes of the Securities Exchange Act of 1934, as amended, which we refer to as the Exchange Act. In addition, it constitutes a notice of meeting with respect to each of the NSAM special meeting, the Colony special meeting and the NRF special meeting.

You should rely only on the information contained or incorporated by reference into this joint proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this joint proxy statement/prospectus. This joint proxy statement/prospectus is dated November 18, 2016. You should not assume that the information contained in this joint proxy statement/prospectus is accurate as of any other date. You should not assume that the information incorporated by reference into this joint proxy statement/prospectus is accurate as of any date other than the date of such incorporated document. Neither the mailing of this joint proxy statement/prospectus to NSAM stockholders, Colony stockholders or NRF stockholders nor the issuance of shares of Colony NorthStar common stock and preferred stock, as applicable, to NSAM stockholders, Colony stockholders or NRF stockholders pursuant to the merger agreement will create any implication to the contrary.

**This joint proxy statement/prospectus does not constitute an offer to sell, or a solicitation of an offer to buy, any securities or the solicitation of a proxy in any jurisdiction in which, or from any person with respect to whom, it is unlawful to make any such offer or solicitation in such jurisdiction. Information contained in this joint proxy statement/prospectus regarding NSAM has been provided by NSAM, information contained in this joint proxy statement/prospectus regarding Colony has been provided by Colony and information contained in this joint proxy statement/prospectus regarding NRF has been provided by NRF.**

## SELECTED DEFINITIONS

Unless otherwise indicated or as the context otherwise requires, a reference in this joint proxy statement/prospectus to:

- "Colony" refers to Colony Capital, Inc.;

- "Colony class A common stock" refers to class A common stock of Colony;

- "Colony class B common stock" refers to class B common stock of Colony;

- "Colony common stock" refers to, collectively, shares of Colony class A common stock and class B common stock;

- "Colony equity awards" refers to equity awards granted under the Colony stock plans that are denominated in Colony common stock;

- "Colony LTIP units" refers to membership units in Colony Capital Operating Company, LLC designated as LTIP units;

- "Colony merger" refers to the merger of Colony with and into Colony NorthStar with Colony NorthStar surviving the merger;

- "Colony NorthStar" refers to Colony NorthStar, Inc., formerly known as New Polaris Inc., a Maryland corporation;

- "Colony NorthStar bylaws" refers to the Amended and Restated Bylaws of Colony NorthStar, Inc., a form of which is attached as Annex C to this joint proxy statement/prospectus;

- "Colony NorthStar charter" refers to the Articles of Amendment and Restatement of Colony NorthStar, Inc., a form of which is attached as Annex B to this joint proxy statement/prospectus;

- "Colony NorthStar class A common stock" refers to class A common stock of Colony NorthStar;

- "Colony NorthStar class B common stock" refers to class B common stock of Colony NorthStar;

- "Colony NorthStar common stock" refers to, collectively, Colony NorthStar class A common stock and class B common stock;

- "Colony NorthStar equity awards" refers to equity awards denominated in Colony NorthStar common stock;

- "Colony NorthStar preferred stock" refers to, collectively, Colony NorthStar series A, B, C, D, E, F, G and H preferred stock;

- "Colony NorthStar series A preferred stock" refers to the 8.75% series A cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony NorthStar series B preferred stock" refers to the 8.25% series B cumulative redeemable perpetual preferred stock of Colony NorthStar;

iii

- "Colony NorthStar series C preferred stock" refers to the 8.875% series C cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony NorthStar series D preferred stock" refers to the 8.500% series D cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony NorthStar series E preferred stock" refers to the 8.75% series E cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony NorthStar series F preferred stock" refers to the 8.50% series F cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony NorthStar series G preferred stock" refers to the 7.50% series G cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony NorthStar series H preferred stock" refers to the 7.125% series H cumulative redeemable perpetual preferred stock of Colony NorthStar;

- "Colony OP" refers to Colony Capital Operating Company, LLC;

- "Colony OP units" refers to membership units in Colony OP;

- "Colony preferred stock" refers to, collectively, Colony series A preferred stock, Colony series B preferred stock and Colony series C preferred stock;

- "Colony series A preferred stock" refers to the 8.50% series A cumulative redeemable perpetual preferred stock of Colony;

- "Colony series B preferred stock" refers to the 7.50% series B cumulative redeemable perpetual preferred stock of Colony;

- "Colony series C preferred stock" refers to the 7.125% series C cumulative redeemable perpetual preferred stock of Colony;

- "Colony stock plans" refers to the 2009 Non-Executive Director Stock Plan of Colony and/or the 2014 Equity Incentive Plan of Colony;

- "Colony stockholder approval" refers to the receipt at the Colony special meeting of the affirmative vote of a majority of the votes entitled to be cast by the holders of the outstanding shares of Colony common stock, voting together as a single class, to approve the Colony merger proposal and the Colony charter proposal;

- "Companies" refer to NSAM, Colony and NRF, collectively;

- "Company" refers, as the context requires, to any of NSAM, Colony or NRF;

- "LLC conversion" refers to the conversion of NRF into a limited liability company under the laws of the State of Maryland immediately following the New NRF Holdco merger;

- "merger agreement" refers to the Agreement and Plans of Merger, dated as of June 2, 2016, among NSAM, Colony, NRF, Colony NorthStar, New NRF Parent, NRF LP, NRF OP Merger Sub

iv

and New Parent Merger Sub, as amended from time to time including by the two separate letter agreements dated July 28, 2016 and October 16, 2016, respectively;

- "Mergers" refers to, collectively, the Redomestication merger, the NRF LP merger, the NRF LP upstream merger, the New NRF Holdco merger, the NRF merger and the Colony merger;

- "New NRF Holdco merger" refers to the merger of New Parent Merger Sub with and into NRF with NRF surviving the merger;

- "New NRF Parent" refers to New Sirius Inc.;

- "New NRF Parent preferred stock" refers to, collectively, New NRF Parent series A, B, C, D and E preferred stock;

- "New NRF Parent series A preferred stock" refers to the 8.75% series A cumulative redeemable preferred stock of New NRF Parent;

- "New NRF Parent series B preferred stock" refers to the 8.25% series B cumulative redeemable preferred stock of New NRF Parent;

- "New NRF Parent series C preferred stock" refers to the 8.875% series C cumulative redeemable preferred stock of New NRF Parent;

- "New NRF Parent series D preferred stock" refers to the 8.500% series D cumulative redeemable preferred stock of New NRF Parent;

- "New NRF Parent series E preferred stock" refers to the 8.75% series E cumulative redeemable preferred stock of New NRF Parent;

- "New Parent Merger Sub" refers to New Sirius Merger Sub LLC, a Delaware limited liability company and a wholly owned subsidiary of New NRF Parent;

- "NRE" refers to NorthStar Realty Europe Corp.;

- "NRF" refers to NorthStar Realty Finance Corp.;

- "NRF common stock" refers to common stock of NRF;

- "NRF equity awards" refers to equity awards granted under the NRF stock plan or otherwise granted by NRF that are denominated in NRF common stock;

- "NRF LP" refers to NorthStar Realty Finance Limited Partnership, a Delaware limited partnership;

- "NRF LP merger" refers to the merger of NRF OP Merger Sub with and into NRF LP with NRF LP surviving the merger;

- "NRF LP upstream merger" refers to the merger of NRF LP with and into NRF with NRF surviving the merger;

- "NRF LTIP units" refers to partnership units in NRF LP designated as LTIP units;

- "NRF management agreement" refers to the Amended and Restated Asset Management Agreement, dated as of October 31, 2015, by and between NRF and NSAM J-NRF Ltd;

- "NRF merger" refers to the merger of New NRF Parent with and into Colony NorthStar with Colony NorthStar surviving the merger;

- "NRF OP Merger Sub" refers to Sirius Merger Sub-T, LLC, a Delaware limited liability company and a wholly owned subsidiary of NRF;

- "NRF preferred stock" refers to, collectively, NRF series A, B, C, D and E preferred stock;

- "NRF series A preferred stock" refers to the 8.75% series A cumulative redeemable preferred stock of NRF;

- "NRF series B preferred stock" refers to the 8.25% series B cumulative redeemable preferred stock of NRF;

- "NRF series C preferred stock" refers to the 8.875% series C cumulative redeemable preferred stock of NRF;

- "NRF series D preferred stock" refers to the 8.500% series D cumulative redeemable preferred stock of NRF;

- "NRF series E preferred stock" refers to the 8.75% series E cumulative redeemable preferred stock of NRF;

- "NRF stock plan" refers to the NRF Third Amended and Restated 2004 Omnibus Stock Incentive Plan;

- "NRF stockholder approval" refers to the receipt at the NRF special meeting of the affirmative vote of the holders of a majority of the outstanding shares of NRF common stock entitled to vote at the NRF special meeting to approve the NRF merger proposal and the NRF charter proposal;

- "NSAM" refers to NorthStar Asset Management Group Inc.;

- "NSAM common stock" refers to common stock of NSAM;

- "NSAM equity awards" refers to equity awards granted under the NSAM stock plans or otherwise granted by NSAM that are denominated in NSAM common stock;

- "NSAM Jersey" refers to NorthStar Asset Management Group Ltd, a Jersey limited company;

- "NSAM LP" refers to NorthStar Asset Management LP;

- "NSAM LTIP units" refers to partnership units in NSAM LP designated as LTIP units;

- "NSAM's managed companies" refers to, collectively, the companies managed by NSAM that raise capital through the retail market and the future sponsored companies that raise money from retail investors, which we refer to, collectively, as NSAM's retail companies, NRF and NRE;

- "NSAM/NRF side agreement" refers to the agreement by and among NSAM, NRF and NSAM J-NRF Ltd, dated as of June 2, 2016;

- "NSAM performance common stock" refers to the performance common stock of NSAM;

- "NSAM stock plans" refers to the 2014 Omnibus Incentive Plan and any new equity plan adopted by NSAM prior to the closing of the Mergers, to the extent such new equity plan is permitted to be adopted pursuant to the merger agreement;

- "NSAM stockholder approval" refers to the receipt at the NSAM special meeting of the affirmative vote of the holders of a majority of the outstanding shares of NSAM common stock entitled to vote at the NSAM special meeting to approve the NSAM merger proposal and the NSAM charter proposal; and

- "Redomestication merger" refers to the merger of NSAM with and into Colony NorthStar pursuant to Section 253 of the DGCL and Section 3-101, et seq. of the MGCL with Colony NorthStar surviving the merger.

\* \* \*

# RISK FACTORS

In addition to the other information included and incorporated by reference into this joint proxy statement/prospectus, including the matters addressed in the section entitled "Cautionary Statement Concerning Forward-Looking Statements" beginning on page 79 of this joint proxy statement/prospectus, you should consider carefully the following risks before deciding whether to vote for the proposals presented in this joint proxy statement/prospectus. By voting in favor of the merger proposals, NSAM, Colony and NRF stockholders will be choosing to invest in Colony NorthStar common stock following the completion of the Mergers. Accordingly, you should read and consider the risks associated with each of the businesses of NSAM, Colony and NRF because these risks will also affect Colony NorthStar. Risks related to NSAM can be found in NSAM's Annual Report on Form 10-K, as amended, for the fiscal year ended December 31, 2015 and NSAM's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2016, risks related to Colony can be found in Colony's Annual Report on Form 10-K, as amended, for the year ended December 31, 2015 and Colony's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2016 and risks related to NRF can be found in NRF's Annual Report on Form 10-K, as amended, for the fiscal year ended December 31, 2015 and NRF's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2016, each of which is incorporated by reference into this joint proxy statement/prospectus. You should also read and consider the other information in this joint proxy statement/prospectus and the other documents incorporated by reference into this joint proxy statement/prospectus. Refer to the section entitled "Where You Can Find More Information; Incorporation by Reference" beginning on page 420 of this joint proxy statement/prospectus. In addition to the risks set forth below, new risks may emerge from time to time, and it is not possible to predict all risk factors nor can NSAM, Colony or NRF assess the impact of all factors on the Mergers and Colony NorthStar following the Mergers or the extent to which any factor or combination of factors may cause actual results to differ materially from those contained in or implied by any forward-looking statements.

## Risks Relating to the Mergers

### NSAM, Colony and NRF common stockholders cannot be sure of the market price of Colony NorthStar class A common stock they will receive as consideration.

Upon completion of the Mergers, NSAM, Colony and NRF common stockholders will receive shares of Colony NorthStar common stock. Prior to the Mergers, there has not been and will not be established public trading for Colony NorthStar common stock. The market price of Colony NorthStar class A common stock following the Mergers will be unknown until the commencement of trading following completion of the Mergers.

### The exchange ratios are fixed and generally will not be adjusted for changes affecting the Companies.

Each of the NSAM exchange ratio, Colony class A exchange ratio, Colony class B exchange ratio and NRF exchange ratio is fixed and may be adjusted only under certain limited circumstances as set forth in the merger agreement and as described in this joint proxy statement/prospectus and will not be adjusted to reflect any changes in the trading prices of NSAM, Colony or NRF common stock on the NYSE between the signing of the merger agreement and the closing of the Mergers.

### Completion of the Mergers is subject to many conditions and if these conditions are not satisfied or waived, the Mergers will not be completed.

Completion of the Mergers is subject to many conditions which must be satisfied or waived under the merger agreement in order for the Mergers to be completed including, among others, receipt of each of the NSAM stockholder approval, Colony stockholder approval and NRF stockholder approval.

For a more complete summary of the conditions that must be satisfied or waived prior to completion of the Mergers, refer to the section entitled "The Merger Agreement—Conditions to Completion of the Mergers."

In addition, NSAM, Colony and NRF each may terminate the merger agreement under certain circumstances, including, among other reasons, if the Mergers are not completed by the outside date. If the Mergers are not consummated, the market price of each Company's common stock may decline. Refer to the section entitled "The Merger Agreement—Termination of the Merger Agreement" beginning on page 301 of this joint proxy statement/prospectus.

There can be no assurance that the conditions to the closing of the Mergers will be satisfied or waived. For example, Colony NorthStar's ability to qualify as a REIT depends on its acquisition of Colony's and NRF's qualifying REIT assets in the Mergers. Accordingly, in order for counsel to Colony NorthStar to deliver the REIT qualification opinion that is a condition to the closing of the Mergers (a condition that the parties will not waive), the Mergers must be completed sufficiently early in 2017 to allow Colony NorthStar to project, and its counsel to reasonably assume, that Colony NorthStar will satisfy the REIT income and asset tests for the entire taxable year of the Mergers. The date by which the Mergers must be completed for these purposes may be significantly earlier than the outside date. A delay in the closing of the Mergers could therefore preclude Colony NorthStar from being able to satisfy the REIT requirements for the year of the closing and from obtaining the REIT qualification opinion that is a condition to closing.

Accordingly, there can be no assurance that the Mergers will be completed.

***NSAM, Colony or NRF may waive one or more of the closing conditions without re-soliciting stockholder approval.***

NSAM, Colony or NRF may determine to waive, in whole or in part, one or more of the conditions to their obligations to consummate the Mergers (other than the condition that each of Colony and NRF receives an opinion of counsel regarding Colony NorthStar's ability to qualify as a REIT for its taxable year ending December 31, 2017 and subsequent taxable years). NSAM, Colony or NRF currently expect to evaluate the materiality of any waiver and its effect on NSAM stockholders, Colony stockholders or NRF stockholders, as applicable, in light of the facts and circumstances at the time to determine whether any amendment of this joint proxy statement/prospectus or any re-solicitation of proxies or voting cards is required in light of such waiver. Any determination whether to waive any condition to the Mergers and whether to re-solicit stockholder approval or amend this joint proxy statement/prospectus as a result of a waiver will be made by NSAM, Colony or NRF, as applicable, at the time of such waiver based on the facts and circumstances as they exist at that time.

***If the Mergers do not occur, one or more of the Companies may incur payment obligations to the others.***

If the merger agreement is terminated under certain circumstances, NSAM may be required to pay NRF and Colony a total termination fee of $92 million or transaction expenses of up to $20 million (depending on the specific circumstances), NRF may be required to pay NSAM and Colony a total termination fee of up to $49 million, which includes $3 million that NRF would be required to pay NSAM pursuant to the NSAM/NRF side agreement as described in the section entitled "Other Related Agreements" beginning on page 307 of this joint proxy statement/prospectus, or transaction expenses of up to $20 million (depending on the specific circumstances) and Colony may be required to pay NSAM and NRF a total termination fee of $92 million or transaction expenses of up to $20 million (depending on the specific circumstances). Refer to the section entitled "The Merger Agreement—Termination of the Merger Agreement—Termination Fees" and "—Payment of Transaction Expenses upon Termination" beginning on page 304 of this joint proxy statement/prospectus.

***The pendency of the Mergers could adversely affect the business and operations of the Companies.***

Due to the operating covenants in the merger agreement, each of the Companies may be unable, during the pendency of the Mergers, to take certain actions without the consent of the other Companies, even if such actions would otherwise prove beneficial to such Company's stockholders. Those operating covenants will continue to apply until the Mergers occur, which will take place no earlier than January 4, 2017 even if the conditions to the closing of the Mergers would have been satisfied prior to that time, unless otherwise agreed by the Companies.

***The common stockholders of NSAM, Colony and NRF, each as a group, will hold a significantly smaller share of Colony NorthStar following the closing of the Mergers, than they do as stockholders of each of the Companies currently.***

Following the Mergers, former NSAM stockholders, former Colony stockholders and former NRF stockholders are expected to hold approximately 32.85%, 33.25% and 33.90%, respectively, of Colony NorthStar immediately after the completion of the Mergers, on a fully diluted basis, excluding the effect of certain equity-based awards issuable in connection with the Mergers. Consequently, NSAM, Colony and NRF common stockholders, each as a group, will exercise less influence over the management and policies of Colony NorthStar after the completion of the Mergers than they currently exercise over the management and policies of NSAM, Colony and NRF, as applicable.

In addition, unlike NSAM and NRF currently, Colony NorthStar will have Colony NorthStar class B common stock outstanding with voting rights equal to 36.5 votes per share of Colony NorthStar class B common stock. Following the Mergers, former NSAM stockholders, former Colony stockholders and former NRF stockholders are expected to hold approximately 34%, 33% and 33%, respectively, of the voting power of Colony NorthStar common stock upon the completion of the Mergers.

***If Colony's financing for the refinancing of certain existing borrowings of NSAM, Colony and NRF becomes unavailable or is insufficient, the Mergers may not be completed.***

Colony has obtained financing commitments to fund the refinancing of certain specified borrowings of the Companies and their affiliates in connection with the consummation of the Mergers. The financing commitments are subject to certain conditions, which may or may not be satisfied. In addition, even if these conditions are satisfied, the amount of financing under those financing commitments may be reduced or the cost of obtaining such financing may be increased if certain conditions are not satisfied. In the event that the financing contemplated by those financing commitments is not available or is available in less than the expected amount, other necessary financing may not be available on acceptable terms, in a timely manner or at all. If alternative financing is available, it could be more costly than that reflected in the financing commitments, which would have a negative impact on Colony NorthStar's results of operations following the Mergers. The merger agreement provides that no party will be required to consummate the Mergers if, subject to certain conditions, financing is unavailable and following the Mergers, Colony NorthStar will not have sufficient unrestricted cash to repay certain specified borrowings and all transaction expenses. As a result, if the financing provided for in the financing commitments obtained by Colony is not available, is insufficient and/or the Companies are unable to secure additional funds through alternative sources, the Mergers may not be completed.

***The merger agreement contains provisions that could discourage a potential competing acquirer of NSAM, Colony or NRF or could result in any competing proposal being at a lower price than it might be otherwise.***

The merger agreement contains "no shop" provisions that, subject to limited exceptions, restrict each Company's ability to solicit, initiate, encourage, facilitate or discuss, or provide any

63

confidential or non-public information with regard to, competing third-party proposals to acquire all, or a significant part, of NSAM, Colony or NRF. In addition, any Company that receives a potentially superior offer or proposal not in violation of the "no shop" provisions is required to give the other Companies the opportunity to match or exceed the competing proposal before the Company is permitted to accept such potentially superior proposal. Upon termination of the merger agreement to accept a superior proposal, NSAM, Colony or NRF may be required to pay a termination fee to NSAM, Colony or NRF, as applicable. Refer to the sections entitled "The Merger Agreement—Covenants and Agreements—No Solicitation or Negotiation of Acquisition Proposals" beginning on page 296 of this joint proxy statement/prospectus and "—Termination of the Merger Agreement—Termination Fees" beginning on page 304 of this joint proxy statement/prospectus.

In addition, Colony stockholders holding approximately 16% of the voting power of Colony have agreed to vote in favor of the transactions contemplated by the merger agreement and against other acquisition proposals and certain other actions and transactions.

These provisions, among others described in this joint proxy statement/prospectus: (i) could discourage a potential competing acquirer that might have an interest in acquiring all, or a significant part, of NSAM, Colony or NRF from considering or proposing an acquisition, even if it were prepared to pay consideration with a higher per share cash or market value than the market value proposed to be received or realized in the Mergers; or (ii) might result in a potential competing acquirer proposing to pay a lower price than it might otherwise have proposed to pay because of the added expense of the termination fee or expense reimbursement that may become payable in certain circumstances.

***If the Mergers are approved, the date on which NSAM, Colony and NRF common stockholders will receive common stock in Colony NorthStar is uncertain.***

Even if the Mergers are approved by the respective stockholders of the Companies, the date on which the Mergers are consummated and NSAM, Colony and NRF common stockholders will receive common stock in Colony NorthStar will remain uncertain, and may not occur at all. Although the Companies expect that the Mergers will be completed in January 2017 (but not before January 4, 2017), the completion date of the Mergers might be later than expected due to delays in obtaining regulatory approvals from certain regulatory and governmental authorities or other unforeseen events. In addition, there can be no assurance that the Mergers will be completed even if the required stockholder approvals are obtained. Refer to the section entitled "The Mergers—Regulatory Approvals in Connection with the Mergers" beginning on page 226 of this joint proxy statement/prospectus.

These regulatory and governmental entities may impose conditions on the granting of such approvals and if such regulatory and governmental entities seek to impose such conditions, lengthy negotiations may ensue among such regulatory or governmental entities, NSAM, Colony and NRF. Such conditions and the process of obtaining regulatory approvals could have the effect of delaying completion of the Mergers and such conditions may not be satisfied for an extended period of time following the NSAM special meeting, Colony special meeting and NRF special meeting. Such conditions may also impose additional costs or limitations on the combined company following the completion of the Mergers, including the requirement that the respective NSAM, Colony and NRF businesses divest certain assets if necessary in order to obtain certain regulatory approvals, and may limit the ability of the combined company to integrate parts of the NSAM, Colony and NRF businesses and negatively impact the ultimate composition of Colony NorthStar. These conditions may therefore reduce the anticipated benefits of the Mergers, which could also have a material adverse effect on the combined company's business and cash flows and results of operations, and neither NSAM, Colony nor NRF can predict what, if any, changes may be required by regulatory or governmental authorities whose approvals are required. The regulatory approvals may not be received at all, may not be received in a timely fashion, and may contain conditions on the completion of the Mergers. Subject to the terms

64

of the merger agreement, NSAM, Colony and NRF have each agreed to use their reasonable best efforts to take all actions necessary, proper or desirable to complete the Mergers and related transactions contemplated by the merger agreement.

***The merger agreement includes restrictions on the ability of each of the Companies to make distributions to its stockholders, even if it would otherwise have net income and net cash available to make such distributions.***

Pursuant to the merger agreement:

- NSAM is permitted, prior to the closing of the Mergers, to declare distributions to its common stockholders of up to (i) $0.10 per share of NSAM common stock with respect to each quarter of 2016 so long as the distribution is declared and paid no earlier than the date of declaration and payment in the prior calendar year and (ii) a pro rata portion of the $0.10 per share dividend for any partial period of the first calendar quarter of 2017. In 2016, NSAM declared its fourth quarter 2015 dividend on February 25, 2016. As a result, if the Mergers are completed on or prior to February 25, 2017, NSAM will not declare a dividend for the fourth quarter of 2016. The NSAM board is also permitted to declare a special dividend in cash in respect of NSAM common stock in an aggregate amount of $228 million to be paid in 2017 to stockholders of record as of a date on or after January 1, 2017 and prior to the closing of the Mergers.

- Colony is permitted, prior to the closing of the Mergers, to declare distributions to its common stockholders of up to (i) $0.40 per share of Colony common stock with respect to each quarter of 2016 so long as the distribution is declared and paid no earlier than the date of declaration and payment in the prior calendar year and (ii) a pro rata portion of the $0.40 per share dividend for any partial period of the first calendar quarter of 2017. Colony declared its fourth quarter 2015 dividend on November 4, 2015. Given that the Mergers will not be completed earlier than January 2017, Colony will be permitted to declare its fourth quarter 2016 dividend even if the Mergers are completed.

- NRF is permitted, prior to the closing of the Mergers, to declare distributions to its common stockholders of up to (i) $0.40 per share of NRF common stock with respect to each quarter of 2016 so long as the distribution is declared and paid no earlier than the date of declaration and payment in the prior calendar year and (ii) a pro rata portion of the $0.40 per share dividend for any partial period of the first calendar quarter of 2017. In 2016, NRF declared its fourth quarter 2015 dividend on February 25, 2016. As a result, if the Mergers are completed on or prior to February 25, 2017, NRF will not declare or pay a dividend for the fourth quarter of 2016.

Given their status as REITs, Colony and NRF may need to (and are permitted to under the merger agreement) make certain minimum distributions in excess of the above limits. In the event the amounts of permitted dividends described above are exceeded, pursuant to a distribution necessary for Colony or NRF, as applicable, to qualify as a REIT or to avoid the incurrence of any income or excise tax, the Colony class A exchange ratio, Colony class B exchange ratio and NRF exchange ratio, as applicable, will be adjusted.

Although the Companies generally have agreed to use their reasonable best efforts to close the Mergers as promptly as practicable in accordance with the merger agreement, certain factors, which include obtaining the NSAM stockholder approval, Colony stockholder approval and NRF stockholder approval, could delay the closing. Therefore, even if NSAM, Colony or NRF has available net income or net cash to make distributions to its common stockholders and satisfies any other conditions to make such distributions, the terms of the merger agreement could prohibit such action. Refer to the section

entitled "The Merger Agreement—Covenants and Agreements—Conduct of the Business Pending the Mergers" beginning on page 293 of this joint proxy statement/prospectus.

***The Companies will be subject to business uncertainties and certain operation restrictions until consummation of the Mergers.***

Uncertainty about the effect of the Mergers on employees and clients may have an adverse effect on the Companies or the combined company following the Mergers. These uncertainties could disrupt the business of the Companies and impair their ability to attract, retain and motivate key personnel until the Mergers are completed, and cause clients and others that deal with the Companies to seek to change existing business relationships, cease doing business with the Companies or cause potential new clients to delay doing business with the Companies until the Mergers have been completed successfully. Retention and motivation of certain employees may be challenging during the pendency of the Mergers due to uncertainty about their future roles and difficulty of integration. If key employees depart because of issues related to the uncertainty and difficulty of integration or a desire not to remain with the combined company, Colony NorthStar's business following the Mergers could be negatively impacted. In addition, the merger agreement restricts the parties thereto from making certain acquisitions and investments and taking other specified actions until the Mergers occur without the consent of the other parties. These restrictions may prevent the Companies from pursuing attractive business opportunities that may arise prior to the completion of the Mergers. Refer to the section entitled "The Merger Agreement—Covenants and Agreements—Conduct of the Business Pending the Mergers" beginning on page 293 of this joint proxy statement/prospectus for a description of the restrictive covenants to which each of the Companies is subject.

***The shares of Colony NorthStar common stock to be received by NSAM, Colony and NRF common stockholders as a result of the Mergers will have rights different from the shares of NSAM, Colony and NRF common stock.***

Upon completion of the Mergers, the rights of former NSAM, Colony and NRF common stockholders who become Colony NorthStar common stockholders will be governed by the Colony NorthStar charter and Colony NorthStar bylaws and the MGCL. The rights associated with NSAM, Colony and NRF common stock are different from the rights to be associated with Colony NorthStar common stock after the Mergers. Refer to the section entitled "Comparison of Rights of Stockholders of NSAM, Colony and NRF with the Rights of Stockholders of Colony NorthStar" beginning on page 373 of this joint proxy statement/prospectus for additional information.

***If counterparties to certain agreements with NSAM, Colony or NRF do not consent to the Mergers, change of control rights under those agreements may be triggered, which could cause the combined company to lose the benefit of such agreements and incur liabilities or replacement costs.***

Each of NSAM, Colony and NRF is a party to one or more agreements that will require NSAM, Colony or NRF, as applicable, to obtain consents from third parties in connection with the Mergers. If these consents cannot be obtained, the counterparties to these contracts and other third parties with whom NSAM, Colony and/or NRF currently have relationships may have the ability to terminate, reduce the scope of or otherwise materially adversely alter their relationships with any or all three of the parties in anticipation of the Mergers, or with the combined company following the Mergers. The pursuit of such rights may result in NSAM, Colony, NRF or the combined company suffering a loss of potential future revenue or incurring liabilities in connection with a breach of such agreements and may result in the loss of rights that are material to the combined company's business. Any such disruptions could limit the combined company's ability to achieve the anticipated benefits of the Mergers. The adverse effect of such disruptions could also be exacerbated by a delay in the completion of the Mergers or the termination of the merger agreement.

***Some of the directors and executive officers of NSAM, Colony and NRF have interests in seeing the Mergers completed that are different from, or in addition to, those of the other NSAM, Colony and NRF common stockholders.***

Some of the directors and executive officers of NSAM, Colony and NRF have arrangements that provide them with interests in the Mergers that are different from, or in addition to, the common stockholders of NSAM, Colony and NRF generally. These interests include, among other things, the continued service as a director or an executive officer of Colony NorthStar following the Mergers and certain rights to continuing indemnification, directors' and officers' liability insurance and other amounts and benefits that may become payable to them in connection with the Mergers. These interests, among other things, may influence the directors and executive officers of NSAM, Colony and NRF to support or approve the Mergers. Refer to the sections entitled "The Mergers—Interests of NSAM's Directors and Executive Officers in the Mergers" beginning on page 211 of this joint proxy statement/prospectus; "—Interests of Colony's Directors and Executive Officers in the Mergers" beginning on page 218 of this joint proxy statement/prospectus; and "—Interests of NRF's Directors and Executive Officers in the Mergers" beginning on page 220 of this joint proxy statement/prospectus.

***Failure to complete contemplated asset divestitures could adversely affect Colony NorthStar's credit profile.***

Under the merger agreement, NRF is required, in good faith, to continue to seek to consummate certain asset sales that NRF was already exploring, the proceeds of which are expected to be used to repay borrowings or pay transaction costs. There can be no assurance that NRF will be able to consummate any such assets sales on favorable terms or at all. Any potential asset sales would be dependent upon a number of factors that may be beyond NRF's control, including, among other factors, market conditions, industry trends, the interest of third parties in NRF's assets and the availability of financing to potential buyers on reasonable terms.

If NRF is unable to divest such assets, or if it is unable to do so on favorable terms, Colony NorthStar may have greater than anticipated borrowings as of the closing, which would impact negatively its credit profile, and could therefore impact negatively its ability to enhance its credit profile in the future and/or make attractive acquisitions.

***Failure to complete the Mergers could negatively affect the stock price and the future business and financial results of each of NSAM, Colony and NRF.***

If the merger agreement is terminated and the Mergers are not completed for any reason, including as a result of NSAM, Colony or NRF stockholders' failing to approve the necessary proposals, each Company's ongoing business could be adversely affected and, without realizing any of the benefits of having completed the Mergers, may be subject to several risks, including that:

- each Company may experience negative reactions from the financial markets, including negative impacts on their respective stock prices;

- each Company may experience negative reactions from their respective customers and employees;

- each Company will be required to pay certain costs relating to the Mergers, whether or not the Mergers are completed, and, depending on the circumstances relating to a termination, may be required to pay a termination fee of $92 million in the case of NSAM and Colony or $49 million in the case of NRF or transaction expenses of up to $20 million; and

• management focus and resources of each Company may be diverted from operational matters and other strategic opportunities while working to implement the Mergers.

**Risks Relating to an Investment in Colony NorthStar Following the Mergers**

***Colony NorthStar may not realize the anticipated benefits of the Mergers.***

NSAM, Colony and NRF entered into the merger agreement because each believes that the Mergers will be beneficial to the Companies and stockholders of the Companies and that combining the businesses of NSAM, Colony and NRF will produce benefits and cost savings. If the combined company is not able to combine successfully the businesses of NSAM, Colony and NRF in an efficient and effective manner, the anticipated benefits and cost savings of the Mergers may not be realized fully, or at all, or may take longer to realize than expected, and the value of Colony NorthStar common stock may be adversely affected.

An inability to realize the full extent of the anticipated benefits of the Mergers and related transactions contemplated by the merger agreement, as well as any delays encountered in the integration process, could have an adverse effect upon the revenues, level of expenses and operating results of the combined company, which may adversely affect the value of Colony NorthStar common stock following the Mergers.

The management of the combined company will have to dedicate substantial effort to integrating the businesses of NSAM, Colony and NRF during the integration process. These efforts may divert management's focus and resources from the combined company's business, corporate initiatives or strategic opportunities. In addition, the actual integration may result in additional and unforeseen expenses and the anticipated benefits of the integration may not be realized. Actual growth and cost savings, if achieved, may be lower than what the combined company expects and may take longer to achieve than anticipated. Difficulties associated with managing Colony NorthStar's larger and more complex portfolio could prevent Colony NorthStar from realizing the anticipated benefits of the Mergers and have a material adverse effect on its business. If Colony NorthStar is not able to address integration challenges adequately, the combined company may be unable to integrate successfully the operations of NSAM, Colony and NRF or to realize the anticipated benefits of the integration of the three Companies.

As discussed above, the senior management of the Companies is expected to change, especially with respect to NSAM and NRF. The changes in senior management could negatively impact the results of operations of Colony NorthStar, particularly as it relates to the business associated with NSAM and NRF prior to the Mergers.

***Following the completion of the Mergers, Colony NorthStar will face risks different from those faced by NSAM, Colony and NRF today, which may affect Colony NorthStar's results of operations and the market price of Colony NorthStar class A common stock.***

Colony NorthStar's business will differ from that of NSAM, Colony and NRF, and, accordingly, the results of operations and financial condition of Colony NorthStar after the Mergers may be affected by factors different from those affecting NSAM's, Colony's or NRF's results of operations and financial condition prior to the Mergers. Examples of differences between NSAM's,

Colony's and NRF's businesses and the new or increased risks Colony NorthStar may face after the Mergers include:

- a large increase in the amount of assets under management and a diversification of types of assets under management, which may create risks related to scaling and combining of the platforms necessary to manage the combined assets of the Companies;

- additional conflicts between and among the clients and managed companies of the Companies;

- certain investment vehicles managed by NSAM and Colony may compete for investment opportunities and may be adversely impacted to the extent such opportunities are allocated between them;

- Colony NorthStar's possible failure to successfully implement its plan to optimize its combined portfolio consisting primarily of owned real estate; and

- a larger and newly combined team of management and employees may require time to become fully effective and may not be able to achieve Colony NorthStar's anticipated synergies and higher earnings growth.

In particular for current NSAM stockholders, Colony NorthStar will be treated as a REIT for tax purposes and, as a result of requirements in order maintain REIT status, Colony NorthStar's flexibility to structure its operations and enter new lines of business will be significantly more limited than the flexibility enjoyed by NSAM currently. Both NRF and Colony are already REITs.

***The market price of Colony NorthStar class A common stock may be volatile and holders of Colony NorthStar class A common stock could lose a significant portion of their investment due to drops in the market price of Colony NorthStar class A common stock following completion of the Mergers.***

The market price of Colony NorthStar class A common stock may be volatile and following completion of the Mergers, stockholders may not be able to resell their Colony NorthStar common stock at or above the implied price at which they acquired such Colony NorthStar common stock pursuant to the merger agreement or otherwise due to fluctuations in the market price of Colony NorthStar class A common stock, including changes in market price caused by factors unrelated to the combined company's operating performance or prospects. Specific factors that may have a significant effect on the market price of Colony NorthStar class A common stock following completion of the Mergers include, among others, the following:

- changes in stock market analyst recommendations or earnings estimates regarding the combined company's common stock, other companies comparable to it or companies in the industries they serve;

- actual or anticipated fluctuations in the combined company's operating results or future prospects;

- reactions to public announcements by the combined company;

- strategic actions taken by the combined company or its competitors, such as the intended business separations, acquisitions or restructurings;

- failure of the combined company to achieve the perceived benefits of the transactions, including financial results and anticipated synergies, as rapidly as or to the extent anticipated by financial or industry analysts;

- adverse conditions in the financial market or general U.S. or international economic conditions, including those resulting from war, incidents of terrorism and responses to such events; and

- sales of common stock by the combined company, members of its management team or significant stockholders.

***Colony's tax protection agreement could limit the combined company's ability to sell certain properties, engage in a strategic transaction or reduce its level of indebtedness, which could materially and adversely affect the combined company.***

Prior to the closing of the Mergers, Colony, Colony OP, Colony Capital LLC, CCH Management Partners I, LLC, FHB Holding LLC and Richard B. Saltzman, each of which we refer to as a protected member, intend to enter into a tax protection agreement, which we refer to as the TPA. The TPA will provide that each protected member will be indemnified on an after-tax basis for any Section 704(c) gain, calculated as provided in the TPA, as a result of a transaction occurring during the period commencing on June 3, 2016 and ending on the fifth anniversary of the closing of the Mergers and that is considered to be a sale of the tax goodwill or going concern value or airplane owned by Colony OP and contributed (directly or indirectly) by such protected members, which we refer to, collectively, as the protected property, other than on transfers to the protected members or persons or entities related to the protected members. The TPA will also apply to a merger or other transaction that would convert interests in Colony OP held by the protected members to cash or otherwise result in a taxable disposition of such interests, but would not apply to a transaction in which the equity interests of the protected members are maintained in a manner that does not trigger gain or offers the protected members the option to roll over their investment into an equity interest that is substantially equivalent (including value, profit and loss share, distribution rights and liquidity) to the equity interests exchanged in such transaction.

If the combined company's tax indemnification obligations were to be triggered under these agreements, the combined company would be required to pay damages for the resulting tax consequences to the protected members and the calculation of damages will not be based on the time value of money or the time remaining within the restricted period. Moreover, these obligations may restrict the combined company's ability to engage in a strategic transaction. In addition, these obligations may require the combined company to maintain more or different indebtedness than the combined company would otherwise require for the company's business. Colony OP estimates that if all of its assets subject to the TPA were sold in a taxable transaction immediately after the completion of the Mergers, its indemnification obligations (based on tax rates applicable for the taxable year ending December 31, 2016 and exchange values and including additional payments to compensate the protected members for additional tax liabilities resulting from the indemnification payments) would be approximately $410 million.

***Tax consequences to holders of operating partnership units upon a sale or refinancing of the combined company's properties may cause the interests of certain members of the combined company's senior management team to differ from your own.***

As a result of the unrealized built-in gain attributable to a property at the time of contribution, some holders of operating partnership units, including the protected members may suffer different and more adverse tax consequences than holders of common stock or other holders of

70

operating partnership units upon the sale or refinancing of the properties owned by the operating partnership, including disproportionately greater allocations of items of taxable income and gain upon a realization event.

As those holders will not receive a correspondingly greater distribution of cash proceeds, they may have different objectives regarding the appropriate pricing, timing and other material terms of any sale or refinancing of certain properties, or whether to sell or refinance such properties at all. As a result, the effect of certain transactions on the protected members may influence their decisions affecting these properties and may cause them to attempt to delay, defer or prevent a transaction that might otherwise be in the best interests of the combined company's other stockholders.

As a result of entering into the TPA described in the above risk factor, the protected members may have an incentive to cause the company to enter into transactions from which they may personally benefit.

***Each of the Companies prior to the closing, and Colony NorthStar following the closing of the Mergers, expects to incur significant costs in connection with the consummation of the Mergers and the integration of the Companies.***

Each of the Companies prior to the closing, and Colony NorthStar following the closing, expects to incur significant costs in connection with consummating the Mergers and integrating the portfolios of NSAM, Colony and NRF into Colony NorthStar, including unanticipated costs and the assumption of known and unknown liabilities. While each of the Companies and Colony NorthStar have assumed that a certain level of transaction and integration expenses will be incurred, there are factors beyond each of the Companies and Colony NorthStar's control that could affect the total amount or the timing of its integration expenses. Many of the expenses that will be incurred, by their nature, are difficult to estimate accurately at the present time. Although NSAM, Colony and NRF expect that the elimination of duplicative costs, as well as the realization of other efficiencies related to the integration of the three businesses, should allow the combined company to offset these incremental expenses over time, the net benefit may not be achieved in the near term, or at all.

***Colony NorthStar cannot assure you that it will be able to continue paying distributions equal to the levels projected by the Companies to be paid following the Mergers or at the levels currently paid by NSAM, Colony and NRF individually.***

Colony NorthStar common stockholders may not receive distributions equal to the levels projected by the Companies to be paid following the Mergers or equivalent to the levels currently paid by NSAM, Colony or NRF for various reasons, including, but not limited to, the following:

- Colony NorthStar may not have enough unrestricted funds to pay such distributions due to changes in Colony NorthStar's cash requirements, capital spending plans, cash flow or financial position;

- decisions on whether, when and in which amounts to make any future distributions will be at the discretion of the Colony NorthStar board and will be dependent on then-existing conditions, including the combined company's financial condition, earnings, legal requirements, including limitations under Maryland law, restrictions in Colony NorthStar's borrowing agreements that limit its ability to pay dividends to stockholders, the rights of holders of Colony NorthStar preferred stock to receive dividends in respect of such shares prior to Colony NorthStar being permitted to pay any dividends in respect of Colony NorthStar common stock and other factors the Colony NorthStar board deems relevant; and

71

- Colony NorthStar may desire to retain cash to improve its credit profile or for other reasons.

In particular, the Companies currently anticipate that the level of distributions to be paid by Colony NorthStar will be lower than the level of distributions currently paid by NRF. Following the closing of the Mergers, common stockholders of Colony NorthStar will have no contractual or other legal right to distributions that have not been declared by the Colony NorthStar board.

***Colony NorthStar's operating results after the Mergers may differ materially from the pro forma information presented in this joint proxy statement/prospectus.***

The unaudited pro forma condensed consolidated financial statements in this joint proxy statement/prospectus are presented for illustrative purposes only and are not necessarily indicative of what Colony NorthStar's actual financial condition or results of operations will be when the Mergers are completed on the dates indicated. The unaudited pro forma condensed consolidated financial statements reflect adjustments based upon preliminary estimates that may change and assumptions about the Mergers that may prove incorrect over time. Accordingly, the final acquisition accounting adjustments may differ materially from the pro forma adjustments reflected in this joint proxy statement/prospectus. Colony NorthStar's operating results after the Mergers may be materially different from those shown in the pro forma information presented in this joint proxy statement/prospectus, which represents only a combination of NSAM's, Colony's and NRF's respective historical results. Refer to the section entitled "Colony NorthStar Unaudited Pro Forma Condensed Consolidated Financial Statements" beginning on page 312 of this joint proxy statement/prospectus.

***At the closing of the Mergers, Colony NorthStar will assume liabilities and obligations of NSAM, Colony and NRF.***

Following and by virtue of completion of the Mergers, Colony NorthStar will have assumed the liabilities and obligations of NSAM, Colony and NRF, including NRF's obligations under its exchangeable senior notes and Colony's obligations under its convertible notes. These liabilities could have a material adverse effect on Colony NorthStar's business to the extent the Companies have not identified such liabilities or have underestimated the nature, amount or significance, based on amount or otherwise, of such liabilities.

***Colony NorthStar may be unable to retain necessary NSAM, Colony and/or NRF personnel successfully after the Mergers are completed.***

The success of the Mergers will depend in part on the combined company's ability to retain the key employees currently employed by the Companies. It is possible that these employees may decide not to remain with NSAM, Colony or NRF, as applicable, while the Mergers are pending or with Colony NorthStar after the Mergers are consummated. If key employees terminate their employment, or if an insufficient number of employees are retained to maintain effective operations, Colony NorthStar's business activities may be adversely affected and management's attention may be diverted from successfully integrating the Companies to hire suitable replacements, all of which may cause Colony NorthStar's business to suffer. In addition, Colony NorthStar may not be able to locate suitable replacements for any key employees or to offer employment to potential replacements on reasonable terms. Further, it is expected that certain current executive officers of NSAM and NRF will depart after providing transition services to Colony NorthStar which may cause Colony NorthStar's business to be adversely affected.

***In connection with the Mergers, Colony NorthStar is expected to refinance certain existing borrowings of NSAM, Colony and NRF. Colony's and NRF's preferred stock and Colony NorthStar's level of outstanding borrowings following the completion of the Mergers could adversely affect Colony NorthStar's ability to raise additional capital and to meet its obligations under its existing borrowings.***

In connection with the Mergers, Colony NorthStar expects to refinance a total of approximately $2.7 billion of outstanding borrowings of NSAM, Colony and NRF and will also assume Colony's and NRF's existing obligations under their outstanding series of preferred stock. Colony NorthStar's obligations under the terms of its expected borrowings at closing and its preferred stock could impact Colony NorthStar negatively. For example, it could:

- limit Colony NorthStar's ability to obtain additional financing for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;

- restrict Colony NorthStar from making strategic acquisitions or cause the combined company to make non-strategic divestitures;

- restrict Colony NorthStar from paying dividends to its stockholders;

- increase Colony NorthStar's vulnerability to general economic and industry conditions; and

- require a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on the combined company's borrowings, thereby reducing Colony NorthStar's ability to use cash flow to fund its operations, capital expenditures and future business opportunities.

Holders of Colony NorthStar preferred stock would receive, upon Colony NorthStar's voluntary or involuntary liquidation, dissolution or winding up, before any payment is made to holders of Colony NorthStar common stock, their respective liquidation preferences as well as any accrued and unpaid distributions. These payments would reduce the amount of the remaining assets of Colony NorthStar, if any, available for distribution to holders of its common stock.

***General market conditions and unpredictable factors, including conditions and factors different from those affecting Colony preferred stock and NRF preferred stock currently, could adversely affect market prices of Colony NorthStar preferred stock after being exchanged for outstanding Colony preferred stock and NRF preferred stock.***

There can be no assurance about the market prices of Colony NorthStar preferred stock that will be exchanged for Colony preferred stock and NRF preferred stock, as applicable, in connection with the Mergers. Several factors, many of which are beyond the control of Colony NorthStar, could influence the market prices of Colony NorthStar preferred stock, including:

- whether Colony NorthStar declares or fails to declare dividends on the Colony NorthStar preferred stock from time to time;

- real or anticipated changes in the credit ratings assigned to the Colony NorthStar securities;

- Colony NorthStar's creditworthiness and credit profile;

- interest rates;

73

- developments in the securities, credit and housing markets, and developments with respect to financial institutions generally;

- the market for similar securities; and

- economic, corporate, securities market, geopolitical, regulatory or judicial events that affect Colony NorthStar, the asset management or real estate industries or the financial markets generally.

Shares of Colony NorthStar common stock and preferred stock will rank junior to all indebtedness of, and other non-equity claims on, Colony NorthStar with respect to assets available to satisfy such claims. The market prices of Colony NorthStar class A common stock and Colony NorthStar preferred stock may be affected by factors different from those currently affecting the market prices of Colony class A common stock, Colony preferred stock, NRF common stock or NRF preferred stock.

***Certain provisions of Maryland law may limit the ability of a third party to acquire control of Colony NorthStar, which could depress the market price of Colony NorthStar class A common stock.***

Certain provisions of the MGCL may have the effect of inhibiting a third party from acquiring Colony NorthStar or of impeding a change of control under circumstances that otherwise could provide Colony NorthStar's stockholders with the opportunity to realize a premium over the then-prevailing market price of Colony NorthStar class A common stock, including:

- *"business combination"* provisions that, subject to limitations, prohibit certain business combinations between an "interested stockholder" (defined generally as any person who beneficially owns 10% or more of the voting power of our outstanding shares of voting stock or an affiliate or associate of the corporation who, at any time within the two-year period immediately prior to the date in question, was the beneficial owner of 10% or more of the voting power of the then outstanding stock of the corporation) or an affiliate of any interested stockholder and Colony NorthStar for five years after the most recent date on which the stockholder becomes an interested stockholder and thereafter imposes two super-majority stockholder voting requirements on these combinations; and

- *"control share"* provisions that provide that holders of "control shares" of Colony NorthStar (defined as voting shares of stock that, if aggregated with all other shares of stock owned or controlled by the acquirer, would entitle the acquirer to exercise one of three increasing ranges of voting power in electing directors) acquired in a "control share acquisition" (defined as the direct or indirect acquisition of issued and outstanding "control shares") have no voting rights except to the extent approved by stockholders by the affirmative vote of at least two-thirds of all of the votes entitled to be cast on the matter, excluding all interested shares.

Pursuant to the Maryland Business Combination Act, the Colony NorthStar board has exempted any business combinations between Colony NorthStar and any person, provided that any such business combination is first approved by the Colony NorthStar board (including a majority of Colony NorthStar's directors who are not affiliates or associates of such person). Consequently, the five-year prohibition and the super-majority vote requirements do not apply to business combinations between Colony NorthStar and any of its interested stockholders (or their affiliates). As a result, such parties may be able to enter into business combinations with Colony NorthStar that may not be in the best interest of the Colony NorthStar stockholders, without compliance with the supermajority vote requirements and the other provisions in the statute. The Colony NorthStar bylaws contain a provision exempting from the Maryland Control Share Acquisition Act any and all acquisitions by any person of

74

shares of Colony NorthStar stock. There can be no assurance that these resolutions or exemptions will not be amended or eliminated at any time in the future.

Additionally Title 3, Subtitle 8 of the MGCL, which we refer to as Subtitle 8, permits the Colony NorthStar board, without stockholder approval, to implement certain takeover defenses. The Colony NorthStar charter contains a provision that prohibits the Colony NorthStar board from opting into any provision of Subtitle 8.

### Risk Relating to Colony NorthStar Status under the Investment Company Act of 1940

***Failure to maintain its exemption from registration under the Investment Company Act could require Colony NorthStar to register as an investment company or substantially change the way it conducts its business, either of which may have an adverse effect on Colony NorthStar and the market price for shares of Colony NorthStar class A common stock.***

As discussed in the section entitled "Colony NorthStar Status under the Investment Company Act of 1940" beginning on page 404 of this joint proxy statement/prospectus, none of Colony NorthStar, NSAM, Colony or NRF is currently registered as an investment company under the Investment Company Act and following the closing of the Mergers, Colony NorthStar intends to conduct its operations so that it is not required to register as an investment company under the Investment Company Act. Maintenance of the applicable exemptions requires that Colony NorthStar subject its business to certain limitations on investment and activities.

If Colony NorthStar fails to maintain its exemption from registration as an investment company under the Investment Company Act, either because of changes in SEC guidance or otherwise, Colony NorthStar could be required to, among other things: (i) substantially change the manner in which it conducts its operations to avoid being required to register as an investment company under the Investment Company Act; or (ii) register as an investment company. Either of (i) or (ii) could have an adverse effect on Colony NorthStar and the market price for shares of Colony NorthStar class A common stock. If Colony NorthStar is required to register as an investment company under the Investment Company Act, Colony NorthStar would become subject to substantial regulation with respect to its capital structure (including its ability to use leverage), management, operations, transactions with affiliated persons (as defined in the Investment Company Act), portfolio composition, including restrictions with respect to diversification and industry concentration and other matters.

***Rapid changes in the values of Colony NorthStar's real estate-related investments may make it more difficult for Colony NorthStar to maintain its qualification as a REIT for U.S. federal income tax purposes or its exemption from registration under the Investment Company Act.***

If the market value or income potential of Colony NorthStar's real estate-related investments declines as a result of increased interest rates, prepayment rates or other factors, Colony NorthStar may need to increase its real estate investments and income and/or liquidate its non-qualifying assets in order to maintain its qualification as a REIT for U.S. federal income tax purposes or its exemption from registration as an investment company under the Investment Company Act. Given the illiquid nature of certain real estate investments, Colony NorthStar can provide no assurances that it would be able to liquidate its non-qualifying assets at opportune times or prices, if at all, in order to maintain its qualification as a REIT or its exemption from registration under the Investment Company Act. Similarly, Colony NorthStar can provide no assurances that it would have sufficient capital or access to capital at favorable prices, if at all, if it were required to increase its qualifying real estate assets in order to maintain its qualification as a REIT or its exemption from registration under the Investment Company Act. If the value of Colony NorthStar's assets fluctuates significantly, Colony NorthStar's ability to maintain its qualification as a REIT or its exemption from registration under the Investment

Company Act may become particularly difficult, which may cause Colony NorthStar to make investment decisions that it otherwise would not make absent the REIT and Investment Company Act considerations.

***Regulation of a subsidiary of Colony NorthStar under the Investment Advisers Act of 1940 subjects Colony NorthStar to the anti-fraud provisions of the Investment Advisers Act of 1940 and to fiduciary duties derived from these provisions.***

Following the closing of the Mergers, Colony NorthStar will have a subsidiary that is registered with the SEC as an investment advisor under the Investment Advisers Act of 1940, as amended, which we refer to as the Investment Advisers Act. As a result, Colony NorthStar will be subject to the anti-fraud provisions of the Investment Advisers Act and to fiduciary duties derived from these provisions that apply to Colony NorthStar's relationships with the investment funds that it manages. These provisions and duties impose restrictions and obligations on Colony NorthStar with respect to its dealings with its fund investors and its investments, including, for example, restrictions on agency, cross and principal transactions. Colony NorthStar or its registered investment adviser subsidiaries will be subject to periodic SEC examinations and other requirements under the Investment Advisers Act and related regulations primarily intended to benefit advisory clients. These additional requirements relate to, among other things, maintaining an effective and comprehensive compliance program, recordkeeping and reporting requirements and disclosure requirements. The Investment Advisers Act generally grants the SEC broad administrative powers, including the power to limit or restrict an investment adviser from conducting advisory activities in the event it fails to comply with federal securities laws. Additional sanctions that may be imposed for failure to comply with applicable requirements under the Investment Advisers Act include the prohibition of individuals from associating with an investment adviser, the revocation of registrations and other censures and fines.

**Tax Risks Relating to the Mergers**

***If any of the Redomestication merger, the New NRF Holdco merger together with the LLC conversion, the NRF merger or the Colony merger does not qualify as a "reorganization" within the meaning of Section 368(a) of the Code, stockholders participating in such merger may be required to pay substantial U.S. federal income taxes.***

Although the parties intend that each of the Redomestication merger, the New NRF Holdco merger together with the LLC conversion, the NRF merger and the Colony merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code, it is possible that the Internal Revenue Service, which we refer to as the IRS, could assert that one or more of the Mergers fails to so qualify. If the IRS were to be successful in any such contention, or if for any other reason any such merger were to fail to qualify as a "reorganization," each U.S. holder participating in any such merger would recognize gain or loss with respect to all such U.S. holder's shares of stock based on the difference between: (i) that U.S. holder's tax basis in the relevant shares; and (ii) the aggregate cash and the fair market value of the shares of stock received in the applicable merger. For additional information, refer to the section entitled "U.S. Federal Income Tax Consequences" beginning on page 229 of this joint proxy statement/prospectus.

***REITs are subject to a range of complex organizational and operational requirements.***

To qualify as a REIT, Colony NorthStar must distribute with respect to each taxable year at least 90% of its net income (excluding capital gains) to its stockholders. A REIT must also meet certain other requirements, including with respect to the nature of its income and assets and the ownership of its stock. For any taxable year that Colony NorthStar fails to qualify as a REIT, it will not be allowed a deduction for dividends paid to its stockholders in computing its net taxable income and

thus would become subject to federal, state and local income tax as if it were a regular taxable corporation. In such an event, Colony NorthStar could be subject to potentially significant tax liabilities. Unless entitled to relief under certain statutory provisions, Colony NorthStar would also be disqualified from treatment as a REIT for the four taxable years following the year in which it lost its qualification. If Colony NorthStar were to fail to qualify as a REIT, the market price of its common stock could decline, and Colony NorthStar could need to reduce substantially the amount of distributions to its stockholders as a result of any increased tax liability.

***Colony NorthStar may incur adverse tax consequences if Colony or NRF were to fail to qualify as a REIT for U.S. federal income tax purposes prior to the Mergers.***

It is a condition to the closing of the Mergers that each of Colony and NRF receives an opinion of counsel to the effect that it has qualified as a REIT for U.S. federal income tax purposes under the Code through the time of the Mergers. Neither Colony nor NRF, however, has requested or plans to request a ruling from the IRS that it qualifies as a REIT. Qualification as a REIT involves the application of highly technical and complex Code provisions for which there are only limited judicial and administrative interpretations. The complexity of these provisions and of the applicable Treasury Regulations that have been promulgated under the Code is greater in the case of a REIT that holds its assets through a partnership (such as Colony and NRF). The determination of various factual matters and circumstances not entirely within the control of Colony or NRF may have affected its ability to qualify as a REIT.

If, notwithstanding the opinions described above, Colony's or NRF's REIT status prior to the Mergers were successfully challenged, Colony NorthStar would face serious tax consequences that would substantially reduce its core funds from operations, which we refer to as Core FFO, and cash available for distribution, which we refer to as CAD, including cash available to pay dividends to its stockholders, because:

- Colony or NRF, as applicable, would be subject to U.S. federal, state and local income tax on its net income at regular corporate rates for the years it did not qualify as a REIT (and, for such years, would not be allowed a deduction for dividends paid to stockholders in computing its taxable income) and Colony NorthStar would succeed to the liability for such taxes;

- if Colony NorthStar were considered to be a "successor" of such entity, it would not be eligible to elect REIT status until the fifth taxable year following the year during which such entity was disqualified, unless it is entitled to relief under applicable statutory provisions;

- Colony NorthStar, even if eligible to elect REIT status, would be subject to tax (at the highest corporate rate in effect at the date of the sale) on the built-in gain on each asset of Colony or NRF, as applicable, existing at the time of the Mergers if Colony NorthStar were to dispose of such asset for up to 10 years following the Mergers; and

- Colony NorthStar would succeed to any earnings and profits accumulated by Colony or NRF, as applicable, for tax periods that such entity did not qualify as a REIT and Colony NorthStar would have to pay a special dividend and/or employ applicable deficiency dividend procedures (including interest payments to the IRS) to eliminate such earnings and profits to maintain its REIT qualification.

If there is an adjustment to Colony's or NRF's taxable income or dividends paid deductions, Colony NorthStar could elect to use the deficiency dividend procedure to maintain Colony's or NRF's, as applicable, REIT status. That deficiency dividend procedure could require Colony NorthStar to make significant distributions to its stockholders and to pay significant interest to the IRS.

As a result of these factors, Colony's or NRF's failure to qualify as a REIT prior to the Mergers could impair Colony NorthStar's ability after the Mergers to expand its business and raise capital and could materially adversely affect the value of Colony NorthStar's stock.

***Risks Related to Colony's Qualification as a REIT***

You should read and consider the risk factors specific to Colony's qualification as a REIT, which will also affect Colony NorthStar, as the combined company, after the Mergers. These risks are described in Part I, Item 1A of Colony's Annual Report on Form 10-K for the fiscal year ended December 31, 2015 under the heading "Risks Related to Our Taxation as a REIT" and in other documents that are incorporated by reference into this joint proxy statement/prospectus. Refer to the section entitled "Where You Can Find More Information; Incorporation by Reference" beginning on page 420 of this joint proxy statement/prospectus.

***Risks Related to NRF's Qualification as a REIT***

You should read and consider the risk factors specific to NRF's qualification as a REIT, which will also affect Colony NorthStar, as the combined company, after the Mergers. These risks are described in Part I, Item 1A of NRF's Annual Report on Form 10-K for the fiscal year ended December 31, 2015 under the heading "Risks Related to Regulatory Matters and Our REIT Tax Status," and in other documents that are incorporated by reference into this joint proxy statement/prospectus. Refer to the section entitled "Where You Can Find More Information; Incorporation by Reference" beginning on page 420 of this joint proxy statement/prospectus.

***Risks Related to Colony NorthStar's Qualification as a REIT***

You should read and consider the risks relating to Colony NorthStar's ability to qualify as a REIT, both as a condition to the closing of the Mergers and on an ongoing basis. Refer to the section entitled "Taxation of Colony NorthStar" beginning on page 235 of this joint proxy statement/prospectus. As noted in that section, the opinion of Hogan Lovells (or other counsel reasonably satisfactory to the Companies) regarding Colony NorthStar's ability to qualify as a REIT for the taxable year ending December 31, 2017 and subsequent taxable years will only be filed with this registration statement prior to the closing of the Mergers, by post-effective amendment. Refer also to the section entitled "Taxation of Colony NorthStar—Failure to Qualify" for a discussion of tax consequences were Colony NorthStar to fail to qualify as a REIT following the closing of the Mergers.

**CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS**

This joint proxy statement/prospectus, including information included or incorporated by reference in this joint proxy statement/prospectus, may contain certain forecasts and other forward-looking statements within the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements relate to expectations, beliefs, projections, future plans and strategies, anticipated events or trends and similar expressions concerning matters that are not historical facts. In some cases, you can identify forward-looking statements by the use of forward-looking terminology such as "may," "will," "should," "expects," "intends," "plans," "anticipates," "believes," "estimates," "predicts" or "potential" or the negative of these words and phrases or similar words or phrases which are predictions of or indicate future events or trends and which do not relate solely to historical matters. Forward-looking statements involve known and unknown risks, uncertainties, assumptions and contingencies, many of which are beyond the Companies' control, and may cause actual results to differ significantly from those expressed in any forward-looking statement. Any statements regarding the benefits of the Mergers or NSAM's, Colony's or NRF's future financial condition, results of operations and business are also forward-looking statements. Without limiting the generality of the preceding sentence, certain statements contained in the sections "The Mergers—Background of the Mergers," "The Mergers—Certain Unaudited Prospective Financial Information of NSAM," "The Mergers—Certain Unaudited Prospective Financial Information of Colony" and "The Mergers—Certain Unaudited Prospective Financial Information of NRF" constitute forward-looking statements.

These forward-looking statements are subject to a number of risks, uncertainties and assumptions, most of which are difficult to predict and many of which are beyond NSAM's, Colony's and NRF's control. These include the factors described above in "Risk Factors" and under the caption "Risk Factors" in NSAM's Annual Report on Form 10-K for the year ended December 31, 2015, as amended, Colony's Annual Report on Form 10-K for the year ended December 31, 2015, as amended, and NRF's Annual Report on Form 10-K for the year ended December 31, 2015, as amended, and subsequent Quarterly Reports on Form 10-Q, each of which is incorporated herein by reference, as well as:

- the failure to receive, on a timely basis or otherwise, the required approvals by NSAM, Colony and NRF stockholders, governmental or regulatory agencies and third parties;

- the risk that a condition to the closing of the Mergers may not be satisfied;

- NSAM's, Colony's and NRF's ability to consummate the Mergers;

- operating costs and business disruption may be greater than expected;

- the ability of NSAM, Colony and NRF to retain their senior executives and maintain relationships with business partners pending consummation of the Mergers;

- the ability to realize substantial efficiencies and synergies as well as anticipated strategic and financial benefits, and the impact of legislative, regulatory and competitive changes; and

- the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement.

Should one or more of the risks or uncertainties described above or elsewhere in reports incorporated by reference herein occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in any forward-looking statements. You are cautioned not to place undue reliance on these statements, which speak only as of the date of this joint

proxy statement/prospectus or the date of any document incorporated by reference in this joint proxy statement/prospectus, as applicable.

All forward-looking statements, expressed or implied, included in this joint proxy statement/prospectus are expressly qualified in their entirety by this cautionary statement. This cautionary statement should also be considered in connection with any subsequent written or oral forward-looking statements that NSAM, Colony, NRF or persons acting on their behalf may issue.

Except as otherwise required by applicable law, NSAM, Colony and NRF disclaim any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section. Also refer to the section entitled "Where You Can Find More Information; Incorporation by Reference" beginning on page 420 of this joint proxy statement/prospectus.

***

approval or NRF stockholder approval; and (ii) the failure to obtain regulatory approval or the imposition of conditions on such approval that could have a negative impact on Colony NorthStar;

- the fact that each of NSAM, Colony and NRF has incurred and will continue to incur significant transaction costs and expenses in connection with the Mergers, regardless of whether the Mergers are consummated;

- certain of Colony's directors and executive officers may receive certain benefits that are different from, and in addition to, those of Colony's other stockholders (see sections entitled "—Interests of Colony's Directors and Executive Officers in the Mergers" beginning on page 218 of this joint proxy statement/prospectus and "—Interests of Colony's Directors and Executive Officers in the Mergers—Information for Advisory Vote on Merger-Related Compensation for the Colony Named Executive Officers—Golden Parachute Compensation" beginning on page 220 of this joint proxy statement/prospectus; and

- the risks of the type and nature described in the section entitled "Risk Factors" beginning on page 61 of this joint proxy statement/prospectus.

The Colony board considered these and other factors as a whole, and unanimously concluded the relevant information and factors that they considered to be favorable to, and in support of, their determinations and recommendations. The foregoing discussion of certain information and factors considered by the Colony board is not exhaustive but is intended to reflect the material factors considered by the Colony board in its consideration of the merger agreement, the Mergers and the transactions contemplated by the merger agreement. In light of the complexity and numerous factors considered, the Colony board did not assign any relative or specific weight to those various factors. Rather, the Colony board based its recommendations on the totality of the information presented to and considered by it. In addition, individual members of the Colony board may have given weight to different factors not mentioned above.

The foregoing discussion of the information and factors considered by the Colony board utilized forward-looking information. This information should be read in light of the factors described under the section entitled "Cautionary Statement Concerning Forward-Looking Statements" beginning on page 79 of this joint proxy statement/prospectus.

**After carefully considering the various potentially positive and negative factors, including the foregoing, the Colony board concluded that, overall, the potentially positive factors relating to the merger agreement and the transactions contemplated by the merger agreement outweighed the potentially negative factors. Accordingly, the Colony board recommends that you vote "FOR" the Colony merger proposal, "FOR" the Colony charter proposal, "FOR" the Colony compensation proposal and "FOR" the Colony adjournment proposal.**

**Reasons for the Mergers and Recommendation of the NRF Board**

The decision of the NRF special committee and the NRF board to enter into the merger agreement (including as amended) was the result of careful consideration by each of the NRF special committee and the NRF board of numerous factors, including the following (in no particular order):

- the internalization of management for Colony NorthStar, which will materially enhance Colony NorthStar's flexibility to operate and manage its business and potentially enable Colony NorthStar to trade at a higher multiple as compared to similarly sized externally managed REITs;

147

- the synergies and other benefits to Colony NorthStar that could result from the Mergers, including the potential to realize estimated annual cost savings of approximately $115 million, $80 million of which is in cash and $35 million of which is in equity-based compensation savings, with the potential for further cost savings from operational efficiencies;

- the creation of an internally managed real estate and investment management company with a larger, more diversified portfolio with approximately $58 billion of assets under management, which will primarily include real estate equity investments;

- bringing together a highly experienced team of executive officers from each of NSAM, Colony and NRF, which will provide continuity, transparency and a clear, consistent vision for the combined Colony NorthStar business;

- the improvement of the combined company's credit profile and the achievement of a lower cost of capital on a go-forward basis;

- the ability to broaden access to capital and attract institutional capital for co-investment opportunities and enhance returns on equity through the co-investment model;

- the potential to unlock value as a result of Colony NorthStar's increased scale and an improved leverage profile, the potential to expand Colony NorthStar's Core FFO/CAD, trading multiple compared to that currently applicable to NRF, which the NRF board and the NRF special committee believed to be undervalued relative to NRF's industry peers;

- the oral opinion delivered on June 2, 2016, subsequently confirmed in writing, of UBS to the NRF special committee as to the fairness, from a financial point of view as of such date and taking into account the Redomestication merger, the New NRF Holdco merger and the Colony merger, of the NRF exchange ratio, which opinion was based on and subject to the assumptions and qualifications made, procedures followed, factors considered and limitations on the review undertaken more fully described in the section entitled "—Opinion of the NRF Special Committee's Financial Advisor";

- the fact that NRF's holders will benefit from the liquidity of owning shares of a significantly larger company with a larger float and equity base and the expectation that Colony NorthStar will be in the top quartile of REITs (in terms of size) included in the RMZ Index;

- the fact that the NRF exchange ratio is subject to adjustment only under certain limited circumstances as set forth in the merger agreement and will not increase or decrease based upon changes in the market price of NSAM, Colony or NRF common stock between the date of the merger agreement and the date of the consummation of the Mergers;

- the long-term accretion to Core FFO/CAD per share associated with the Mergers;

- the ability of holders of NRF common stock to benefit, because the consideration to be received by holders of NRF common stock consists solely of Colony NorthStar common stock and NRF stockholders will own approximately 33.90% of the equity of Colony NorthStar, from any increase in the trading price of the shares of Colony NorthStar common stock following the closing of the Mergers, whether from future growth in Core FFO/CAD per share or from an increase in the value of the assets of NSAM prior to the Mergers, the assets of Colony prior to the Mergers or the assets of NRF prior to the Mergers;

148

- the ability to complete the Mergers on the anticipated schedule (including the likelihood of receiving the NSAM, Colony and NRF stockholder approvals necessary to complete the Mergers) given the commitment of the Companies to complete the Mergers pursuant to their respective obligations under the merger agreement;

- the fact that, simultaneously with the execution of the merger agreement, NRF entered into the NSAM/NRF side agreement pursuant to which, among other things:

    - NRF and its subsidiaries party to the merger agreement will not be liable to NSAM and its affiliates for breaches of their obligations under the merger agreement if and to the extent that such breaches result from an action or omission taken or made by NSAM or any of its affiliates in performance of the services or any of the asset manager's duties or obligations under the NRF management agreement, unless such action or omission was taken with the prior written consent of the NRF special committee; and

    - should a termination fee become payable by NRF to NSAM under certain circumstances, NSAM will waive the payment of such termination fee in excess of $3 million, subject to certain conditions (for a more detailed description of the NSAM/NRF side agreement, refer to the section entitled "Other Related Agreements—NSAM/NRF Side Agreement" beginning on page 308 of this joint proxy statement/prospectus), resulting in a total termination fee of up to $49 million payable by NRF compared to a total termination fee of up to $92 million payable by either NSAM or Colony;

- the fact that certain members of NRF's management agreed to an amendment to, and waiver by those members of management of, certain provisions of their existing employment agreements and equity award arrangements, in connection with the closing of the Mergers, by: (i) fixing the number of shares that will vest upon the closing of the Mergers pursuant to the terms of the performance-based equity awards held by certain NRF executive officers based on pre-signing stock prices and on an assumed closing date in January 2017, with Messrs. Hamamoto, Tylis and Gilbert further agreeing to forfeit approximately 2.6 million shares that these members of management were projected to earn based on information available prior to the signing of the merger agreement with a forfeited value (including the payment of related accumulated dividends) of approximately $33 million (based on share prices as of May 31, 2016); (ii) eliminating certain NRF executive officers' rights to receive any cash severance following the closing of the Mergers (except for a nominal severance payment in certain circumstances); (iii) granting Colony NorthStar equity awards, subject to a one-year vesting period, with a maximum aggregate value that is approximately $52 million less than the estimated cash severance that these members of management would have been entitled to receive if they voluntarily terminated their employment following the Mergers, with Messrs. Hamamoto, Tylis and Gilbert bearing the full amount of this reduction, with the number of shares subject to such awards being attributed a minimum value of $15.00 per share, which would result in an additional approximately $22 million reduction in the value of these replacement equity awards based on an assumed price per share of Colony NorthStar common stock equal to $12.23 per share, and with the shares received pursuant to such awards subject to an additional one-year post-vesting holding period for Messrs. Hamamoto and Gilbert under certain circumstances; and (iv) eliminating base salary and annual bonus opportunity for services performed for Colony NorthStar in 2017 following the Mergers, other than a nominal annual base salary equal to $1.00;

149

- the agreement by David T. Hamamoto and certain entities owned or controlled by him, Albert Tylis and Daniel R. Gilbert to vote (or cause to be voted) all of their respective shares of NSAM common stock and/or NRF common stock in favor of the Redomestication merger and/or the New NRF Holdco merger, as well as the other transactions contemplated by the merger agreement and against any alternative proposal;

- the agreement by Thomas J. Barrack, Jr. and Richard B. Saltzman to vote (or cause to be voted) all of their respective shares of Colony common stock, which represent, in the aggregate, approximately 16% of the voting power of Colony common stock, in favor of the Colony merger and related transactions contemplated by the merger agreement and against any alternative proposal;

- the efforts made by the NRF special committee to evaluate and negotiate, with the assistance of its legal and financial advisors, the terms of the merger agreement and make recommendations regarding the merger agreement to the NRF board;

- the judgment of the NRF special committee, following consultation with its advisors, that because of the NRF management agreement it was unlikely that a third party other than NSAM and Colony would consummate a transaction on superior terms and that would provide NRF stockholders greater consideration, than is being provided in connection with the Mergers;

- the merger agreement provisions that, while prohibiting each of the Companies, including NRF, from soliciting third-party acquisition proposals, permit the NRF board to consider and respond to unsolicited proposals, subject to certain requirements and to change or withdraw its recommendation in favor of the merger agreement in connection with a superior proposal or for certain unforeseen events should the NRF board (or the NRF special committee), after compliance with certain requirements, including consultation with its legal advisors, determine that failure to do so would be inconsistent with its duties, subject to the payment of a termination fee;

- the right of the NRF special committee or the NRF board to change its recommendation to NRF stockholders upon the occurrence of certain intervening events, subject to certain conditions (including payment to each of NSAM and Colony of a termination fee);

- the results of the due diligence review conducted by the NRF special committee's and NRF's advisors and management regarding NSAM and Colony and, in that regard, that both NSAM and Colony are public companies subject to public reporting any other legal requirements and that NRF's management has a full understanding of NSAM's business and financial position due to the advisory relationship between NSAM and NRF;

- the fact that NRF's and the NRF special committee's legal and financial advisors interacted with the NRF special committee directly and regularly throughout the process, which provided the NRF special committee with perspectives on the process from outside advisors;

- the fact that Colony obtained committed financing for the transaction, the limited number and nature of the conditions to the financing and the obligation under the merger agreement for all parties to use reasonable best efforts to obtain alternative financing if all or any portion of the committed financing became unavailable for any reason;

- the restrictions on the conduct of NSAM's and Colony's businesses between the date of the merger agreement and the date of the consummation of the Mergers, including the fact that

150

such restrictions permit NRF, subject to certain conditions, to continue its asset monetization strategy and improve NRF's leverage profile even if the Mergers fail to close;

• the terms of the merger agreement placing limitations on the ability of NSAM and Colony to solicit, initiate or knowingly encourage or knowingly facilitate any inquiry or proposal for, or engage in any negotiations concerning, or provide any confidential or nonpublic information or data to, or have any discussion with, any person relating to any inquiry, proposal or offer that constitutes, or could reasonably be expected to lead to, any alternative acquisition proposals;

• the post‑closing governance structure of Colony NorthStar, including that:

  ○ the board of Colony NorthStar will include five directors appointed by NSAM and NRF, including industry veterans Jon A. Fosheim and Douglas Crocker II;

  ○ NRF's Chairman, David T. Hamamoto, will be Executive Vice Chairman of the board of Colony NorthStar; and

  ○ NRF's Chief Investment and Operating Officer, Daniel R. Gilbert, will be the head of Colony NorthStar's retail platform;

• that under the merger agreement, NRF is permitted to continue to pay regular quarterly dividends with respect to each quarter of 2016 so long as the distribution is declared and paid no earlier than the date of declaration and payment in the prior calendar year and a pro rata dividend for the first quarter of 2017;

• the Mergers are expected to qualify as tax‑free transactions to NRF stockholders, except with respect to cash received in lieu of fractional shares; and

• the ability of NRF to pursue other strategic alternatives or remain a standalone entity in the event of the failure of the Mergers.

In addition, the NRF special committee and the NRF board also identified and considered a variety of risks and other potentially negative factors weighing against the Mergers, including:

• the possible disruption to NSAM's, Colony's or NRF's business that may result from the announcement and pendency of the Mergers (including the likelihood of litigation brought by or on behalf of NSAM, Colony or NRF stockholders challenging the Mergers);

• the challenges in absorbing the effect of any failure to complete the Mergers, including potential termination fees and stockholder and market reactions;

• the fact that the holders of NRF common stock might not receive a premium for their shares of NRF common stock in connection with the Mergers;

• the fact that that, prior to the Mergers there has not been and will not be established a public trading for Colony NorthStar common stock, and that NRF stockholders cannot be sure of the market price of the Colony NorthStar stock they will receive as consideration;

• the changes in senior management resulting from the Mergers;

- the possibility that Colony may be unable to obtain all or a portion of the financing contemplated by the financing commitments;

- the risk that the operational synergies and other benefits expected to result from the Mergers might not be fully realized or realized at all;

- the challenges inherent in the combination of three businesses of the size and complexity of NSAM, Colony and NRF;

- that NRF stockholders will be foregoing the potential benefits, if any, that could be realized by NRF remaining a standalone entity;

- that some of the directors and executive officers of NRF have arrangements that provide them with interests in the Mergers that are different from, or in addition to, other common stockholders of NRF, as more fully described in the section entitled "—Interests of NRF's Directors and Executive Officers in the Mergers";

- the terms of the merger agreement placing limitations on the ability of NRF to solicit, initiate or knowingly encourage or knowingly facilitate any inquiry or proposal for, or engage in any negotiations concerning, or provide any confidential or nonpublic information or data to, or have any discussion with, any person relating to any inquiry, proposal or offer that constitutes, or could reasonably be expected to lead to, any alternative acquisition proposals;

- the right of each of the NSAM board and the Colony board to terminate the merger agreement in order to accept an NSAM superior proposal or a Colony superior proposal, respectively, subject to certain conditions (including payment to NRF of a portion of a termination fee);

- the right of each of the NSAM board and the Colony board to change its recommendation to NSAM and Colony stockholders, respectively, upon the occurrence of certain intervening events, subject to certain conditions (including the payment to NRF of a portion of a termination fee);

- the restrictions in the merger agreement on the conduct of NRF's business between the date of the merger agreement and the date of the consummation of the Mergers, including restrictions on the amount of distributions that may be made by NRF to its common stockholders;

- the risk that the Mergers might not be completed in a timely manner or at all;

- that forecasts of future financial and operational results of Colony NorthStar are necessarily estimates based on assumptions, may vary significantly from future performance and NSAM, Colony and NRF may not meet their respective financial projections;

- the potential risk of diverting management focus and resources from operational matters and other strategic opportunities while working to implement the Mergers; and

- various other risks associated with the Mergers and Colony NorthStar described in the section entitled "Risk Factors" beginning on page 61 of this joint proxy statement/prospectus and the matters described in the section entitled "Cautionary Statement Concerning Forward-Looking Statements" beginning on page 79 of this joint proxy statement/prospectus.

The NRF special committee and NRF board considered these and other factors as a whole and concluded the relevant information and factors that they considered to be favorable to, and in support of, their determinations and recommendations.

The foregoing discussion of certain information and factors considered by the NRF special committee and NRF board is not exhaustive but is intended to reflect the principal factors considered by the NRF special committee and NRF board in their consideration of the merger agreement and the transactions contemplated by the merger agreement. In light of the complexity and numerous factors considered, neither the NRF special committee nor the NRF board assigned any relative or specific weight to those various factors. Rather, the NRF special committee and NRF board based their recommendations on the totality of the information presented to and considered by them. In addition, individual members of the NRF special committee and the NRF board may have given weight to different factors not mentioned above. Moreover, Ms. Hannaway and Messrs. Hamamoto, Minami, Paglia and Tylis recused themselves from participating in the meetings of the NRF board, including the June 2, 2016 meeting (other than Mr. Tylis, who attended such meeting but did not participate in the deliberations) and the meeting held on October 10 and October 11, 2016 (other than Mr. Hamamoto, who attended such meeting but did not participate in the deliberations), at which the NRF board deliberated and voted to approve the merger agreement and the transactions contemplated by the merger agreement.

The foregoing discussion of the information and factors considered by the NRF special committee and the NRF board utilized forward-looking information. This information should be read in light of the factors described under the section entitled "Cautionary Statement Concerning Forward-Looking Statements" beginning on page 79 of this joint proxy statement/prospectus.

**After carefully considering the various potentially positive and negative factors, including the foregoing, the NRF special committee and the NRF board concluded that, overall, the potentially positive factors relating to the merger agreement and the transactions contemplated by the merger agreement outweighed the potentially negative factors. Accordingly, the NRF board, following the unanimous recommendation of the NRF special committee, recommends that you vote "FOR" the NRF merger proposal, "FOR" the NRF charter proposal, "FOR" the NRF compensation proposal and "FOR" the NRF adjournment proposal.**

**Opinion of the NSAM Special Committee's Financial Advisor**

The NSAM special committee retained Evercore to act as its financial advisor in connection with its evaluation of potential strategic alternatives for NSAM, which included a transaction involving Colony and NRF. On June 2, 2016, at a joint meeting of the NSAM special committee and NSAM board, Evercore rendered its oral opinion, subsequently confirmed by delivery of a written opinion, that, as of June 2, 2016, after giving effect to the payment of the original NSAM special dividend and based upon and subject to the factors, procedures, assumptions, qualifications and limitations set forth in its opinion, the NRF exchange ratio, the Colony class A exchange ratio and the Colony class B exchange ratio were fair, from a financial point of view, to the holders of NSAM common stock.

**The full text of Evercore's written opinion, dated June 2, 2016, which sets forth, among other things, the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken by Evercore in delivering its opinion, is attached as Annex D to this joint proxy statement/prospectus and is incorporated herein by reference in its entirety. The description of Evercore's written opinion set forth in this joint proxy statement/prospectus is qualified in its entirety by the full text of such opinion. We encourage you to read Evercore's opinion carefully and in its entirety. Evercore's opinion is not a recommendation as to how**

153

\*\*\*